UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

RACHEL SMITH, as next friend and
Mother of SEBASTION TOWLER,
ETHAN TOWLER, and JESSIE
TOWLER, and CHARLIE NELMS, as
next friend and mother of NOAH
TOWLER-NELMS and SHERRIE
TOWLER, individually, and KRISTINA
MARTINEZ, as Personal Representative of
the estate of CODY TOWLER,

      Plaintiffs,

  vs.                               Case No. 2:15-CV-01004 – CG-LAM

CITY OF ROSWELL, a New Mexico
municipality, PHILLIP SMITH,
JONATHON KELTON, JORGE
ARROYO-JAMIE and
DYLAN THOMAS, individually and as
agents and employees of the City of
Roswell,

      Defendants.

**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED
COMPLAINT AND/OR MOTION FOR SUMMARY JUDGMENT ON THE
GROUNDS OF QUALIFIED IMMUNITY AND PROTECTIONS AFFORDED
UNDER THE NEW MEXICO TORTS CLAIMS ACT, AND MEMORANDUM
OF LAW IN SUPPORT THEREFORE**

**COME NOW** the Defendants, City of Roswell, Phillip Smith, Jonathan Kelton, Jorge Arroyo-Jamie, and Dylan Thomas, individually and as agents and employees of the City of Roswell, by and through their counsel, Hinkle Shanor LLP (Richard E. Olson and Stephen S. Shanor), and move this Court pursuant to Rule 12(b)(6), and/or Rule 56, of the Federal Rules of Civil Procedure to dismiss Plaintiff's *Second Amended Complaint for Wrongful Death and Damages and Liability Under the Tort Claims Act, and for Violations of Civil Rights* ("*Second Amended Complaint*") against Defendants, and as grounds in support therefore state:

## I. INTRODUCTION

On October 27, 2015, Plaintiffs filed their *Second Amended Complaint* against Defendants, alleging, for the first time, claims under 42 USC §§ 1983 and 1988, arising out of the death of Cody Towler ("Towler") while in the custody of the Roswell Police Department. As is clear, the Officers use of force was objectively reasonable in light of Towler's aggressive and threatening conduct. As a consequence, Plaintiffs cannot demonstrate that the Officers used excessive or unnecessary force against Towler or that they violated Towler's Fourth Amendment rights. Plaintiffs also cannot show that the Officers violated Towler's Fourth Amendment rights because there was not an unlawful search, seizure, wrongful detention or arrest of Towler by the Officers. Defendants are entitled to qualified immunity from these claims as, under the undisputed facts, the officers did not violate any clearly established rights of Towler of which a reasonable man would have known.[1] In addition, Plaintiff's claim for municipal liability fails because no constitutional violation occurred in this case. Finally, to the extent that Plaintiff is asserting any state law claims, Defendants are statutorily immune from such claims. Accordingly, Plaintiff's *First Amended Complaint* must be dismissed in its entirety.

## II. UNDISPUTED MATERIAL FACTS

1. On or about February 4, 2013, at approximately 2:00 a.m., Cody Towler ("Towler") was in the area of South Union, West Buena Vista Drive and Ridgecrest, in Roswell, New Mexico. [*Second Amended Complaint* ¶ 13]

2. Officers were dispatched to Towler's location based on a complaint of a disorderly subject and a possible fight. *See Deposition of Thomas, attached hereto as Exhibit A*. [Dep. Thomas, 132:17-21]

---

[1] On or about October 29, 2014, Plaintiffs filed their *Complaint for Wrongful Death and Damages and Liability Under the Tort Claims Act* in New Mexico State Court in the Fifth Judicial District. In State Court, Plaintiffs and Defendants participated in discovery, including depositions, document production, and written discovery. On or about October 27, 2015, Plaintiffs filed their *Second Amended Complaint for Wrongful Death and Damages and Liability Under the Tort Claims Act, and for Violations of Civil Right*. Due to the claims made pursuant to 42 U.S.C. §§ 1983 and 1988 in the *Second Amended Complaint,* this Action was removed to Federal Court.

> I remember the call coming out as a disorderly subject. And I also remember I believe coming over the radio that complainant could hear yelling and screaming coming from the area.

