UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

RACHAEL SMITH, as next friend and           )
Mother of SABASTION TOWLER,                  )
ETHAN TOWLER, and JESSIE TOWLER,             )
And CHARLIE NELMS, as next friend and        )
Mother of NOAH TOWLER-NELMS and              )   CASE NO. 2:15-CV-01004-KG-LAM
SHERRIE TOWLER, individually, and            )
as Personal Representative of the Estate     )
of CODY TOWLER, Deceased,                    )
                                             )
              Plaintiffs,                     )
vs.                                          )
                                             )
CITY OF ROSWELL, a New Mexico                )
Municipality, PHILLIP SMITH,                 )
JONATHON KELTON, JORGE ARROYO-               )
JAIME, and DYLAN THOMAS, Individually        )
And as agents and employees of the           )
City of Roswell,                             )
                                             )
              Defendants.                     )

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT AND/OR MOTION FOR SUMMARY JUDGMENT
ON THE GROUNDS OF QUALIFIED IMMUNITY AND PROTECTIONS AFFORDED
UNDER THE NEW MEXICO TORTS CLAIMS ACT**

**COME NOW** the parties, by and through their undersigned counsel of record, and file

their response to Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint and/or

Motion for Summary Judgment on the Grounds of Qualified Immunity and Protections Afforded

Under the New Mexico Torts Claims Act as follows:

**PLAINTIFFS' FACTS CONTRAVERTING SUMMARY JUDGMENT**

1.       When he arrived on the scene, Officer Dylan Thomas arrived under a "Code One"

designation (non-emergency) without his red and blue cruiser lights or siren. *See* Exhibit 1,

Deposition of Officer Thomas at 87/2-88/16.[1]

2.      When the officer first encountered Cody Towler, Mr. Towler was alone, standing or walking on Buena Vista Street, in Roswell, N.M., and Thomas shined his spotlight on Mr. Towler. Exhibit 1 at 146/9-18, 143/3-13, 253/6-12.

3.      Officer Thomas tried to speak to Mr. Towler but he did not believe Mr. Towler recognized him as a police officer, though he claims he said that he was "RPD." He saw Mr. Towler deploy an asp baton and walk away from him.  See Exhibit 2, Statement of Officer Thomas at 317/15-17.

4.      No officer at the scene then, or thereafter, requested identification from Mr. Towler.  Deposition of Officer Kelton at (hereinafter Exhibit 3) page/line 181/6-14; 184/5-7; 203/15-23, 207/2-16; and Exhibit 1 at 151/1-20. Officer Kelton, who arrived just after Thomas, said that the only things said to Mr. Towler before the final arrest sequence was, "Calm down, calm down, drop the weapon and calm down" and "things like that."  At no time did Officer Kelton hear Officer Thomas say, nor did he identify either of them, as being from the "Roswell Police Department" (or "RPD").   Exhibit 3 at 207/13-18.

5.      When Officer Kelton arrived, he also arrived "Code One"; he didn't have his "red and blues" on.  Exhibit 3 at 139/2-14.

6.      The three primary officers, Kelton, Thomas and Arroyo, had passed primary field officer training by the RPD five months, eleven and one-half months, and three months prior, respectively.  Exhibit 3 at 143/2-9; Exhibit 1 at 249/2-9; and Exhibit 4 at 53/12-22.

7.      According to Officer Thomas, Mr. Towler turned and headed off Buena Vista Street into an alleyway.  According to Officer Kelton, Mr. Towler lingered at the entry to the

---

[1] The references to deposition exhibits are to "page/line," within the exhibit.

alleyway that intersected north and south with Buena Vista Street for about 20-30 seconds. Exhibit 3 at 180/18-25.

8.      At all moments prior to what Officer Kelton called Cody Towler's "final charge" in the alleyway, Officer Kelton did not feel he had been assaulted,  Exhibit 3 at 196/8-14, nor that he was in any jeopardy. Id., 191/15-21.

9.      Officer Kelton acknowledged that, in the moments from his first encounter until just prior to Cody Towler's arrest, it was:

  i.   Not illegal for Cody Towler to have and carry an asp.   Exhibit 3 at 203/24-204/1;

  ii.  Not required that Cody Towler cooperate with officers, Exhibit 3 at 204/2-4, or answer their questions. Exhibit 3 at 197/14-18;

  iii. Not illegal to refuse to stop and talk to an officer if he did not wish to, even if he was creating a disturbance, Exhibit 3 at 71/14-74-18;

  iv.  Not illegal to walk away from an officer, Id.;

  v.   Not illegal to not provide identification, Exhibit 3 at 71/14-74-18 and  76/11-17;

  vi.  Not illegal for Cody Towler to refuse to drop his asp on their request, Exhibit 3 at 204/2-4.

10.     According to Officer Kelton, at the time Mr. Towler walked away from the officers into the alleyway, and until the point of the alleged "final charge" by Mr. Towler, Officer Kelton did not have any suspicion of Mr. Towler violating the law or breaking the law. Exhibit 3 at 196/18-20.  Officer Thomas believes Mr. Towler violated the law because Mr. Towler would not stop and talk to him.  Exhibit 1 at 151/1-13.

11.     Officer Jaime Arroyo arrived at Buena Vista Street shortly after the time that Cody Towler entered the alleyway.   Arroyo said he had not seen the subject and had no knowledge of any violation of law by Cody Towler to justify an arrest; he was just there backing up the other officers.  See Deposition of Officer Arroyo (hereinafter Exhibit 4) at 204/10-205/2.

12.     Officers Kelton and Thomas waited about a minute before they headed into the alleyway after Mr. Towler.  Exhibit 3 at 190/4-12.  Officer Arroyo delayed entry longer.

**Facts Regarding What the Officers Knew About Cody Towler's Mental Condition**

13.     From his demeanor, Officer Thomas testified that he did not believe that Cody Towler was mentally capable at that moment of even knowing that he was a police officer. Exhibit 2 at 319/17-21 ("he wouldn't even recognize that I was a police officer – he didn't really fully understand the situation").

14.     Officer Kelton did not think, given what he observed, that Cody Towler "would be thinking clear[ly] enough to be walking away from us."  Exhibit 3 at 201/20-25.  He observed that Towler was, according to him, either on drugs or alcohol, and had an "inability to either comprehend verbal commands or [he] completely ignore[d] them."  Exhibit 3 at 34/6-14.  He knew, from training, that in dealing with different types of mental impairments, including impairment by drugs and alcohol, sometimes those people "can't pay attention."  Exhibit 3 at 121/20-122/23.

15.     Officer Kelton also knew that persons with excited delirium were "basically too excited," "unpredictable," "typically are pretty much unaware of – not – not able to understand really what's going on, that they're hyper-excited."  Exhibit 3 at 278/25-22.

**Facts Regarding the Alleged Times Cody Towler Charged the Officers While He Walked Away from them in the Alley**

16.     Officer Kelton said in his Statement that, before going into the alleyway, Mr. Towler charged towards him and Officer Thomas three to five times.  Exhibit 3 at 194/24-195/8.

17.     However, Officer Thomas did not report any attempted charges by Cody Towler at them at the alleyway entry, or even within the alleyway, except for the final altercation leading to Cody Towler's death.  Exhibit 1 at 185/5-186/18.

18.     After leaving the entry to the alleyway, Cody Towler walked northbound into the alleyway and got "quite a bit ahead of them."   Officer Thomas reported to the dispatch operator, "Can't catch up to him."  Exhibit 3 at 187/20-25, 198/11-17.  Officer Kelton acknowledged at deposition that Thomas' voice on the dispatch radio is panting while saying that Towler was "staying quite a bit ahead of" them.  Exhibit 3 at 202/19-24.

19.     According to Kelton, Mr. Towler got far enough ahead that they were having difficulty "closing distance."  Exhibit 3 at 202/1-17.

20.     Despite the foregoing facts, Kelton insists that Cody Towler "would charge us every so often, stop, turn around, keep walking."  Exhibit 3 at 205/5-23.  When confronted with dispatch recordings, Kelton  changed the description of Mr. Towler's alleged periodic  charges in the alleyway to say that Cody Towler only  stopped walking and took a "few" steps back and "waved the baton" a couple of times, but didn't really charge them until the "final" time.  Exhibit 3 at 209/1-22.  Accord, testimony of Thomas.  Exhibit 1 at 183/9-23.