[Dep. Kelton 167:23-168:4] *See Deposition of Kelton, attached hereto as Exhibit B.*

3. After arriving at the scene, Officer Thomas identified himself as Roswell Police and asked to speak to Towler. [Dep. Thomas, 146:9-15] Towler turned and faced Officer Thomas, deployed an asp type baton in his possession, and then he walked away. [Dep. Thomas, 146:9-147:2]

4. As Towler walked away he was yelling, screaming, hitting objects with the baton, and not listening to or complying with Officer Thomas's commands. [Dep. Thomas, 150:17-25]

5. The next Officer to arrive at the scene was Officer Kelton. As Officer Kelton arrived, both Officer Thomas and Officer Kelton exited their squad cars and followed Towler down the alley. As they followed Towler, every so often Towler would turn and aggressively charge at the Officers' and then turned around and keep walking. [Dep. Kelton, 205:9-11; Dep. Thomas, 154:18-20]

6. The last time Towler aggressively charged he did so with more ferocity and when Towler was within 5 yards of Officers Thomas and Kelton, a zone in which he felt personally in danger, Officer Kelton made the decision to deploy his Taser. [Dep. Kelton 207:21-24 209:1-4 and 214:7-14]

7. After Officer Kelton deployed his Taser, Towler was ordered to comply with the Officers' demands, but he did not obey. He immediately started flailing and grabbing rocks, attempting to throw them at the Officers. The initial Taser did not appear to "take". [Dep. Thomas, 192:11 to 193:4]

8. After the initial Tasering by Officer Kelton did not take, Officer Thomas discharged his Taser. [Dep. Thomas, 196:17-22]

9. This discharge also failed to take and after multiple more commands to comply and Towler's failure to do so, Officer Thomas discharged his Taser again. [Dep. Thomas, 204:20 to 205:2]

10. After the third discharge, Towler continued to fight:

> I mean it was similar to the other two. Originally had a good effect on him but once he went down, he was immediately flailing his arms and like around in front of him, too.

And I believe the leads, the strings that go to the prongs, I believe they got broken right away. So it had an effect, very briefly initially, and then after he went down again, there was no -- it was not effective at all.

[Dep. Thomas, 208: 10-19]

11. After Towler failed to respond to the first Tases, Officer Arroyo arrived to assist Officers Thomas and Kelton. [Dep. Arroyo, 187: 16-23] *See Deposition of Arroyo, attached hereto as Exhibit C.*

12. At that point, Officer Arroyo and Officer Thomas were able to Taser Towler at the same time. This was effective and Officer Kelton was able to secure one of Towler's hands behind his back. [Dep. Thomas, 209:21 to 210:1]

13. As the Officers were attempting to free Towler's other arm in order to secure it, Officer Arroyo and Officer Thomas used pain compliance techniques. [Dep. Kelton, 253:1-8 and 254:6-11] Officer Thomas used his foot in order to avoid exposing his gun to Towler's reach. [Dep. Thomas, 210:13-20 and 216:19-23] As soon as both arms were secured, the pain compliance techniques stopped. [Dep. Thomas, 211: 19-22]

14. After Towler was handcuffed, he continued to be aggressive. As a result, the Officers were forced to physically secure Towler and shackle his legs. [Dep. Kelton, : 265:5-10 and Dep. Arroyo, 205:6-16]

15. Only after Towler's legs were shackled did he stop resisting. [Dep. Kelton, : 265:5-10 and Dep. Arroyo, 205:6-16] At that point, Arroyo immediately got off of Towler. [Dep. Arroyo, 213:8-9] Officer Kelton kept Towler from rolling, but no force was applied. [Dep. Kelton, 251:4-18]

16. After Towler was secured, a 10-55 was used to call for an ambulance. This is a standard procedure after a Taser deployment. [Dep. Kelton, 269:10-17]

17. Less than two minutes later, the Officers recognized there was a problem with Towler and a Code 3 was called. A code 3 is used for emergency situations. [Dep. Kelton, 269: 21-25, 270:9-

10] The Officers acted immediately after realizing something was wrong with Towler. [Dep. Kelton, 270:22 to 271: 3]

18. The autopsy report revealed that the "[t]oxicological analysis performed on femoral blood revealed a high level of methamphetamine and the presence of its metabolite amphetamine." [Autopsy Report, Page 7, Bates #668, *attached hereto as Exhibit D*]