21.     Despite all that Kelton describes above, at this point in time before the "final charge" he says he still felt no jeopardy for his safety.  Exhibit 3 at 205/12-14.

22.     Officer Thomas described Mr. Towler as loud, but staying ahead of them in the alleyway and moving northward down the alley.  Exhibit 1 at 185/5-186/16.

## The Confused Facts Regarding the "Final Charge" by Mr. Towler

23.    Officer Kelton, in his deposition, describes a scene where the officers moved around the 45 degree bend in the alleyway, continued walking, and, at some point beyond the bend, he says that Mr. Towler rushed them in a "final charge."   In his deposition he said Mr. Towler rushed from the middle of the alleyway.     Exhibit 3 at 210-212/25.   In his earlier Statement[2], Officer Kelton described Mr. Towler as rushing them from behind a fence opening.

24.    In deposition, Officer Kelton placed the location of the "final charge" and eventual place of arrest and death for Cody Towler at the "fence opening," but that opening is about 50-55 yards away from where the body ultimately lay in crime scene photographs.  All officers deny that they moved the body.  The officers have no explanation why the body appears some fifty-five (55) yards from the location of the "fence" opening Kelton says is the place of Towler's final charge.  Exhibit 4 at 149/5-18; Exhibit 3 at 294/9-295/6.

## The Facts Regarding the Application of ECD Stimulation/Taser Darts

25.    The officers describe Mr. Towler as having "charged" them.   They say they repelled his charge when Officer Kelton fired his Taser weapon.  Exhibit 3 at 207/21-24.

26.    Yet, Mr. Towler had a Taser prong in his mid-back and in the back of his head. Exhibit 1, 199/16-200/3; Exhibit 5, Autopsy, Towler 311, II.B.1.

27.    The officers each describe having fired their Tasers while they faced Mr. Towler and while Mr. Towler faced them.  Exhibit 1 at 199/16-200/3, Exhibit 4 at 187/2-12, and Exhibit 3 at 215/1-10.

FIRST TASER APPLICATION

28.    When Officer Kelton's first Taser darts impacted Mr. Towler, Officer Thomas and Officer Kelton both said that it "dropped him to the ground."  Thomas says Mr. Towler fell

---

[2]  Exhibit 6, Statement of Officer Kelton, at 349/11-17.

hard on his face from a run, that he was not able to brace his fall with his hands. [Exhibit 2, Statement of Officer Thomas at 329/25-31, Exhibit 6 at 351/31]. Exhibit 3 at 215/6-8. Officer Kelton says he fell "from a dead run," at least to his hands and knees. Exhibit 3 at 216/16-18. What is material: the officers both confirm that the Taser darts from Kelton's first deployment struck Mr. Towler so effectively it dropped him from a dead run. Id.

29.     Both officers describe that Cody Towler's baton was dropped when the Taser struck him and he went sprawling. Exhibit 3 at 215/6-18.   Officer Kelton acknowledges Mr. Towler dropped the baton; he did not throw it at them, and it landed closer to the officers than Mr. Towler. It landed out of his reach, about ten (10) feet away from Cody Towler. Exhibit 3 at 216/3-6.

30.     After this point, Mr. Towler was unarmed.   Exhibit 3 at 217/7-9.

31.     The first Taser cycle and all cycles thereafter were for the full five-second cycles (which are the normal cycles with a single trigger pull), and some were longer. Exhibit 3 at 218/18-20, 223/9-19 & Exhibit 7, Taser Report.

SECOND TASER APPLICATION

32.     Officer Thomas deployed his Taser one to six seconds after Officer Kelton's first cycle. Exhibit 3 at 219/2-9, 16-21.

33.     Officer Thomas's first ECD[3] application had an effect on Mr. Towler because, "It stopped him" and was "more effective than the first." Statement of Kelton, Exhibit 6 at 353/10, Exhibit 3 at 220/1-8. Thus, it was clear to the officers that both the first two strikes impacted and affected Mr. Towler. Exhibit 3 at 220/14-19.

---

[3]  Electrical Control Device or Taser.

THIRD AND FOURTH TASER APPLICATIONS – SIMULTANEOUS TASER CYCLING

34.      According to Officer Kelton's deposition, Thomas then ran a second cycle which "had a little bit more effect." Exhibit 3 at 220/20-221/11-18.

35.      Officer Kelton stated that the second cycle was more effective because he and Thomas were running two cycles at once. Exhibit 3 at 222/7-13.

FIFTH, SIXTH, SEVENTH TASER APPLICATIONS BY KELTON

36.      Officer Kelton does not know exactly how many times he cycled his Taser into Mr. Towler, but he does know that he pulled the trigger only one time in which it had *no* effect. Exhibit 3 at 260/1-4, 224/24-225/12, 226/25-227/2. The Taser Logs for Officer Kelton reflect that he ran six five-second cycles in total. By inference, only one (the last) of his six cycles was ineffective. Exhibit 3 at 225/25-226/16.

37.      Officer Kelton does not remember giving Cody Towler any pauses between ECD applications, even though he has been trained to give pauses between the deployments. Exhibit 3 at 240/6-241/2.

THE ARRIVAL OF OFFICER ARROYO AND TASER APPLICATIONS EIGHT, NINE, TEN, ELEVEN, TWELVE, THIRTEEN AND FOURTEEN BY ARROYO AND THOMAS

38.      Officer Arroyo arrived in the alleyway by car, and he parked his car with his headlights shining in Cody Towler's eyes, his spotlight shining on Cody Towler, who was down on the ground. Exhibit 4 at 134/4-24. Exhibit 4 at 177/11-12. Arroyo, as all officers responding prior to Cody Towler dying, did not have his red and blue top lights activated, nor his siren, because he wanted to "be less visible." Id., and Exhibit 4 at 138/11-14.

39.      When Officer Arroyo exited his car, he says Cody Towler was on his hands and knees, but his body was not even erect enough to see Mr. Towler's waistline. Exhibit 4 at 172/4-174/4. Cody Towler never got to his feet during the time Officer Arroyo was on scene. Exhibit

4 at 185/1-10. In fact, Mr. Towler never even attempted to stand, according to Arroyo.  Exhibit 4 at 188/11-15; 185/11-13.

40.      As Officer Arroyo arrived, Mr. Towler was "screaming," but "he wasn't making any sense."  "I couldn't understand nothing," said Officer Arroyo.  Exhibit 4 at 182/15-23.

41.      Despite those observations, Officer Arroyo says he made no assessment of Mr. Towler's mental condition.  Exhibit 4 at 183/8-10.

42.      When Officer Arroyo arrived, he heard Tasers being deployed.   Exhibit 4 at 171/9-15.

43.      Officer Arroyo said that Mr. Towler was flailing on the ground as he was being Tased and had rocks in his hands, but he could not say that Mr. Towler was trying to throw the rocks at the officers as opposed to just reaching for anything in his vicinity as he remained on the ground while being subjected to multiple Taser applications.  Exhibit 4 at 174/10-25.

44.      Officer Arroyo heard 2-3 cycles of Tasers being deployed before he began to deploy his own Taser.  Exhibit 4 at 175/20-23.  He stood watching the situation for 30 seconds to a minute before he engaged Mr. Towler with his own Taser.  Exhibit 4 at 183/19-22.  Tasers were going off during that time.  Exhibit 4 at 184/1-5.  He did not know how many times Cody Towler had been Tased before he began deploying his own Taser at Mr. Towler.   Exhibit 4 at 184/20-23.

45.      When Officer Arroyo arrived, Cody Towler's face did not have the facial lacerations and abrasions depicted in Exhibit 24 of Officer Arroyo's deposition, attached here as Exhibit 4.   Exhibit 4 at 186/11-22.

46.      Officer Arroyo's first Taser application (the Eighth Application, by this count) had "the desired effect."  Exhibit 3 at 231/25-232/2.  It fully incapacitated Mr. Towler; it put

Cody Towler on the ground, face first.  Exhibit 3 at 241/18-23. Arroyo says Mr. Towler immediately dropped from his hands and knees to his stomach, with an immediate effect. Exhibit 4 at 191/20-25, 192/4-14.