19. Counsel for Defendants have conferred with counsel for Plaintiffs, and Plaintiffs do not concur with this Motion.

### III. STANDARD OF REVIEW

A complaint should be dismissed if it does not have sufficient factual allegations which, taken as true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "The burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (*quoting Twombly*, 550 U.S. at 570). Importantly, "mere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (*quoting Twombly* 550 U.S. at 555). Furthermore, "a plaintiff must offer sufficient factual allegations to 'raise a right to relief above the speculative level'" *Id.* "Thus, in ruling on a motion to dismiss, a court should disregard all conclusory statements of law and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Id.* The Tenth Circuit Court of Appeals has also noted that "complaints in § 1983 cases against individual government actors pose a greater likelihood of failures in notice and plausibility because they typically include complex claims against multiple defendants." *Robbins*, 519 F.3d at 1249. Accordingly, especially when a qualified immunity defense is raised by an individual government defendant, the

complaint must allege exactly who did what to the plaintiff in order to provide fair notice to each defendant as to the basis of the claims against him or her. *Id.*

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendants need only make a prima facie showing of entitlement to summary judgment. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 644, 670 (10th Cir. 1998). A prima facie showing may be satisfied merely by pointing out to the Court that there is an absence of evidence to support any element of Plaintiff's claims. *Id*. at 671. If Defendants demonstrate "a prima facie case that would entitle [them] to a judgment as a matter of law if uncontroverted at trial, summary judgment will be granted unless the [Plaintiff offers] some competent evidence that could be presented at trial showing that there is a genuine issue as to a material fact." *New Mexico v. General Elec. Co.*, 322 F.Supp.2d 1237, 1251 (D.N.M. 2004) (citation omitted); Fed. R. Civ. P. 56(e). Plaintiff "cannot avoid summary judgment merely by presenting a scintilla of evidence to support her claim; she must proffer facts such that a reasonable jury could find in her favor." *Turner v. Pub. Serv. Co. of Colorado*, 563 F.3d 1136, 1142 (10th Cir. 2009).

### A. <u>Standard for Qualified Immunity</u>

"Under the qualified immunity doctrine, 'government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law." *Id*. at 2085 (quoting *Malley v. Briggs*, 474 U.S. 335, 341 (1986)). Once a defendant asserts a defense of qualified immunity, a plaintiff must show that: (1) he has "asserted a violation of a constitutional or statutory right;" and (2) "that right was clearly

established such that a reasonable person in the defendant's position would have known that her conduct violated the right." *Latta v. Keryte*, 118 F.3d 693, 697 (10th Cir. 1997) (citation and internal quotations omitted). "If the plaintiff fails to carry either part of his two-part burden, the defendant is entitled to qualified immunity." *Albright v. Rodriquez,* 51 F.3d 1531, 1535 (10th Cir. 1995). "[Q]ualified immunity is proper when the record plainly demonstrates no constitutional right has been violated, or that the allegations do not offend clearly established law." *Riggins*, 575 F.3d at 1107.

The Officers did not violate Towler's Fourth Amendment right to be free from the application of excessive force because the Officers' actions were objectively reasonable. "When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan v. Cotton*, 134 S.Ct. 1861, 1865 (2014). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 39 (1989) (internal quotations emitted). When determining the reasonableness of the Officer's action in an excessive force case, it is an objective standard and the question is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397. Reasonableness is not judged from the perspective of "20/20 vision of hindsight." *Id.* at 395. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgment—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. In assessing the reasonableness of an officer's conduct, the Court considers the totality of the circumstances, including a number of factors such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest to attempting to evade arrest by flight." *Id.* at 396.

The Officers' use of force on Towler on February 4 at two o'clock in the morning was objectively reasonable under the totality of the circumstances. Officers were called to the scene based on a complaint of a disorderly subject, screaming, and a possible fight. [Fact no. 2] Upon arrival on the scene Officer Thomas identified himself as Roswell Police and asked if he could speak to Towler. [Fact no. 3] In response, Towler turned around and faced Officer Thomas, aggressively deployed a baton, and then turned around and kept walking. [Fact no. 3] When Officer Kelton arrived on the scene, Officer Thomas and Officer Kelton exited their squad cars and followed Towler down the ally, Towler was screaming, hitting objects with the baton, and every little while he would aggressively charge at the Officers. [Fact no. 5] The last time Towler charged, he did so with more ferocity and as he closed in on the Officers, Officer Kelton made the decision to use his Taser on Towler. [Fact no. 6] Though the Taser was initially effective, as soon as the charge of the Taser ceased, Towler became combative by flailing about, throwing rocks, and disobeying the Officers' orders. [Fact no. 7] The Officers were forced to use the Taser several more times before Officer Kelton was able to secure one of Towler's arms behind his back. [Fact nos. 8 to 12] After Officer Kelton secured one arm, the Officers used pain compliance techniques to secure the other arm. [Fact nos. 12 and 13] Even after they were able to secure both arms, Towler continued to be aggressive. [Fact no. 14] After both his legs and arms were secured, Towler finally stop resisting and the Officers were immediately stopped using force. [Fact no. 15]