47.     Kelton stated that Officer Thomas also loaded a new Taser cartridge and fired after Officer Arroyo commenced cycling (the Ninth Activation).  Exhibit 3 at 236/18-23, 238/2-5.  Thomas, likewise, says that deployment of his was "effective."  Exhibit 1, 209/21-25.

48.     At this point, all three officers on the scene were either cycling ECD stimulation or standing by watching while Cody Towler endured seven (7) more ECD applications -- some occurring simultaneously.   Exhibit 3 at 257/20-24.  Mr. Towler was shocked with four total Taser applications from Arroyo and five total from Thomas' (three of Thomas' occurring after the arrival of Arroyo). Exhibit 4 at 191/3-16; see Exhibit 7 (Taser Report).

49.     Officer  Kelton  confirmed  that  Arroyo  and  Thomas  used  the  Tasers simultaneously.  Exhibit 3 at 239/14-22.

50.     Officer Arroyo also does not recall giving Mr. Towler any breaks between his sequential applications of ECD stimulation, Exhibit 4 at 248/7-19.  He does not remember the Taser training material RPD has provided that instructs as follows:  "If circumstances require extended duration discharges and rapid restraint is not an option, the ECD operator should carefully observe the subject and provide breaks in ECD stimulation when practical."  Exhibit 4 at 248/7-13.

51.     Officer Kelton recalls being taught in official Taser corporation curricula, before coming to Roswell, that officers should avoid repeated, extended, prolonged Taser applications. Exhibit 3 at 280/4-7, and that deployments over 15 seconds in total duration should be avoided.

Exhibit 3 at 281/3-5.  He was aware of that training when he arrested Cody Towler.  Exhibit 3 at 281/6-8.

52.      Officer Arroyo was taught to limit the duration of Taser stimulation to 15 seconds.  Exhibit 4 at 250/25-251/4.  He was taught that there is a significant problem as it relates to "Tasing" someone for greater than 15 seconds as it increases the risk of arrest-related deaths.  Exhibit 4 at 251/19-24.

53.      Officer Arroyo applied individual cycles for as long as eight seconds, often simultaneously with Officer Thomas, without pausing, and he acknowledged that all four of his activation cycles into Mr. Towler were effective.  Exhibit 4 at 192/21-25.

**Facts Regarding Failure to Utilize the "Window of Opportunity" to Subdue Mr. Towler To Avoid Repeated Taser Applications**

54.      Officer Kelton's Taser logs show 6 separate Taser activations or cycles, for 30 seconds of ECD stimulation;  Officer Thomas's show five separate Taser cycles over 25 seconds of ECD stimulation, and "while the Tasings were going off … [they] all were waiting to go and lay hands or get hands on Cody Towler."  Exhibit 4 at 191/3-16.

55.      Arroyo activated his Taser into Cody Towler in four separate cycles, the first a six-second cycle, the second an 8-second cycle, and two five-second cycles; each time he admits the Tasing cycle was effective on Mr. Towler, beginning with the first one that had "the desired effect."  Exhibit 3 at 231/24-232/2 and Exhibit 4 at 192/21-25.  After the fourth Taser application, Cody Towler was laying on his face, "completely prone."  Exhibit 4 at 193/6-11. (See also Taser Log, Exhibit 7).

56.      Kelton says the officers were screaming at Cody Towler to "roll on his stomach," but he admits Mr. Towler was already on his stomach, and to "put his hands behind his back," but he admits Towler's hands were pinned underneath his body and that Towler "did not have

the ability to put his hands behind his back during the shocking phase." Exhibit 3 at 243/90-244/5.

57.     During the cycling of any of the 14 separate Taser applications, neither Arroyo, Kelton nor Thomas made any effort to utilize what Taser training materials call the "window of opportunity" and subdue Cody Towler. Exhibit 3 at 229/14-18, 230/2-4. Kelton admits he was trained that an officer can and should "approach someone while a Taser is being deployed and subdue them while they're being Tased," Exhibit 3 at 229/20-230/1.

58.     Neither Kelton nor Thomas attempted to subdue Cody Towler until after all Taser cycles by Kelton, Thomas and Arroyo had concluded. Exhibit 3 at 242/16-243/4; Exhibit 4 at 189/9-190/6.

59.     Officer Kelton admits he was taught that the officer is supposed to "minimize the number of [Taser] applications by working quickly to restrain the subject." Exhibit 3 at 281/14-17; 282/2-14.

60.     Officer Arroyo did not attempt an arm bar or other compliance maneuver during that time. Exhibit 4 at 190/6-17. Despite training materials saying differently, Officer Arroyo said he was not taught that he could go "hands on" – to move in during the five-second cycle and utilize that window of opportunity to subdue the arrestee. Exhibit 4 at 253/17-22.

**Facts Regarding Excessive Force While Handcuffing the *LEFT* Hand of Mr. Towler**

61.     According to Officer Arroyo, Officer Kelton waited until after Arroyo's last Taser cycle was complete: "And Officer Kelton simply walks in, he grabs his left arm, he pulls it behind his back." Exhibit 4 at 193/10-18. In a single movement, Kelton was able to cuff Cody Towler's left arm. Exhibit 4 at 193/19-25.

62.     Officer Arroyo testified that Mr. Towler's left arm required no pain compliance to get it cuffed.  Exhibit 4 at 194/9-13.

63.     Officer Kelton, however, says it took between 15 and 20 seconds to get Mr. Towler's left hand out from underneath his person so that Officer Kelton could get a handcuff on it.  Exhibit 3 at 245/16-19.

64.     At this time, Cody Towler was lying "completely prone," hands underneath his body, and, according to Officer Kelton, Officer Arroyo delivered something between 1 and 5 baton strikes to Cody Towler's thighs so that they could handcuff the left hand.  Exhibit 3 at 255/16-256/16.

**Facts Regarding Excessive Force While Handcuffing the *RIGHT* Hand of Mr. Towler**

65.     Officer Kelton reports that it took approximately 10 seconds to get Cody Towler's right hand from underneath his body to behind his back and get it handcuffed.  In that ten-second time frame, Officer **Thomas** kicked Cody Towler in the shoulder 5-10 times with his boot. (Exhibit 9, Autopsy photo of boot, picture of boot print).  Exhibit 4 at 212/17-20.  Exhibit 3 at 253/1-25.

66.     Officer **Arroyo** delivered, by his count, four kicks to Mr. Towler's right lower torso.   Arroyo also delivered two strikes with his baton to Towler's right thigh.  Exhibit 4 at 193/23-194/21.

67.     Officer Arroyo had no indication from any source that Cody Towler had a weapon.  Exhibit 4 at 194/17-195/17.

68.     During the entire sequence in trying to handcuff Mr. Towler's right hand, Officer Kelton had the left arm subdued and was sitting on Mr. Towler's back.  Exhibit 4 at 196/2-6.

69.     Before Officer Arroyo kicked and struck Mr. Towler he did not attempt to grab Cody Towler's arm or his elbow or pull his arm behind his back.  He did not use any of the pain compliance measures that he had been taught; instead he struck and kicked Mr. Towler.   Exhibit 4 at 196/20-197/198/9.  Officer Arroyo knew there were "several other" tactics he could have employed, such as "pain maneuvers" he had been taught which could be used on the left arm already pinned behind the back and in handcuffs.  Or, he could pry the arm out by using the leverage he and Officer Kelton had over Cody Towler.  Id.

70.     All of this time, the Officers were yelling at Cody Towler to give them his arm. Arroyo said that Cody Towler was screaming, but making no sense.  Exhibit 4 at 200/12-25. "He was incoherent." Exhibit 4 at 201/1-2.

**Facts Regarding Excessive Force by Positional Asphyxiation**

71.     After placing Mr. Towler's right hand in handcuffs, Officer Arroyo testified that he sat on Cody Towler's buttocks area, straddling Mr. Towler's body with his legs and knees. Exhibit 4 at 210/4-16.  Exhibit 3 at 250/3-9. The officers were "using quite a bit of [their] own strength to keep him down."  Exhibit 4 at 211/6-12.