Under the circumstances, the Officer's use of force was objectively reasonable. In a dark alley, at two o'clock in the morning, the Officers were confronted with a suspect who was out of control, and resisting the Officer's commands and aggressively deploying a deadly weapon against the Officers. When Towler charged Officers Thomas and Kelton the final time, they did not employ lethal force but rather responded with nonlethal force deploying their Tasers instead of utilizing their firearms. They put

themselves in danger by engaging their Tasers at close range.[2] This is the kind of situation the United States Supreme Court contemplated when it stated, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgment—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S.at 396-97. Each event occurred one after another, there was no time to stop and contemplate the situation. In judging the actions of the Officers, "[w]e must avoid 'unrealistic second guessing' of police officers' decisions." *U.S. v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994). In light of the danger Towler posed, the Officers' actions were reasonable.

This is supported by Tenth Circuit's opinion in *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 776 (D.Kan. 1993). In *Hinton*, a resident of Elwood, Kansas had multiple disputes with an Elwood animal control officer. *Id.* at 776. After the third dispute between the two men, the animal control officer called the police. *Id.* An officer responded to the call and found the resident walking home with his daughter. *Id.* The officer asked if he could talk to the resident and the resident replied that he had not been disturbing the peace and kept walking. *Id.* As the encounter continued, the Mayor of Elwood and the Police Chief arrived at the scene. *Id.* As the conversation was ending, the resident shoved the officer out of his path, picked up his daughter, and began walking home. *Id.* The Police Chief grabbed the resident and told him he was under arrest. *Id.* A struggle ensued and the resident was pushed to the ground. *Id.* at 777. The officer and Police Chief attempted to handcuff the resident but he resisted by "kicking his feet, flailing his arms, and biting the officers, and in the ensuing scuffle White [the Police Chief] shoved Hinton's [the resident] face into the asphalt and twisted his arm behind his back." *Id.* Upon resistance, the Police Chief used a stun gun to subdue the resident. *Id.* The Police Chief insisted

---

[2] Even though "the reasonableness standard does not require that officers use alternative 'less intrusive' means [,]" the Officers did use a "less intrusive" means by employing their Tasers instead of their guns. *See Medina v. Cram*, 252 F.3d 1124, 1133 (10th Cir. 2001) (internal quotations emitted).

that the stun gun was only used three times, but the resident argued that it was used "numerous amounts of times." *Id*. As a result of this incident the resident argued that the officer and Police Chief used excessive force, but the Tenth Circuit upheld the district court's decision dismissing the claim on summary judgment based on qualified immunity. *Id*. at 779. In making its decision, the Tenth Circuit relied on *Graham*. *Id.* at 780-82. One factor on which the court based its decision was the resident's resistance to the officers' commands. *Id.* at 781. The court cited an earlier Tenth Circuit opinion stating that a "rough frisk of defendant by police officer held not excessive even though defendant was suspected of no crime where defendant's turning around and swearing could have been interpreted as resistance." *Id.* (citing *Dixon v. Richer*, 922 F.2d 1456, 1462 (10th Cir. 1991)). The court also recognized that multiple shots with the stun gun was reasonable since the officers ceased use after the resident was secured. *Id.* Additionally, the court found that the force was not excessive even though:

> [t]he crime for which Hinton was initially stopped by the police was the misdemeanor of disturbing the peace. Furthermore, it is difficult to maintain that Hinton constituted any type of immediate threat to the police or the public. There was no showing that he had a weapon or was under the influence alcohol or drugs.

*Id.* at 781. Based on these factors, Towler and Hinton were treated similarly, even though Towler's conduct was much more violent and aggressive. By the time Officer Kelton and Officer Thomas discharged their Taser's, Towler had charged at them with a weapon. [Fact nos. 3, 5 and 6) Towler had committed a misdemeanor by failing to identify himself to the Officers.[3] Additionally, Towler's irrational behavior at two o'clock in the morning was a strong indication that he was under the influence of alcohol and/or drugs, which was later confirmed in the Autopsy Report. [Fact no. 18] Applying the

---

[3] Under New Mexico law:
> [c]oncealing identity consists of concealing one's true name or identity, or disguising oneself with intent to obstruct the due execution of the law or with intent to intimidate, hinder or interrupt any public officer or any other person in a legal performance of his duty or the exercise of his rights under the laws of the United States or of this state.