72.     Arroyo describes Officer Kelton as sitting on Cody Towler's back, "doing pretty much what I was doing."  Exhibit 4 at 209/10-15. Kelton said he had his "legs in the middle of [Cody's] back."  Exhibit 3 at 250/18-21.

73.     Kelton describes what he was doing as "wall containment" to keep Mr. Towler from getting up.   He says that wall containment is using an immovable object, like the ground, and pinning the person so that they can't move, to contain them.  Exhibit 3 at 249/16-22. 247/25-248/3.

74.     Soon thereafter, another officer named Burkowski sat on Mr. Towler's legs. Exhibit 3 at 250/22-24.

75.     In total, the sergeant on duty, Officer Sharpe, described seeing on his arrival at the scene 3-5 officers on top of Cody Towler.   Exhibit 8, Statement of Officer Sharpe at page 416/line 21.  The officers confirm that Officer Kelton sat on Mr. Towler's back, while Officer Arroyo sat on his buttocks and Officer Burkowski on his legs.  Exhibit 3 at 250/3-9, 17-21, 22-24.

76.     At the time when the dispatcher was called and told that Mr. Towler was "in custody," at least three officers were sitting on top of Cody Towler.  Exhibit 3 at 250/3-9, 17-21, 22-24.

77.     Officer Arroyo admits he received training that officers are to place the arrestee in a seated position as soon as possible after an arrest to avoid positional asphyxiation.  Exhibit 4 at 244/23-245/2

78.     These officers stayed on Mr. Towler's back without rolling him over or sitting him up from at least 2:12:37 a.m. to after 2:17:04 a.m., four and one-half to five minutes or more, with them sitting on his shoulders, back, buttocks and legs.   All that time, Mr. Towler lay face down and was not rolled over.   Exhibit 3 at 263/14-264/22.  Exhibit 4 at 216/3-25, 222/7-8.

79.     The officers remained on Mr. Towler's back despite the fact that once Cody Towler's legs were shackled, "he was pretty well compliant."  Exhibit 4 at 246/4-6.  He "wasn't resisting anymore."  Exhibit 4 at 219/16-18.

80.     Officer Kelton was 5'11" and weighed 220 pounds, lifted every day, ran every day, had had Army National Guard Training, had been a high school athlete, and could bench press 350 pounds.  Exhibit 3 at 125/20-126/12, 89/22-90/11, 245/20-24.

81.     Officer Arroyo was 5'9" tall, weighed 175 pounds, played competitive soccer, had a long-standing reputation for working out at the gym a lot.  Exhibit 4 at 35/6-16.  He could bench press 220 pounds.   Exhibit 4 at 37/21-23.   He learned defensive combat in Law Enforcement Academy.  Exhibit 4 at 39/1-7

82.     Officer Kelton admits he has had training in Pennsylvania on ways to detain and subdue a subject without asphyxiating that person because of the position of his body on the arrestee.  Exhibit 3 at 275/2-6.  He was trained that an officer must be careful of the weight he or she puts on the body due to the fact it can cause asphyxiation of the subject being arrested. Exhibit 3 at 276/14-18.

**Facts Regarding Lack of Medical Care by Failure to Carefully Observe Towler After Repeated, Prolonged Taser Activations**

83.     Officer Kelton admits that he has received training that "the [Taser] operator should carefully observe the subject and provide breaks in the ECD stimulation when practical." Exhibit 3 at 281/9-13.

84.     After he arrived on scene, Sergeant Sharp instructed the officers to get off of Mr. Towler.   According to dispatch records, from that time until someone noticed some problem with Mr. Towler, one minute, 55 seconds transpired.  Exhibit 3 at 299/20-300/12.  Thus, Mr. Towler lay with no observation or medical treatment for at least a minute and 55 seconds. Exhibit 3 at 270/11-271/17.  During that time, no one was checking on him or doing anything for him.  Id.

85.     Even according to Officer Kelton, who did not keep count of the time, Cody Towler was "just laying there by himself for a minute, he had his head to one of the sides and then after that he wasn't talking, he wasn't doing anything."  Exhibit 3 at 268/17-269/3.

86.     Officer Kelton does not personally know how long it was before someone noticed Mr. Towler:

> Q:     "No one saw to his medical needs during that period of time.  And you have training that you are supposed to immediately look at someone's physical health after he's been tased that many times, correct?
>
> A:     Correct."   Exhibit 3 at 299/20-300/12.

**Facts Regarding Failure to Provide Reasonable Medical Intervention Post-Code Event**

87.     Ominously, Kelton testified: "Up to the point we noticed something was wrong, I think we thought he was fine." Exhibit 3 at 300/16-17.  Officers are supposed to be taught to "carefully observe" subjects post-arrest because people are at risk because of the physiological and  metabolic stresses that can contribute to arrestee's deaths, including excited delirium, especially after multiple, sequential, prolonged Taser applications.   Exhibit 4 at 249/15-24 and 251/9-18.

88.     Officers are also taught to log with the dispatch operator when CPR ensues at the scene. According to the dispatch log, CPR was not initiated until 2:21:30 a.m., even though the dispatch operator was alerted to a "Code 3" (call for an emergency Ambulance) at 2:18:56. Exhibit 3 at 272/6-273/1.

89.     According to dispatch logs, the officers delayed initiating CPR for two minutes, thirty-four seconds *after* Sergeant Sharpe called for the "Code 3" emergency transport, knowing that Mr. Towler was not breathing (Exhibit 3 at 273/14-16), had no pupil dilation (Exhibit 3 at 273/17-20) and was without a pulse.   Exhibit 3 at 44/15-19.

90.     In addition to the delay in onset of CPR, the officers knew Mr. Towler was not breathing while CPR was underway.  Exhibit 3 at 44/20-25.

91.     The Roswell Police Department teaches that breathing assistance or "rescue breathing" is a mandatory part of CPR for a person in need of resuscitation.  Exhibit 4 at 228/20-229/6.

92.     None of these officers attempted any rescue breathing.   Exhibit 3 at 273/13-274/17.

93.     When asked why, Officer Kelton explained:

      A:     "I would never give anybody mouth to mouth without a mouth guard if I didn't know that person."

      Q:     Even if their life was – even if it was apparent they were going to die without it?

      A:     My life if pretty important, too, so if you have some type of communicable disease so I'm not going to get that, so no.  Exhibit 3 at 274/3-11.

94.     When EMTs arrived at the scene, officers misrepresented Mr. Towler's history. They told EMTs he had been "tased" only five (5) times,  though he had been subjected to 14 Taser cycles, some sequential, some prolonged for as much as eight (8) seconds and without giving Mr. Towler any pauses between applications.   Exhibit 3 at 259/7-24.

95.     Officer Kelton told EMTs that Cody Towler had been on the ground with officers on him "for about 30 seconds and went from 100 miles an hour to nothing."   Exhibit 3 at 34/6-35/11.  No officer informed EMTs that Mr. Towler had been asphyxiated under the weight of 3-5 officers' bodies for at least 4 ½ to 5 minutes, or that he had been left without medical assistance for more than four minutes after officers got off of him.

**Facts Regarding Excessive Force for Lacerations and Abrasions to Cody Towler's Face**

96.     Officers Arroyo testified that Mr. Towler's facial lacerations were caused  during the period of hand-cuffing and thereafter.  Exhibit 4 at 186/19-22.  Mr. Towler ended up with a pretty "chewed up face."  Exhibit 4 at 216/13-25.

97.     All the time the officers were in the process of subduing him, Cody Towler's face was down, "rubbing against the gravel." There is no other explanation Officer Arroyo has for the abrasions than that Mr. Towler's face was being pressed down into the gravel while the officers were on top of him.   Exhibit 4 at 217/18-218/9.

98.     This occurred after Mr. Towler was hand-cuffed and shackled for the majority of the time.  Id.

99.     Mr. Towler's face ended up looking as is depicted in Exhibit 10.

### **Additional Fact**

100.    The Roswell Police Department ("RPD") cannot locate or provide the Taser training manual which it says it used to train Officers Arroyo and Thomas.  Exhibit 4 at 246/18-247/7.  It thinks what Plaintiffs have been provided is how it trained its officers.  Id.