NMSA 1978, Section 30-22-3.

standard that the Supreme Court and the Tenth Circuit have so clearly established, the Officers were objectively reasonable in their conduct towards Towler.

Additionally, at the time of the confrontation, "it would not have been clear to a reasonable officer that the conduct at issue might be unlawful in these circumstances." *Waters v. Coleman*, __Fed.Appx.__, 2015 WL 6685394, 5 (No. 14-1431) (10th Cir., 2015). In *Waters*, police were dispatched to the Denver Zoo due to an unruly customer, Mr. Ashley. *Id.* at 1. Officer Jones, the first officer to arrive, ordered Mr. Ashley to sit down. *Id.* He did sit down, but then got up and started walking toward the exit. *Id*. Officer Jones followed Mr. Ashley and at some point Mr. Ashley stopped walking and started moving towards Officer Jones. *Id.* Officer Jones tried to grab his arm to put it behind his back but Mr. Ashley resisted. *Id.* A struggle ensued between the two men, zoo security, and other zoo employees. *Id.* Officer Jones tackled Mr. Ashley, punches were thrown, and Officer Jones deployed his Taser twice. *Id.* Officer Coleman arrived and also deployed his Taser twice. *Id.* Three more officers arrived and employed an Orcutt Police Nunchaku in attempt to control Mr. Ashley. *Id.* After Mr. Ashley was handcuffed, one of the officers, Officer Gasca, crossed Mr. Ashley's ankles, bending his knees, putting his ankles to his buttock, and kneeling or leaning on his legs while Mr. Ashley was on his stomach. *Id.* 1-2. Officer Gasca continued to exhibit this force for up to five minutes even though Mr. Ashley was handcuffed and had vomited twice. *Id.* Mr. Ashley stopped breathing and died soon after. *Id.* at 2. In analyzing the officers' conduct for the purpose of qualified immunity, the Tenth Circuit focused on the second factor in the two part qualified immunity standard laid out above. *Id*. at 2-3. The court reiterated that "for the second qualified-immunity prong, 'a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" *Id.* at 3 (quoting *Plumhoff v. Rickard,* 134 S.Ct. 2012, 2012 (2014)). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must

have found the law to be as the plaintiff maintains.'" *Id.* (quoting *Morris v. Noe,* 672 F.3d 1185, at 1196 (10th Cir. 2012)). Due to the unlikelihood of a case with the exact same facts, the Tenth Circuit has adopted a sliding, "'[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.'" *Id.* (internal citations omitted). In making their decision the Court considered the initial force, whether force was properly used based on Mr. Ashley's state of excited delirium, the escalation of force, and whether the force was unnecessarily prolonged. *Id*. at 4-10. As to the initial force used until Mr. Ashley was handcuffed, the Court looked at many cases that existed at the time and found that "this court upheld use of force by officers who faced physical resistance, including against persons who were impaired." *Id*. at 5. As a result the Court found that the force used to gain control of Mr. Ashley was not excessive force. *Id.* However, the Court did find that the force applied by Officer Gasca after the officers gained control was excessive. *Id*. at 8-9. "[I]f Officer Gasca applied the complained-of force in an effort to control Mr. Ashley while he was resisting arrest and struggling with officers, the law would not have been clearly established and Officer Gasca is entitled to qualified immunity." *Id.* at 9. However, evidence supported "a determination that Officer Gasca continued to restrain Mr. Ashley's legs, while he was in a prone position, for several minutes after he was handcuffed… there was evidence that Officer Gasca did so after perceiving that Mr. Ashley had vomited and that he had exhibited symptoms of excited delirium." *Id.* at 9. The Court found this continued force to be excessive. *Id.*

The *Waters* decision is applicable to this case because the facts leading up to the officers securing Mr. Ashley are very similar to those leading up to the securing of Towler. Courts have repeatedly held that force used by officers who face physical resistance, even against those with impairments, is not excessive force. *Id.* at 5. "[I]t would not have been clear to a reasonable officer that the conduct at issue might be unlawful in these circumstances." *Id*. at 5. *Waters* also draws an important distinction between what occurred after Ashley and Towler were secured. In *Waters*, force was continued to be applied even

after it was clear that something was amiss with Mr. Ashley. In regard to Towler, as soon as Towler's legs were shackled, the Officers ceased using force and a 10-55 was called. [Fact no. 16] When the Officers realized there was something wrong with Towler, they immediately reacted. [Fact no. 17] Under the legal standard for qualified immunity, the actions of the Roswell Police Officers called to the scene that night were objectively reasonable and did not violate a clearly established right.