### **CONTESTING DEFENDANTS' FACTS IN ITS MOTION, PAGES 2-5**

1.     Plaintiffs admit numbered paragraphs 1through 4 and 12.

2.     Plaintiffs deny paragraphs 5-6, and contest with Plaintiffs' numbered paragraphs 7-12, 16-22, 23-31.

3.     Plaintiffs deny paragraphs 7-10, and contest with Plaintiffs' numbered paragraphs 32-37.

4.     Plaintiffs deny paragraphs 11, 13-15, and contest with Plaintiffs' numbered paragraphs 38-82, 96-99.

5.     Plaintiffs deny paragraphs 16-17, and contest with Plaintiffs' numbered paragraphs 83-96.

6.     Plaintiffs deny paragraph 18 insofar as it requires foundation and expert testimony of a trained pathologist to determine what a "high level" means, and what significance it may

have, but acknowledges that Mr. Towler used some form of chemical substance that night which affected his mental state.

## DISCUSSION

### A. **Standard for Qualified Immunity in Excessive Force Cases.**

The United States Supreme Court has developed a two-part test for determining if the qualified immunity defense is available in any given case.  See Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151 (2001).   If the Plaintiff has sufficiently established a violation of a constitutional right, the second step in the qualified immunity analysis is to determine whether the violated right was clearly established.  Id.

While the claimed right must be clear to the reasonable officer, it is not required that Plaintiff point to "explicit case law of the Supreme Court and the relevant circuit courts to show that the rights violated were 'clearly established."  Brousseau v. Haugen, 543 U.S. 194, 198-99, 125 S. Ct. 596 (2004); Landis v. Baker, 2008 U.S. App. Lexis 21946 (6th Cir. Oct. 16 2008). Plaintiff must not engage "in a scavenger hunt for prior cases with precisely the same facts," or identify a "case on point," because even a general constitutional rule that has already been established can apply with obvious clarity to the specific conduct in question.   Gomes v. Wood, 451 F.3d 1122, 1134 (10th Cir. 2006); Anderson v. Blake, 469  F.3d 910, 914 (10th Cir. 2006)[4].

### B. **Multiple, Sequential, Simultaneous, Unabated Taser Applications**.

Under prevailing Tenth Circuit authority, "it is excessive to use a Taser to control a target without any reason to believe that a lesser amount of force – or a verbal command – could not exact compliance."  See Walton v. Gomez, 745 F. 3d 405, 424 (10thCir. 2014) *citing* Casey

---

[4] See also, Casey v. Federal Heights, 509 F.3d 1278, 1285 (10th Cir. 2007)(The Tenth Circuit has stated that it was not necessary to locate a case in which a citizen peacefully was returning a file illegally removed from the courthouse when he was tackled, tasered, struck, tasered again, without warning, involving similar facts  to say no reasonable officer could have believed he was entitled to so behave).

v. City of Federal Heights, 509 F.3d 1278, 1280-81 (10th Cir. 2007).  In Walton, the use of a Taser on a pre-trial detainee for "three seconds longer than recommended when he was already handcuffed on the ground and subdued by multiple deputies" was unreasonable.  The court in Walton found the amount of time to be a "sixty percent upward departure from a normal cycle on a handcuffed man [and that] demonstrate[d]," to the Court, "excessive zeal." Id. at 427.  It violated a constitutional right under the Graham standard, one that was clearly established.  Id. In the instant case, the Plaintiffs claim that multiple factors in this Tasing event individually, and certainly in aggregate, violate Graham principles and clearly-established Constitutional rights, including the *number* of Taser applications, the *length* of individual and aggregate cycle durations, the *lack of pauses* between cycles, the *simultaneous* cycles, and, as stated in the next section, the failure to use the *window of opportunity*.  In the Tenth Circuit, any use of a Taser constitutes a severe intrusion on the interests protected by the Fourth Amendment. Cavanaugh v. Woods Cross City, 625 F.3d 661, 665 (10th Cir. 2010).

In the instant case, the Taser materials the RPD have provided to Plaintiff as its *possible* training materials warn against the very uses of the Taser which occurred here.  It says that use for more than 15 seconds departs from a "significant safety point." Exhibit 11 at 2512.  The materials also instruct that:

- Exposure longer than 15 seconds – whether continuous or in multiple cycles (both present here) – increases the risk of death, Id. at 2513
- Taser application greater than 15 seconds must be independently justifiable; Id.
- Evaluation between each 5-second cycle must be done to determine if subsequent cycles are necessary, Id.
- Individuals in crisis are often physiologically/metabolically susceptible to arrest-related death, Id. at 2516
- Every trigger pull is a separate use of force and must be objectively reasonable and separately justified.  Id. at 2547 & 2556, 2669
- Multiple Taser applications cannot be justified solely on the grounds the suspect fails to comply with a command, particularly when more than one officer is present to assist in controlling the situation. Id. at 2548

- Any decision to apply multiple Taser cycles must take into account whether the suspect is capable of complying with officers' commands (including physical and mental condition). Id. at 2549
- Taser use should be avoided on those mentally ill or with elevated risk, id at 2558; and that "excited delirium" sufferers" may not comply with verbal commands." Id. at 2668
- One should not target Taser darts to the head. Id. at 2630
- Extended cycles (beyond 5 seconds), repeated or continuous discharges increase the risk of injury to an arrestee. Id. at 2654
- An officer can go "hands on" during the 5-second cycle without feeling the effect of the Taser. Id. at 2666
- Each 5-second cycle is a "window of opportunity" to establish control of the subject. "Move in, control, and handcuff during the 5-second 'window of opportunity.'" Id. at 2667.
- If circumstances require extended duration or repeated discharges, the operator should carefully observe the subject and provide breaks in the Taser stimulation. Id. at 2670.
- Once the subject is controlled/cuffed, evaluate the need for medical attention. Id. at 2683.

Mr. Towler was subjected to 14 separate Taser cycles here, some lasting more than 5 seconds, some simultaneous, apparently continuous without any significant break or pause. Defendants attempt to justify their conduct by saying that Mr. Towler was not "incapacitated" in order to justify repeated cycles.    That is not reasonable here.  Every Taser deployment except Kelton's sixth deployment appears to have hit its mark, with the Officers noting some effect on Mr. Towler.   Kelton even called his and Thomas' joint *second* cycles as having "a little more effect" than the first one which dropped Mr. Towler from a "dead run."

Without doubt, however, after Officer Arroyo arrived and when his first deployment hit Mr. Towler, no one suggests that Mr. Towler was not "incapacitated."  All officers agree it was doing what Tasers are supposed to do.  Yet, all three officers stood by while Mr. Towler was shocked by seven more total cycles, two of which exceeded beyond the 5-second standard cycle time.  (That means Officer Arroyo just kept holding down the trigger, though he admits Mr. Towler was incapacitated on his first Taser activation).

Multiple Taser applications over a period of "several seconds" can, particularly when coupled with other abuses, amount to excessive force. Landis v. Baker, 2008 U.S. App. Lexis 21946 (6th Cir. Oct. 16 2008); Oliver v. Fiorino, 586 F.3d 898, 907-08 (11th Cir. 2009)(repeatedly tasering a pedestrian constituted excessive force where officers made no attempt to handcuff or arrest the pedestrian during the shock cycle (i.e., the window of opportunity) and pedestrian was not accused of any crime); Simmons v. Hinton, 2015 U.S. Dist. LEXIS 27715 (D. Colo. March 5, 2015)(Continued deployment of Taser -- 3 in dart mode, one by drive stun -- after deployment of the first Taser strike, along with the fist to the face of the allegedly resisting subject was without legitimate justification for summary judgment in light of Graham); Magruder v. Kuritz, 2010 U.S. Dist. LEXIS 129595 (D.Colo. 2010)("In evaluating the 'nature and quality of the intrusion on the individual's Fourth Amendment interests' caused by a tasing, the *number and length of electric shocks given* to the subject is generally relevant": tasing two times held not qualifiedly immune because the issue was whether the amount of force used was reasonable under the circumstances").