B. **The Officers did not unreasonably seize Towler.**

In the *Second Amended Complaint*, Plaintiffs allege that the Officers violated Towler's Fourth Amendment right against unreasonable seizure. Based on the totality of the circumstances, the Officers had reasonable suspicion sufficient to stop Towler and probable cause to make the subsequent arrest. Under the Fourth Amendment, officers are permitted to conduct brief investigative stops when there is "a particularized and objective basis for suspecting the particular person of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-418 (1981). This standard of "reasonable suspicion" is based on "the totality of the circumstances—the whole picture." *Id.* at 417. It is a "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Navarette v. California*, 134 S.Ct. 1683, 1688 (2014) (internal quotations and citations removed). "[T]he level of suspicion required for a *Terry* stop is obliviously less demanding than that for probable cause." *U.S. v. Sokolow*, 490 U.S. 1, 7 (1989). "The officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)) (internal quotations omitted).

"Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995) (*quoting Jones v. City and County of Denver*, 854 F.2d 1206, 1210 (10th Cir. 1988)). The determination of probable cause is an objective standard and "is evaluated in relation to the

circumstances as they would have appeared to prudent, cautious and trained police officers." *U.S. v. Davis*, 197 F.3d 1048, 1051 (10th Cir. 1999) (internal citations and quotations omitted). "When a warrantless arrest is the subject of a § 1983 action, the defendant arresting officer is 'entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest' the plaintiff." *Romero*, 45 F.3d at 1476 (*citing Hunter v. Bryant*, 502 U.S. 224, 228 (1991)). "Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Id.* at 1476 (internal quotations and quoted authority omitted).

At two o'clock in the morning Officers were called to the scene based on a complaint of a disorderly subject, screaming, and a possible fight. [Fact no. 2] After arriving at the scene, Officer Thomas announced that he was a Roswell Police Officer, and asked if he could speak to Towler. [Fact No. 3] In response, Towler turned around and faced Officers Thomas, deployed a baton, and then turned around and continued walking down the alley screaming, and hitting objects with the baton. [Fact nos. 3 and 4] Towler continued to act aggressively and even charged at Officers Thomas and Kelton. [Fact 5] No seizure had yet occurred, but there is no question that the Officers had reasonable suspicion to stop Towler. Then when Towler charged the Officers the last time, he came closer and the Officers were forced to defend each other and themselves. [Fact no. 6] Based upon Towler's erratic and violent conduct, the Officers were not safe until Towler was secured by both his hands and feet. [Fact no. 14] Under these circumstance, the Officers had probable cause to make the arrest.

    **C.**    **Plaintiffs' claim for municipal liability fails to state a claim upon which relief can be granted and must be dismissed.**

Plaintiffs assert that the City of Roswell is liable because their policies and customs and failure to adequately train and supervise the Officers caused Towler's death. In *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), the Supreme Court of the United States held that municipal bodies sued under § 1983 could no longer be entitled to absolute immunity. *Monell*, 436 U.S. at 701 (1978); *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163,

166 (1993) ("municipalities do not enjoy immunity from suit-either absolute or qualified-under § 1983."). Nonetheless, *Monell* and its progeny hold that although a municipality can be sued under 42 U.S.C. § 1983, "it cannot be held liable unless a *municipal policy or custom caused* the constitutional injury." *Leatherman*, 507 U.S. at 166 (emphasis added). This can raise certain issues regarding causation as liability may not be premised upon any theory of *respondeat superior*. *Monell*, 436 U.S. at 691. "[I]t must be shown that the unconstitutional actions of an employee were representative of an official policy or custom of the municipal institution, *or* were carried out by an official with final policy making authority with respect to the challenged action." *Seamons v. Snow*, 206 F.3d 1021, 1029 (10th Cir. 2000) (emphasis added).