Under the appropriate circumstances, gratuitous, repeated applications of a Taser over short periods of time can amount to excessive force. Lee v. Metro. Gov't of Nashville & Davidson County, 596 F. Supp. 2d 1101, 1117 ¶36 (D. Tenn. 2009). In Lee, officers fired Taser devices and cycled those Tasers at least three times in rapid succession within the space of two minutes. *Id.* The suspect was at most guilty of a minor and non-violent crime, unarmed and surrounded. The Court found a right violated, and it found that the "repeated, quick succession, gratuitous use of a shocking, incapacitating device on a cornered, unarmed, non-violent, naked suspect who committed no serious crime is a violation of a clearly established constitutional right." Id. at 1118.

23

Cody Towler, as well, had committed no crime, particularly if the jury believes he did not make the alleged "final charge."   In this case, only the officers are alive to testify that Mr. Towler actually charged them.   But the Plaintiff is entitled to an inference that Mr. Towler did not charge the officers, as they now allege, because: (a)  he was inexplicably struck with Taser darts in his back and on the back of his head; (b) Officer Kelton has conflicting memories of how the "charge" occurred (i.e. from middle of alley or from behind fence); (c) the location the officers describe as the place of the "final charge" (where a fence opening exists) is inexplicably 50-55 yards from where the body ultimately lay in crime scene photos.    The inference to which Plaintiffs are entitled is that Mr. Towler was struck by Taser darts in the back and back of head while he legally walked away from the officers and that the "charge" from behind the fence is a fabrication by the officers.

A Taser strike in Mr. Towler's head is, also, significant.   "No one questions that the use of a taser, especially if one probe hits the head, amounts to a significant physical intrusion requiring a correspondingly significant justification."   <u>Wilson v. City of Lafayette</u>, 2013 U.S. LEXIS 2954, at ¶10 (10th Cir. 2013).   There is no justification here with this paltry claim of criminal wrongdoing by Mr. Towler (failure to identify self without even a request to show ID).

Moreso, at the time Mr. Towler was walking away from officers down the alleyway, Officer Kelton testified that he felt in no jeopardy, nor had he felt that he had been assaulted at any time (before the alleged "final charge"), nor did he have suspicion that Mr. Towler had committed any crime.   There can be no justification here ever to Taser Mr. Towler in the back of the head, unless, perhaps Officer Kelton and Thomas convince a jury that there really was a "final charge" by Mr. Towler.

Further, it is not clear that Cody Towler even knew that they were police officers who

shined lights, spotlights, headlights and flashlights in his eyes, and who did not use red and blue

lights, sirens, and may not have announced themselves as police officers, or that Cody Towler

had the mental capacity on that night, at that moment, to process what was going on.   The

Officers are the ones who suggest that Mr. Towler was not "coherent," was "incapable of

following commands," was "making no sense," and who doubted that Mr. Towler even knew

they were officers.   The Tenth Circuit has examined the use of tasers against the mentally ill and

found it clearly established that officers may not tase non-criminal, non-threatening subjects who

primarily exhibit passive resistance.    Aldaba v. Pickens, 777 F.3d 1148, 1155-56 (10th Cir.

2015).  As one district stated:

> In addition to the Tenth Circuit's comments about mental health and excessive
> force in Giannetti, 216 Fed. Appx. at 764, other court decisions have stressed that an
> officer should hesitate to deploy a taser when the subject is incoherent and he does not
> appear to understand the officers' commands. See Bryan v. MacPherson, 630 F.3d 805,
> 812 (9th Cir. 2010); Estate of Mathis, 2009 U.S. Dist. LEXIS 32040, 2009 WL 1033771
> (D. Colo. 2009). This principle is premised on recognition that "[t]he problems posed by
> an unarmed, emotionally distraught individual who is creating a disturbance are
> ordinarily different from those involved in law enforcement efforts to subdue an armed
> and dangerous criminal. . . . In the former instance, increasing the use of force may
> exacerbate the situation." Deorle v. Rutherford, 272 F.3d 1272, 1283 (9th Cir. 2001).

Cardall v. Thompson, 845 F. Supp. 2d 1182, 1192 (D. Utah 2012).

However, throughout the arrest sequence, the officers continue to re-apply force over and

over again for the sole reason that the unarmed Mr. Towler would not obey their verbal

commands, though they each observe his responses are non-sensical.

The RPD Taser training materials (which it thinks it trains under[5]) contains specific

training on the legal contours in Taser settings, specifically citing the case of Beaver v. City of

Federal Way, 507 F.Supp 2d 1137 (W.D. Wa. 2007)[6], in which a suspected residential burglar,

Mr. Beaver, was "tased" five times during the course of his arrest.   The case – now a standard

---

[5]  Again, it cannot find its 2010-11materials for Taser training.  See Fact 100.
[6]  See Harper v. Rose, 2012 U.S. Dist. LEXIS 48740 (D. Utah 2012)(citing Beaver v. City of Federal Way).

training block in Taser International training materials -- stands for the proposition that it is clearly established that: 1) the use of a Taser involves the application of force; 2) each application of a Taser involves an additional use of force; 3) multiple applications of a Taser cannot be justified on the grounds that a suspect fails to comply with a command, particularly when more than one officer is present to assist in controlling a situation; 4) any decision to apply multiple applications of a Taser must take into consideration whether a suspect is capable of complying with officers' commands. Id. at §3 of decision.  The court specifically found that the first 15 seconds of Taser application in that case could be justified, under those circumstances, but the last ten seconds -- the fourth and fifth cycles by the officers -- could not, and those violated Mr. Beaver's constitutional right to due process.  Both the state of mind of Mr. Beaver (clearly by the fourth cycle he was not able to comply with commands) and by the failure of the second officer present at the scene to use the window of opportunity to subdue Mr. Beaver, convinced the Court that Tasers activations beyond 15 seconds clearly violated Mr. Beaver's rights. Id at §1 of decision.

As here, Mr. Towler's mental condition as reported by the officers, and, in addition, their prolonged, continuous, unabated, sequential, multiple taser applications, without taking advantage of their window of opportunity here, violated clearly-established constitutional rights. Oliver v. Fiorino, 586 F.3d 898, 907-08 (11th Cir. 2009).

As made clear by Taser manual materials, it creates an unreasonable risk when officers exceed 15 seconds in duration.  Here, the Tasing of Mr. Towler was an upward departure of 350% over that recommended even by the RPD training manual, by Beaver v. City of Federal Way, and by the Taser corporation.    That is an upward departure from that duration recommended by training that well exceeds the "60%" of the normal 5-second cycle which the

Walton Court found egregious.

## C. **Failure to Use the Window of Opportunity.**

This section is a further elaboration of the previous discussion on excessive force from use of the Taser. Like in Beaver v. City of Federal Way, supra, other courts have found that the failure to utilize the "window of opportunity" both violates clearly-established rights and even implicates municipalities who fail to train on the window of opportunity. It was deliberate indifference to the foreseeable consequences to arrestees in the Lee case, supra, to not train its officers to use the window of opportunity. See Lee, 2009 U.S. Dist. LEXIS, at 1112, 1123, §3, 1126 ("If members of the 'arrest team' had been sufficiently instructed to get close to the suspect, swoop in and immediately detain the suspect during the 'window of opportunity,' many of the subsequent Taser applications and the subsequent struggle would not have occurred"). "It is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force could not exact compliance." Casey v. City of Fed. Heights, 509 F.3d 1278, 1286 (10th Cir. 2007). Also, when a law enforcement officer can prevent another from using excessive force (which clearly the window of opportunity is intended to prevent), officers who do nothing, or participate in the excessive force, are liable. Mick v. Brewer, 76 F.3d 1127, 1136(10th Cir. 1996)(failure to intervene to prevent another law enforcement officer from use of excessive force may be liable under § 1983); Fogarty v. Gallegos, 523 F.3d 1147 (10th Cir. 2008)(no qualified immunity for failure to intervene when defendant officer was present during unconstitutional arrest which lasted between three and five minutes).

Here, the officers do not dispute that they ignored their "window of opportunity" and, instead, opted to do exactly opposite of what their *alleged* policy implores: "minimize the number of [Taser] applications by working quickly to restrain the subject."