> As the Supreme Court of the United States has recognized:
>
> it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Board of County Commissioners of Bryan County. v. Brown*, 520 U.S. 397 (1997) (emphasis added). The court further opined, "[w]here a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id*. at 405. Thus, absent a deprivation of a federal right caused by a municipal employee, there can be no municipal liability under § 1983. *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993) ("[a] municipality may not be held liable where there was no underlying constitutional violation by any of its officers."); *Gose v. Bd. of County Com'rs of County of McKinley*, 2011 WL 1516119 (D.N.M. Apr. 20, 2011). Alternatively, assuming a deprivation of a federal right occurred, municipal liability will not be imposed unless it can be shown that the alleged injury was directly caused by a deliberate action attributable to the municipality itself. *Dickson v. City of Clovis*, 2010-NMCA-058, ¶ 15, 148 N.M. 831,

242 P.3d 398. A "single isolated incident" is not enough to establish an unconstitutional policy or custom exists. *City of Okla. City v. Tuttle*, 471 U.S. 808, 821, (1985). Plaintiffs cannot show that the Officers violated Towler's constitutional rights. Therefore, Plaintiff's municipal claims against the City of Roswell should be dismissed.

> D. **The limit or cap on liability under the New Mexico Torts Claims Act is constitutional.**

Plaintiffs' constitutional challenge on the liability caps under the Torts Claims Act ("TCA") should be dismissed because the constitutionality of the caps has already been litigated and upheld. In *Wachocki v. Bernalillo County Sheriff's Dept.*, the court performed an extensive analysis of the validity of the caps. 2010-NMCA-021, 147 N.M. 720. In *Wachocki*, the Plaintiff sued the Bernalillo County Sherriff's Department ("BCSD"), among others, for an automobile accident caused, in part, by the failure of BCSD to enforce traffic laws against correction officers on a road near the Metropolitan Detention Center ("Jail"). *Id.* ¶ 3. The district court set the total compensatory damages for the accident at $3,707,563.82, of which $1,112,269.15 was attributed to BCSD. *Id.* ¶ 13. However, the government's liability was capped at $400,000 pursuant to limits set forth in the TCA under NMSA 1978, Section 41-4-19(A)(3). *Id.* On cross-appeal the Plaintiffs argued that the cap on liability under the TCA is unconstitutional under both the State and Federal Constitution.[4] *Id.* ¶ 32. Specifically, the plaintiffs claimed: "(1) that the cap violates state and federal guarantees of equal protection, (2) it violates the guarantee of substantive due process, (3) it encroaches on the separation of powers clause, and (4) it encroaches on the right to a jury trial."[5] *Id.* The court considered each of these arguments in turn and ruled against them all.

---

[4] "[T]here exists a presumption of constitutionality, and the party attacking the constitutionality of the statute has the burden of proving the statute is unconstitutional beyond all reasonable doubt." *Id.* ¶ 33.
[5] The due process and equal protections analyses are limited to the federal constitution because the court was unpersuaded that the New Mexico constitution affords any greater protections. *Wachocki*, 2010-NMCA-021, ¶ 34.

First, under substantive due process, plaintiffs argued that the cap inhibits the "fundamental right" to hold the government fully accountable for its actions. *Id.* ¶ 35. The court found that such an ability is not a fundamental right and the court was not willing to extend substantive due process to include it as a fundamental right. *Id.* ¶¶ 35-37. "Federal substantive due process protection extends only to a narrow and limited set of fundamental rights, which include the 'rights to marry, to have children, to direct education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortions.'" *Id.* ¶ 36 (*quoting Washing v. Glucksberg,* 521 U.S. 702, 720 (1997). The right to fully recover damages from the government is not on this list and, therefore, it is not recognized as an area protected under substantive due process. *Id*. ¶ 37.

Second, the Plaintiffs argued that the cap violates equal protection because it creates two classes of individuals: (1) those with damages exceeding the cap and (2) those with damages equal to or less than the cap. *Id.* ¶ 38. Under the equal protection analysis the court applied the rational basis test.[6] *Id.* ¶¶ 39-40. Under such a low standard, the court found that the cap does not lack a rational basis. *Id.* ¶ 42. Even if the cap is disproportionate to the judgment or the amount is outdated, there is a rational basis for the government to protect against catastrophic judgments. *Id.* ¶ 43.