### D. Baton Strikes Accompanying the Left Hand Handcuffing.

Officer testimony is conflicted here about whether any use of force was necessary to gain compliance and handcuff Mr. Towler's *left* hand.  If Officer Arroyo is to be believed (that no force was needed to gain access and handcuff Mr. Towler's left hand), then the delivering of one to five baton strikes on Mr. Towler in conjunction with that handcuffing attempt was patently excessive.  Fogady v. Gallegos, 523 F.3d 1147, 1161-62 (10th Cir.)(p. 388); Monday v. Oullette, 118 F.3d 1099, 1104 (6th Cir. 1997)(pepper spray); Champion v. Outlook Nashville, Inc., 380 F.3d 893, 902 (6th Cir. 2004)(asp baton) cited with approval by Walton v. Gomez, 745 F. 3d 405, 424 (10th Cir. 2014).   The limited uses of an asp  baton, if purposeful, not gratuitous or repeated, and if other less forceful means fail, is permitted.  Id.  It is not permitted to strike with no purpose.

### E. From Nine to Fourteen Boot Strikes and Two (or "Numerous") Baton Strikes in Ten Seconds for Right Hand Handcuffing Was Excessive[7]

Again, the testimony is that no attempt was made by Officers Arroyo or Thomas or Kelton to gain Mr. Towler's right arm for handcuffing.  Over only a period of 10 seconds, two officers kicked him at least nine times and as many as fourteen times, and one delivered at least two asp baton blows.  It boggles the mind that such violent resort could even transpire that quickly, but the officers agree that the blows took place over only ten seconds.  As other, less forceful methods had not yet proved ineffective as Mr. Towler was already face down prone, with officers around him and at least one officer on his back holding his left arm behind his back, and because of the overly-aggressive use of force, this cannot be qualifiedly immune from liability.  The availability of alternative methods of capturing or subduing a suspect" is a factor

---

[7] For sake of space, Plaintiff does not separately discuss the unconstitutionality of grinding Mr. Towler's face into the gravel.  Any gratuitous act of violence, or shoving a face into the gravel while crushing the breath out of a subdued arrestee, is a violation of clearly established right, and the law and arguments raised in this and the previous section apply with equal force to Mr. Towler's facial injuries.

to consider in assessing the reasonableness of an officer's actions. <u>Chew v. Gates</u>, 27 F.3d 1432, 1441, n. 5 (9th Cir. 1994). No attempt was made by the officers to use their leverage over Mr. Towler to restrain his right arm, or to use an arm bar maneuver on Mr. Towler's already-cuffed left hand/arm, or any of the other less-violent or painful means. Moreover, had the officer utilized the "window of opportunity," they could have restrained and cuffed the hands while Mr. Towler remained incapacitated, without the struggle they allege.[8] <u>Oliver v. Fiorino</u>, at 337 (repeated tasering unnecessary if officers had attempted to handcuff during Taser shock cycles).

**F.  Positional Asphyxiation.**

In the Tenth Circuit, it is clearly established that putting substantial or significant pressure on the back of a suspect while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force. <u>Weigel v. Broad</u>, 544 F.3d 1143, 1155 (10th Cir. 2008); *see also* <u>Walton v. Gomez</u>, 745 F. 3d 405, 424 (10th Cir. 2014). In <u>Walton</u>, 142.5 pounds of one deputy's weight on the handcuffed subject could be construed as substantial or significant. Here, three to five deputies weighing together more than 600 pounds clearly meets the threshold; and here they never attempted to sit Mr. Towler up during the arrest, or roll him over, or provide him with relief from their combined weight on his torso for many more minutes than a person can survive without breath. <u>Lee v. Metro. Gov't of Nashville & Davidson County</u>, 596 F. Supp. 2d 1101, 1116-17 ¶¶34- 35 (2009)(failure to move suspect to seated position, creating asphyxiating condition, was a violation of clearly established rights).

**G.  Denial of Medical Care Post-Arrest.**

<u>Estelle v. Gamble</u>, 429 U.S. 97 (1976) established that prisoners were entitled to

---

[8]  A Taser has two modes, a "dart" mode and a "drive stun" mode. See <u>Mattos v. Agarano</u>, 661 F.3d 433, (9th Cir. 2011). In dart mode, a taser shoots probes into a subject and overrides the central nervous system, whereas the drive stun is a direct application of the weapon on skin of the victim and it delivers a painful electric shock, but does not incapacitate the victim's central nervous system. It is a pain compliance tool with limited threat reduction, unlike the dart mode. See <u>Walton</u>, 745 F.3d at n. 10 (10th Cir. 2014).

medical care. The "Estelle rule" from that case has been extended to the treatment of pretrial detainees. Garcia v. Salt Lake City, 768 F.2d 303, 307 (10th Cir. 1985). Mr. Towler's rights arose after subdual, but in the course of arrest, and, thus, he is not a "pre-trial detainee," and he should enjoy protection of his rights under the Fourth, not Fourteenth Amendment.[9]   However, summary judgment is not appropriate under either standard and Plaintiff should prevail. Plaintiff analyzes this matter under the harsher Fourteenth Amendment standard out of an abundance of caution.

Under the Fourteenth Amendment standard, a Plaintiff must establish, for this claim, "both an objective and a subjective" component. Mata v. Saiz, 427 F.3d 745, 751 (10th Cir. 2005). First, in that standard, a plaintiff must establish a "serious medical concern," i.e. one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. Second, a plaintiff must establish deliberate indifference to the serious medical condition of the subject in the "official's culpable state of mind." That is, a plaintiff must show that the "official acted or failed to act despite his/her knowledge of a substantial risk of serious harm." Id., and Farmer v. Brennan, 511 U.S. 825, 842 (1994).

Even under the harder 14th Amendment standard, plaintiff prevails. In the instant case, the serious medical condition in this matter had been warned of in multiple places in training manuals for Taser:

- arrest-related death from "repeated, extended, prolonged" Taser applications,
- "physiological and  metabolic stresses that can contribute to arrestee's deaths, including excited delirium,"
- anoxia or hypoxia from positional asphyxiation;
- shock from a physical arrest;
- the need for emergency resuscitation,  including rescue breathing after severe strain.

---

[9]  Any force used "leading up to and including an arrest" may be actionable under the Fourth Amendment's prohibition against unreasonable seizures. Porro v. Barnes, 624 F.3d 1322, 1325-26 (10th Cir. 2010). However, any claim of excessive force brought by a pre-trial detainee – one who has had a determination of probable cause as a prerequisite to his custody – is governed by the Fourteenth amendment. Bell v. Wolfish, 441 U.S. 520, 536 (1979).

Every juror can appreciate how 50,000 volts of electricity through a person's body can cause the aforementioned harms, (not to mention at least temporary paralysis and excruciating pain). Cavanaugh v. Woods Cross City, 625 F. 3d 661 (10th Cir. 2010)(a taser "sends up to 50,000 volts of electricity through a person's body...making the 'nature and quality of the intrusion...quite severe").    In this case, the duration and extent of Taser applications exceeded training maximums by more than 350% of acceptable levels.  Also, with more than 600 pounds from the 3-5 officers' weight on Mr. Towler, for four and one-half to five or more minutes, any juror could easily recognize the potential for harm.

As to the second prong, the actors here were supposed to be trained in exactly these harms as foreseeable risks.  The training manuals supplied by RPD warn of exactly these risks, all of which the officers ignored.  When EMTs arrived, moreover, the officers misrepresented the severity of their conduct.    They said they tased Mr. Towler only five times, that he was on the ground for only about 30 seconds; they hid their positional asphyxiation and their failure to respond to his medical emergency for more than 4 minutes.  They ignored Mr. Towler's known or suspected needs.

In Walton, where the arresting officers did not check the subject's vital signs or attempt to determine whether he needed immediate medical attention, but, instead, placed him face down on the cell floor and left him alone for approximately 3 to 5 minutes, with reason to suspect he might need medical help, the court found that such conduct sufficed to deny qualified immunity to those officers.    745 F.3d at 415-16.  Here, the officers ignored the training RPD claims it provided on medical care post-tasering; they did not determine his medical needs despite clear mandates in their training.    Not one officer instituted CPR immediately, and, then, once commenced, not one officer performed rescue breathing on a man not breathing.