Third, Plaintiffs argued that the cap infringes on their constitutional rights to access the courts and to jury trial because it "interferes with the jury's—or other judicial fact finder's—right to determine damages." *Id.* ¶ 44. The court was unconvinced by this argument. *Id.* In regard to whether the cap interferes with the right to access the courts, the court found that the constitutional right to access the courts does not create a right to unlimited recovery. *Id.* ¶ 45. "[N]othing within New Mexico's constitutional provision itself purports to control the scope or substance of remedies afforded." *Id.* (*quoting Trujillo v. City of Albuquerque*, 1998-NMSC-031, ¶ 23, 125 N.M. 721. Additionally, the court

---

[6] The Supreme Court in *Trujillo v. City of Albuquerque* held that "this Court adopts rational basis scrutiny as the equal protection analysis to be used in TCA cap challenges from this point forward." 1998-NMSC-031, ¶48, 125 N.M. 721.

could not see how the right to a jury trial is adversely affected. *Id.* ¶45. "New Mexico's right to trial by jury 'merely preserves the common law right to jury trial and does not create a new or broader right.'" *Id.* (*quoting Bd. of Educ. v. Harrell,* 1994-NMSC-096, ¶ 34, 118 N.M. 470).

Lastly, the plaintiffs argued that the fixed cap on damages impermissibly infringes on the authority of the judicial branch to regulate court practices, procedure, and verdicts. *Id.* ¶ 46. To determine whether the TCA cap violates the separation of powers, the court determined "whether it is in irreconcilable conflict with the power of the courts to grant remittitur." *Id.* ¶ 47. The court found that the "TCA cap, as a limit on damages for a cause of action created by statute, does not interfere with 'the judicial machinery administered by the courts for determining the facts upon which the substantive right of the litigant rest and are resolved.'" *Id.* ¶49 (*quoting Ammerman v. Hubbard Broadcasting, Inc.*, 1976-NMSC-031, ¶8, 89 N.M. 307). "[T]he TCA cap is based on a broad legislative policy, rather than on any consideration of whether a damages award is unsupported by evidence or the result of some undue influence." *Id.* Since these considerations are for the court to decide, the TCA cap does not prevent a court from ordering remitter under proper circumstances and, therefore, the cap does not violate the separation of powers. *Id.*

The Court of Appeals in *Wachocki* extensively analyzed and held that the caps on damages under the TCA are constitutional. Under this precedence, this Court is bound by the Court of Appeals' decision and should dismiss Plaintiffs' claim.

### E. <u>Under the New Mexico Torts Claims Act there is no waiver allowing Plaintiffs' spoliation claim.</u>

By enacting the NMTCA, the New Mexico Legislature recognized that, while private parties can rightly be held liable for their actions in a wide variety of areas, "the area within which the government has the power to act for the public good is almost without limit, and therefore government should not have the duty to do everything that might be done." NMSA 1978, § 41-4-2. In light of this recognition, the Legislature declared it the public policy of New Mexico that government entities shall "only be liable

within the limitations of the [NMTCA] and in accordance with the principles established in that act." Id.; see also, Electro-Jet Tool Mfg. Co., Inc. v. City of Albuquerque, 1992-NMSC-060, ¶ 20, 114 N.M. 676, 682, 845 P.2d 770. "The doctrine of sovereign immunity bars suits against the State of New Mexico and its agencies, unless the state has waived its immunity." *Sean E. v. Fraga*, No. CIV 07-1191 RB/KBM, mem. op. & order at 10, 2008 WL 8937906 (D.N.M. 2008) (non-precedential) (*attached hereto as Exhibit E*). To bring a cause of action for intentional spoliation of evidence there must be a waiver of immunity under the Tort Claims Act. *Id.* Plaintiffs' claims are based on NMSA 1978, 41-4-12, under which no waiver for intentional spoliation of evidence exists:

> [t]he immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

§ 41-4-12. Without a waiver, Plaintiff's intentional spoliation of evidence claim is barred pursuant to the doctrine of sovereign immunity.

## IV. CONCLUSION

**WHEREFORE,** for the foregoing reasons, as supported by the above undisputed facts and authorities, Defendants respectfully request this Court grant their Motion to Dismiss Plaintiffs' *Second Amended Complaint*, or Alternatively, Motion for Summary Judgment and enter an Order in favor of the Defendants dismissing Plaintiffs' Complaint, and for such other and further relief as the Court deems just and proper.

Respectfully Submitted,

**HINKLE SHANOR LLP**

By: */s/ Stephen S. Shanor*
    Richard E. Olson
    Stephen S. Shanor
    P.O. Box 10
    Roswell, NM 88202-0010
    575-622-6510
    *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on this November 12, 2015, I caused the foregoing *Motion,* along with this Certificate of Service, to be served and filed electronically through the EC/CMF File & Serve electronic filing system, which caused all parties or counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

**HINKLE SHANOR LLP**
*/s/ Stephen S. Shanor*