Here, the officers chose not to perform rescue breathing during CPR, intentionally, because they feared threat to their own health despite having already robbed Mr. Towler of breath and a pulse. McRaven v. Sanders, 577 F.3d 974, 983 (8th Cir. 2009)(An officer trained in CPR who fails to perform it on a prisoner in obvious need is liable for his deliberate indifference under § 1983), cited in Walton, 745 F.3d 405, 432 (10th Cir. 2014)(failing to check vital signs, perform CPR, or seek medical care for 3 minutes when a prisoner was limp and unconscious is a clearly unconstitutional use of force).

**H. Municipal Liability.**

Defendants' Section C of its brief seeks dismissal of Plaintiffs' complaint for, apparently, failure to state a claim under which relief can be granted under Rule 12(b)(6). A municipality is not entitled to assert the defense of qualified immunity, Hope v. City of Independence, Mo., 455 U.S. 622 (1980).

Hence, under Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168 (1993), plaintiff must only comply with Rule 8 and its "notice pleading" to sustain their action. Plaintiffs' complaint at paragraphs 48-50 and 55 outline in allegation form specific policies, practices, customs and usages of the RPD, inadequate training, acquiescence to unconstitutional practices and other cognizable municipal liability theories, as patterns of practice. It does not seek to hold RPD and the City of Roswell vicariously liable, as Defendants suggest or liable for a "single isolated incident."[10]

The gravamen of the Defendants' request is likely its statement that:

"Plaintiffs cannot show that the officers violated Towler's constitutional rights. Therefore, Plaintiffs' municipal claims against the City of Roswell should be dismissed."

---

[10]   Although, please see Diaz v. Salazar, 924 F. Supp. 1088, 1099 (p. N.M. 1996)(denying summary judgment to city on inadequate training claim where four officers simultaneously violated accepted standards of police training). Here, three officers simultaneously ignored Taser "window of opportunity" training, positional asphyxia training and multiple officers, including supervisors, ignored post-arrest, post-Taser accepted medical care policies.

See Motion at 16.

Plaintiffs have stated and supported constitutional claims against the officers in their Response and their municipal liability claims should survive in order to engage in the discovery phase.[11]

## I. Spoliation Claim

The New Mexico Tort Claims Act waives immunity, and this waiver of immunity would apply to intentional acts. *See*, NMSA 1978, § 41-4-4(E). *See also*, Risk Mgmt. Div., Dep't of Fin. & Admin. V. McBrayer, 2000-NMCA-104, ¶ 12, 129 N.M. 778, 14 P.3d 43 (recognizing that even when a public employee acts with actual intentional malice to injure another, or deprive another of constitutionally protected civil rights, the state must still defend the employee and pay any damages that result).

The building waiver of § 41-4-6 waives immunity for the faulty operation or maintenance of any building by a public employee acting within the scope of duty. *See*, Cobos v. Dona Ana County Hous. Auth., 1998-NMSC-049, ¶ 8, 126 N.M. 418, 970 P.2d 48. This goal includes the safety of the public's property. See, § 41-4-6(A).

The Court may look to the dictionary definition of the terms of the statute, insofar as the definition is consistent with the statute's goal. *See*, Castillo, 1988-NMSC-037, ¶ 8. The dictionary defines "maintenance" as "the keeping up of a building". *See*, IX Oxford English Dictionary, at 225 (Second ed. 1998) (parentheses omitted). Plaintiffs submit that the removal of trash is an ordinary and essential component of keeping up a government-run building. Accordingly, the term "maintenance" in § 41-4-6 includes the disposal of trash.

In the present case, Plaintiffs' allegations are sufficient to encompass the scenario in

---

[11] Even if not, a municipal claim is not absolutely foreclosed even if individual defendants are not held responsible. Thurman v. Cook County Sheriff's Dept., 604 F. 3d 293, 305 (7th Cir. 2010).

which the subject evidence was held in a building or on property operated by Defendants, and that Defendant disposed of that evidence as trash or erased it from computers in common computer maintenance.  *See*, ¶ 37 of Second Amended Complaint.  Accordingly, Plaintiffs' allegations come within the waiver of immunity provided by Section 41-4-6.

Defendants rely on <u>Sean E. v. Fraga</u>, No. CIV 07-1191 RB/KBM, 2008 U.S. Dist. LEXIS 123814, 2008 WL 8937906 (D.N.M. Oct. 30, 2008).  However, the court in <u>Sean E.</u> did not consider or cite to any definition of the term "maintenance."  *See* <u>Id.</u>, 2008 U.S. Dist. LEXIS 123814, *32-34.  Plaintiffs therefore submit the court's reasoning in <u>Sean E.</u> is inapposite.

**Plaintiffs Also Have the Right to Seek Sanctions for Spoliation, under Federal Law**

Federal law, not state law, governs this Court's power to impose sanctions for spoliation of evidence.  *See*, <u>Peshlakai v. Ruiz</u>, No. CIV 13-0752 JB/ACT, 2014 U.S. Dist. LEXIS 66740, *2-5 (D.N.M. April 28, 2014).  Such sanctions are imposable under the Court's inherent power. *See* <u>Id.</u> at *2 (citation omitted).  *See also*, <u>Moreno v. Taos County Bd. of Comm'rs</u>, 587 Fed. Appx. 442, 444 (10th Cir. 2014) (in action brought against sheriff's deputies under the New Mexico Tort Claims Act and 42 U.S.C. § 1983, court recognized that sanctions for spoliation of evidence would be imposable if the defendant had a duty to preserve the evidence because it knew or should have known that litigation was imminent, and the plaintiff was prejudiced by the destruction of the evidence) (citing <u>103 Investors I, L.P. v. Square D Co.</u>, 470 F.3d 985, 989 (10th Cir. 2006)).

Defendants' Motion does not address this Court's power to impose sanctions for their spoliation of evidence.  Accordingly, even if the Motion were granted, such ruling would not preclude the imposition of spoliation sanctions.

**J.       Unreasonable Detention**

Plaintiffs allege an unreasonable seizure and arrest of Mr. Towler without probable cause. *See* Second Amended Complaint at ¶¶ 51-53.  If the jury concludes that Mr. Towler charged the officers without provocation, obviously, probable cause for his arrest existed.   However, the issue of probable cause for the arrest is a "jury question."  Thatcher v. City of Columbus, 328 F.3d 244, 255 (6th Cir. 2003).  If the jury determines that Mr. Towler was hit by Taser darts in his back and the back of his head while walking down the alley away from officers, a different result obtains.   Where, as Officer Kelton has testified, an officer has no basis to suspect that an individual is involved in criminal activity, a person has a constitutional right to decline to identify himself.  Brown v. Texas, 443, U.S. 47 (1979).  Especially does that right exist when the officer has never asked for identification, as here.   One who is engaged in a voluntary conversation with a police officer has the right to terminate the conversation and leave at any time, if s/he is not subject to a lawful detention.  Manzanares v. Higdon, 575 F.3d 1135 (10th Cir. 2009).

Even if it were determined that it was permissible to temporarily detain Mr. Towler for investigative purposes, an officer may not fire taser darts into Mr. Towler's back and back of head to affect that stop.  Plaintiffs are entitled to the inference that this happened here.  It is, at least, a question for the jury as to the reasonableness of the means of detention.  Buck v. City of Albuquerque, 549 F.3d 1269 (10t Cir. 2008) (jury could conclude that shooting pepper ball rounds at a protestor lying in the street who was not resisting was excessive).

**WHEREFORE,** for the foregoing reasons, Plaintiffs respectfully request that this Court deny the Defendants' requested relief.

Respectfully submitted

**JOEL T. NEWTON, P.A.**

By: _____

　　　JOEL T. NEWTON
　　　1020 S. Main Street
　　　Las Cruces, NM 88005
　　　(575) 525-8202


and

Kenneth G. Egan
1111 E. Lohman
Las Cruces, NM  88001
(575)523-2222
*Attorney for Plaintiffs*


## CERTIFICATE OF MAILING

I hereby certify that on the _15ʰ_ day of December, 2015, I caused the foregoing pleading, along with this Certificate of Service to be served and filed electronically through the EC/CMF File & Serve electronic filing system, which caused all parties or counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing, and mailed by first-class mail, postage prepaid, a copy of the foregoing to the following opposing counsel of record:

Stephen S. Shanor, Esq.
Richard E. Olson, Esq.
P O Box 10
Roswell, NM  88202-0010
*Attorney for Defendants*

_____
Joel T. Newton