STATE OF NEW MEXICO
COUNTY OF CHAVES
FIFTH JUDICIAL DISTRICT
NO:  D-504-CV-2014-00513

RACHEL SMITH, as next
friend and Mother of
SEBASTION TOWLER, ETHAN
TOWLER, and JESSE
TOWLER, and CHARLIE
NELMS, as next friend
and Mother of NOAH
TOWLER-NELMS and
SCHERRIE TOWLER,
individually, and as
Personal Representative
of the Estate of CODY
TOWLER, Deceased,

                        Plaintiffs,

  -vs-

CITY OF ROSWELL, A NEW
MEXICO MUNICIPALITY,
PHILLIP SMITH, JONATHON
KELTON, JORGE
ARROYO-JAIME, AND DYLAN
THOMAS, INDIVIDUALLY AND
AS AGENTS AND EMPLOYEES
OF THE CITY OF ROSWELL,

                        Defendants.

        DEPOSITION OF JORGE ARROYO-JAIME

                SEPTEMBER 18, 2015
                8:30 A.M.
                400 North Pennsylvania
                ROSWELL, NEW MEXICO
        PURSUANT TO THE NEW MEXICO RULES OF CIVIL
PROCEDURE, this deposition was:

TAKEN BY:  JOEL T. NEWTON, ESQ.
           ATTORNEY FOR PLAINTIFFS
REPORTED BY:  LORENA H. ROMERO
              CCR #184
              Romero Reporting, Inc.
              512 N. Lea
              Roswell, New Mexico  88201

        Romero Reporting
        575-625-1710



EXHIBIT
4

**Page 33**

1  it or -- remember what I did, I mean -- I gave my
2  statement and that's what matters to me as far as I
3  gave what I saw and I have no need to review.
4  Q.  All right.  So you're comfortable with
5  what you said back then?
6  A.  Yes.
7  Q.  Is that fair?
8  A.  Yes, sir.
9  Q.  Okay.  Now let's move on then.  If you
10  think you have given me a really full explanation of
11  what you did to prepare for your deposition, I'll
12  leave it alone.  Are you sure there's no other
13  documents that you've looked at that you haven't
14  told me about, right?
15  A.  No, sir.
16  Q.  Okay.  Now your counsel has provided us
17  with copies of your personnel file and training
18  file, right?
19  A.  Yes.
20  Q.  Okay.  In this document, some of these
21  documents that we're going to look at today, we've
22  got portions of your personnel file, all right?  I'm
23  going to ask counsel after we're done to take the
24  original exhibits here and trade them out with the
25  ones that are redacted.  Is that okay?
Romero Reporting
575-625-1710

**Page 34**

1  A.  Yes, sir.
2  Q.  But we may look at some documents that may
3  have your Social Security number, but we're going to
4  take that all out and get it out of the way.
5  A.  Yes, sir.
6  Q.  All right.  Now in your personnel file we
7  were able to read some interviews of various people
8  that were contacted when you went to work for the
9  RPD.  Did you know that happened?
10  A.  Yes.
11  Q.  Almost everybody that I recall said that
12  you like to work out and that you were a member of a
13  gym and things like that.
14  A.  Right.
15  Q.  Is that what your recollection was when
16  you started the RPD?
17  A.  Yes.
18  Q.  When you were working out, what gym did
19  you go to?
20  A.  I used to go to the one at the ENMU-R.
21  Q.  That's the Eastern New Mexico, Roswell
22  branch?
23  A.  Yes, sir.
24  Q.  All right.  And how long did you go there?
25  A.  I would go about -- I would go, I don't
Romero Reporting
575-625-1710

**Page 35**

1  remember exactly how long I went there, just go
2  about two or three times a week.  But I mean not
3  just to do weights, basketball and stuff like that.
4  Q.  Right.  You stay in shape, right?
5  A.  Yes.
6  Q.  And in February of 2013 you were in pretty
7  good shape, weren't you?
8  A.  Yes.
9  Q.  Did you ever run with the other officers
10  like Kelton or Thomas or Craine or Burkowski?
11  A.  No, sir.
12  Q.  Did you run on your own?
13  A.  Yes.
14  Q.  Every day?
15  A.  I wouldn't go out and run -- I play soccer
16  as a sport so that's enough running for me.
17  Q.  So how long did you play soccer?
18  A.  I tried.  I still do to present every now
19  and then.
20  Q.  Did you play soccer in high school?
21  A.  No.
22  Q.  You were not on an organized team at all?
23  A.  Not at the school.  When I graduated high
24  school I was.
25  Q.  What team are you on?
Romero Reporting
575-625-1710

**Page 36**

1  A.  It's a men's league we have here in
2  Roswell.
3  Q.  So you started right at around 2008 and
4  you've been playing till today, is that correct?
5  A.  Yes.
6  Q.  What do you play?  What position?
7  A.  Defender.
8  Q.  Are you guys pretty good?
9  A.  Maybe.
10  Q.  Are you pretty good?
11  A.  I would say so.
12  Q.  So the answer is yes, right?
13  A.  Yes.
14  Q.  You've got a good strong kicking foot?
15  A.  Depends.  I don't think I -- I see my
16  other friends and they have stronger legs than I do
17  so.
18  Q.  Okay.  All right.  Fair to say that in
19  February of 2013 you were in good shape; is that
20  fair?
21  A.  That's --
22  Q.  How much did you bench press back then?
23  A.  I don't know.  I sucked at math.
24  Q.  He sucks at math?
25  A.  Yes.  I wouldn't be able to tell you how
Romero Reporting
575-625-1710

## Page 37

1　much I was at basically. I'd say about 45 on each
2　side.
3　　Q.　So you're saying you would do the bar with
4　two 45s?
5　　A.　On a good day.
6　　Q.　The bar weighs about 45, right?
7　　A.　Yes.
8　　Q.　So you're talking about 135?
9　　A.　Yes.
10　　Q.　Did you ever get up the 45s on each side
11　plus tens or twenty-fives?
12　　A.　I think max is 35s, that's it.
13　　Q.　So 45 and 35?
14　　A.　That's right.
15　　Q.　So 45 and 35 is going to be about 215 or
16　so?
17　　A.　About.
18　　Q.　If my math is right and I suck at math,
19　too.
20　　A.　Yes.
21　　Q.　Okay. So free weights, you were benching
22　about 200 to 220; is that a good range?
23　　A.　Good range.
24　　Q.　And that's -- are you doing that today?
25　　A.　Yes, I still am.

Romero Reporting
575-625-1710

## Page 38

1　　Q.　All right. So your weight and your
2　strength has been consistent since about
3　February 2013, is that right?
4　　A.　My weight? No, I've actually gained some
5　pounds.
6　　Q.　All right. So what's your weight today?
7　　A.　I weigh about 190.
8　　Q.　And what did you weigh in February, 2013?
9　　A.　175, around there.
10　　Q.　All right. So back in February 2013 you
11　were benching about the same as you bench now, 200
12　to 220; but you weighed about 15 pounds less; fair?
13　　A.　Right.
14　　Q.　How tall are you?
15　　A.　Five-nine? Five-eight?
16　　Q.　Haven't had a growth spurt since February,
17　right?
18　　A.　No.
19　　Q.　Now are you a member of any clubs or have
20　you done any training in any fighting or martial
21　arts?
22　　A.　No, sir.
23　　Q.　Did you learn any defensive or hand to
24　hand combat tactics when you were in the Navy?
25　　A.　No. I did not.

Romero Reporting
575-625-1710

## Page 39

1　　Q.　All right. When you did learn hand to
2　hand combat or defensive combat or anything like
3　that, was it just with the Law Enforcement Academy
4　in New Mexico?
5　　A.　Yes. And at the Police Department.
6　　Q.　And at the RPD?
7　　A.　Yes.
8　　Q.　All right. We have got your curriculum --
9　not your curriculum. We've got your scoring from
10　the Law Enforcement Academy but I don't know what we
11　have as it relates to any of that hand to hand
12　combat kind of training information from the RPD.
13　　　　What have you had with RPD as it relates
14　to how to manage physical situations when you have
15　to use force and have to deal with that?
16　　A.　It was -- it's been -- it was when I first
17　got on with the Police Department. It was
18　handcuffing, some take-downs as far as arm bars and
19　stuff like that; holds, arm holds. That's about it.
20　　Q.　You've been on the force now, I think, for
21　four to five years; is that about right?
22　　A.　Going on four.
23　　Q.　Going on four?
24　　A.　Yes.
25　　Q.　So not quite?

Romero Reporting
575-625-1710

## Page 40

1　　A.　Yeah.
2　　Q.　Not quite four years?
3　　A.　Yes, sir.
4　　Q.　In that time, have you felt like you have
5　ever needed to have any additional training to allow
6　you to handle use of force situations, besides the
7　handcuffing techniques, take-down techniques, arm
8　bar techniques and arm holds?
9　　A.　No, sir.
10　　Q.　You feel like you've been adequately
11　prepared, is that right?
12　　A.　Yes, sir.
13　　Q.　Did you feel like there's any point
14　there's a situation you couldn't handle with your
15　training as it relates to an arrest scenario?
16　　A.　Excuse me. Could you repeat?
17　　Q.　Do you feel like you've ever had an arrest
18　scenario put in front of you that your training
19　hadn't equipped you to handle?
20　　A.　No.
21　　Q.　Did you ever have an arrest scenario that
22　you didn't feel personally that you were up to or
23　capable of handling?
24　　A.　No.
25　　Q.　Every time you've been in an arrest

Romero Reporting
575-625-1710

Page 53

1  you probably were?
2      A.   Just in the work we're into, the duty we
3  have to do and sometimes people listen, sometimes
4  don't.  Sometimes people don't want to get arrested,
5  therefore force has to be used.
6      Q.   Right.  All right.  When -- I can't recall
7  exactly when you got your -- you got done with your
8  FTO training; do you recall what month that was?
9      A.   I don't.
10      Q.   I can look and see real quick.  Might as
11  well not have you and I both guessing.
12          I have a document Roswell Towler 2903
13  where a guy named Adam Rhodes, I believe he's
14  Officer 294 says, I believe Arroyo-Jaime has
15  satisfied the requirements of field training of
16  phase three on 9-27-12.
17      A.   That's about right.
18      Q.   Does that sound about right?
19      A.   Yes, sir.
20      Q.   Does that mean that after 9-27-12 you got
21  to start driving around by yourself?
22      A.   Yes, sir.
23      Q.   And did you start driving around by
24  yourself at that point?
25      A.   Yes.

Page 54

1      Q.   You were always assigned to a patrol car
2  and you didn't have someone riding alongside you, is
3  that right?
4      A.   That's right.
5      Q.   Therefore, it sounds like to me that
6  basically beginning at about October --
7      A.   Yes, sir.
8      Q.   -- of 2012 through February of 2013 you
9  had about four months where you had been on the
10  field by yourself?
11      A.   Yes, sir.
12      Q.   Is that about right?
13      A.   That's about right.
14      Q.   In those four months, do you recall any
15  uses of force events?
16      A.   No, I don't.
17      Q.   Do you recall any events involving a Taser
18  where you Tasered someone who was not a police
19  officer and not going through training?
20          MR. SHANOR:  In the months before?
21          MR. NEWTON:  In the months before.
22  From October, 2012 through February, 2013.
23      A.   I don't recall.
24      Q.   Do you recall in your FTO training ever
25  being involved in a Tasering incident?

Page 55

1      A.   I don't recall.
2      Q.   Do you ever recall, in those months prior
3  to February 2013, responding to a situation where a
4  Taser had been deployed?
5      A.   I don't.  I don't recall.
6      Q.   May I infer, then, that it likely did not
7  happen since you do not recall one?
8          MR. SHANOR:  I'll object to form.
9      A.   Like I say, I don't recall.  Could have
10  happened maybe but I don't remember.
11      Q.   All right.  Would you agree that a use of
12  force is not a daily occurrence?
13      A.   That's correct.
14      Q.   Would you agree that a use of force is
15  rather the exception than the rule?
16      A.   Yes.
17      Q.   Would you agree that you probably haven't
18  done more than five or six uses of force reports?
19      A.   From the point I was hired to now?
20      Q.   Yes, sir.
21      A.   Yes.
22      Q.   So in the almost four years you probably
23  haven't done five or six, is that fair?
24      A.   That's fair.
25      Q.   Do you have any recollection of how many

Page 56

1  you actually have done?
2      A.   No, I don't.  I don't have an exact
3  number.
4      Q.   That's fine.  But that's a fair number you
5  think, five or six?
6      A.   Yes.  That's about right.
7      Q.   And a use of force could be anything from
8  having to do wall containment on someone to Tasering
9  or baton strikes or kicking or a handgun, right?
10      A.   Yes, sir.
11      Q.   Had you had any incident occur prior to
12  the Cody Towler event where someone, where you had
13  an in-custody death?
14      A.   No.
15      Q.   Have you had an in-custody death since the
16  Cody Towler incident?
17      A.   No, sir.
18      Q.   Have you had any kind of an incident where
19  you were placed on any leave of absence or
20  suspension for any period of time?
21      A.   No, sir.
22      Q.   Except the Cody Towler incident, correct?
23      A.   Yes, sir.
24      Q.   In the Cody Towler incident you were
25  placed on administrative leave.

## Page 133

1    five to seven yards away from where the body lay?
2       A.   Just about.
3            MR. SHANOR:  Object to the form.
4       A.   About.
5       Q.   Okay.
6            MR. NEWTON:  Did I do something wrong
7    here?
8            MR. SHANOR:  Well, you said six steps
9    and I don't know whether you're talking in terms of
10   paces?  Whether you're talking in terms of
11   measurement?
12      Q.   That's a good clarification then because
13   as we talked about earlier, we have to be thorough
14   and I apologize, it seems tedious.  But Mr. Shanor
15   is right, we really do need to be as exact as we can
16   with things, okay?
17      A.   Okay.
18      Q.   So you saw me step off.  Did it appear I
19   was stepping roughly 3 feet per stride?
20      A.   Yes.
21      Q.   Okay.  Would you feel comfortable saying
22   that based upon what we've just gone through that
23   the grill of the car was five to seven yards, in
24   that range, from the body when you parked and
25   stopped?

## Page 134

1       A.   Approximately, yes.
2       Q.   And when you got out?
3       A.   Yes, sir.
4       Q.   All right.  Now were your red and blues on
5    at that time?
6       A.   I don't believe so.
7       Q.   I will tell you that Officer McKinnon said
8    he saw no red and blues.  Would that be consistent
9    with your recollection?
10      A.   I don't know what -- well yes, because I
11   don't --
12      Q.   Okay.  Including your rear red and blues,
13   right?  Not just your overheads or your grill
14   lights.
15      A.   We only have overheads.  That's all we
16   have.
17      Q.   Okay.  Were your headlights on?
18      A.   Yes.  And my spotlight was on.
19      Q.   And your spotlight was on, is that right?
20      A.   Yes, sir.
21      Q.   Okay.  So your headlights and your
22   spotlight were facing toward the body, is that
23   correct?
24      A.   Correct.
25      Q.   I'm not completely ready to go into the

## Page 135

1    whole event but I do want to know, can you -- at
2    this point, tell me where the officers were as you
3    first drove up and put your unit into park in
4    relation one to the other and to Mr. Towler.
5       A.   I can't be specific on wherever they were
6    at, I just know they were in front of my unit.
7       Q.   All right.  Do you know whether Officer
8    Kelton was to the right or left of Officer Thomas?
9       A.   Be honest with you, I don't remember.
10      Q.   That's okay.  Do you know whether they
11   were between you and where the B is for where Mr.
12   Towler's body eventually lay?
13      A.   I can answer that one, yes.
14      Q.   And is it fair to say that they were
15   facing toward Mr. Towler so facing north, is that
16   fair?
17      A.   Yes.
18      Q.   Which direction was Mr. Towler facing?
19      A.   I don't remember that.
20      Q.   Okay.  And when you parked, did you park
21   more toward the north side or more toward the south
22   side of the alley where your unit is depicted on
23   Exhibit 22?
24      A.   I can only answer that it was in that
25   area, I don't know if it was to the south or to the

## Page 136

1    north.
2       Q.   I understand.
3       A.   I just know it was in that area.
4       Q.   All right.  As it appears your red and
5    blues were not going, is it fair to say that when
6    you responded, you were responding under RPD code
7    one?
8       A.   No.  I did not respond code one.
9       Q.   How did you respond?
10      A.   I responded with a code two, which is
11   lights only.
12      Q.   Lights only being?
13      A.   Overheads.
14      Q.   Red and blues?
15      A.   Correct.  No siren.
16      Q.   Did you at any point turn your red and
17   blues off?
18      A.   Yes.  Once I arrived on scene.
19      Q.   Okay.  Do you believe you came down this
20   alleyway with red and blues on?
21      A.   No, sir.
22      Q.   Where did you turn your red and blues off?
23      A.   As I arrived on scene.
24      Q.   When you say arrived on scene, what do you
25   mean?

Page 137

1     A.  I arrived to the location where the
2  incident took place, the initial contact, I believe.
3     Q.  Do you recall where that is?
4     A.  On Buena Vista and Ridgecrest.
5     Q.  Let's do this, I'm going to ask you to
6  just take your green marker, please, I'm going to
7  ask you to write an O and an S for on scene, okay?
8     A.  Okay.
9     Q.  Where you -- where it was that you arrived
10  and when you turned your red and blues off?
11     A.  Okay.  So I arrived on scene.  Like I say,
12  I'm not going to be specific because I don't
13  remember specific but it was this area right here.
14     Q.  Okay.  So here's what I'd like you to do,
15  I'd like you to write an O and a S where you believe
16  you arrived on scene.
17          Would you please tell me, by making an
18  arrow, the direction from which you came when you
19  arrived on scene.  All right.  I take it then that
20  you started off down here at the south side?
21     A.  Yes, sir.
22     Q.  And you stopped where you have an O and a
23  S, is that fair?
24     A.  No, I did not stop there, I turned off my
25  lights there.

Page 138

1     Q.  Okay.  Let's do this, let's put the arrow
2  down here from the south side up here.  At the point
3  where you have the O and the S, that's where you
4  turned off your lights, correct?
5     A.  Correct.
6     Q.  At that point, were your windows of your
7  unit open or closed?
8     A.  Closed.
9     Q.  And why did you turn off your lights at
10  the O S point?
11     A.  Just one of those things where I've always
12  done it.  One, I mean subjects are able to see our
13  lights and I didn't know what was going on here so I
14  wanted to be less visible.
15     Q.  All right.  And did you slow down or stop
16  at the O S?
17     A.  I slowed down.
18     Q.  How slow did you go?
19     A.  I don't know.  Can't tell you.  About 20,
20  less than 20 miles per hour.
21     Q.  All right.  And when you were -- when you
22  were at the O S going 20 miles per hour, what was
23  your intention?
24     A.  Locating the other officers that were on
25  scene.

Page 139

1     Q.  Okay.  And did you know when you got to
2  point O S who or which officers were on scene?
3     A.  No.
4     Q.  Did you know what the call had been as it
5  related to this particular incident that they
6  were -- responding to?
7     A.  No, sir.
8     Q.  So is it fair to say that when you came
9  this direction and were at point O S, you did not
10  know the call but you did know that a 10-3 had been
11  called, is that fair?
12     A.  Yes, sir.
13     Q.  And a 10-3 means you're clearing the air,
14  is that fair?
15     A.  That's fair.
16     Q.  So at that point, I'm gathering from you
17  guys that if you're free and somebody 10-3s the air,
18  an officer is usually going to move that direction,
19  is that fair?
20     A.  That's fair.
21     Q.  All right.  I'm going to, I think, stop at
22  this moment and take a break.  Is it okay with you
23  if we just go off record?
24     A.  Yes, sir.
25          (Whereupon, the deposition was in
recess from 11:45 to 12:51 and resumed with all

Page 140

1  parties present.)
2     Q.  (By Mr. Newton)  Okay.  Officer Arroyo,
3  we've just taken a lunch break.  You recognize that
4  you are still under oath, right?
5     A.  Yes, sir.
6     Q.  You recognize the oath that you've given
7  requires you to tell the truth as if you are in
8  court?
9     A.  Yes, sir.
10     Q.  Have you ever been trained to testify?
11     A.  Yes.
12     Q.  And have you ever given your deposition
13  before?
14     A.  Twice, I believe.
15     Q.  So doing exactly what we're doing right
16  now, you've done it twice before, correct?
17     A.  Yes, sir.
18     Q.  And what was the context of those cases?
19     A.  I don't remember exactly what they were
20  for but most of them involve somebody -- it was
21  another officer's case, I was just present but I
22  don't remember what it was.
23     Q.  Was it a civil case?
24     A.  No.
25     Q.  Was it a criminal case?

## Page 149

1  when you deployed your Taser?
2  A. I'm still in this area right here.
3  Q. As close as you can get me, is that 55
4  yards --
5  A. It's got to be between my unit and the
6  body.
7  Q. Do you still believe your unit was parked
8  as depicted or do you believe it was parked anywhere
9  else?
10  A. It was parked right there.
11  Q. Okay. So can you explain to me
12  anything -- can you explain anything that would help
13  me understand why Officer Kelton put the point of
14  tasing back at Point No. 9 on his Exhibit 8 and
15  you've got it roughly 50 yards further north?
16  A. I do not know. It's his statement.
17  Q. No explanation that you have?
18  A. No, sir.
19  Q. All right. All right. I'd like to spend
20  some time now, sir, if we can, with you walking me
21  through the incident. And I want to have you keep
22  your green marker --
23  A. Yes, sir.
24  Q. -- handy so that we can get the events
25  plotted out the best that we can. So I'm going to

Romero Reporting
575-625-1710

## Page 150

1  try and set the scene as I understand we had right
2  before lunch, okay?
3  A. Yes.
4  Q. My understanding is you heard on the radio
5  that one of the officers called code 10-3 which is
6  clear the air, correct?
7  A. Yes, sir.
8  Q. Do you know which one it was?
9  A. Officer Thomas.
10  Q. How did you know it was Officer Thomas?
11  A. I recognized his voice.
12  Q. And you say that you came from where ever
13  you were. Where were you before this?
14  A. I was on another call.
15  Q. Is that the call that you said was at 105
16  East Ballard?
17  A. Yes, sir.
18  Q. What kind of call was that?
19  A. I don't recall what it was.
20  Q. Do you know whether at that call, sir,
21  whether you engaged your recording device?
22  A. I do not. No.
23  Q. If you did engage your recording device,
24  would that be downloaded into the police officers'
25  computer?

Romero Reporting
575-625-1710

## Page 151

1  A. Yes, sir.
2  Q. You would never erase a recording, would
3  you?
4  A. No, sir.
5  Q. Why would you not do that?
6  A. Because it's against policy.
7  Q. All right. It would be -- it would be
8  dishonest, wouldn't it?
9  A. And tampering.
10  Q. Yes. All right. So my understanding is
11  that you made your way from the call at 105 East
12  Ballard, you slowed down at the O S which we've said
13  is on scene, correct?
14  A. Yes, sir.
15  Q. You turned off your red and blues,
16  correct?
17  A. Yes, sir.
18  Q. And it looks like you proceeded further
19  north on Union, correct?
20  A. Correct.
21  Q. What did you do next?
22  A. I went ahead and turned on West Buena
23  Vista, drove up until I observed their vehicles
24  here, there being Officer Kelton and officer -- or
25  Detective Thomas' patrol units.

Romero Reporting
575-625-1710

## Page 152

1  Q. Would you please draw in a box with an
2  arrow and put a K in one and draw the other and put
3  a T in it for Kelton and Thomas. Let's do it in
4  another color, let's do it in purple if we can and
5  kind of keep you in the green.
6  A. Okay. Again, I don't remember exactly
7  where they were. I'll just put the area where I
8  first saw them. Now I don't remember the order they
9  were at, but this is the alley here, correct?
10  Q. That is the alley.
11  A. Okay.
12  Q. Are they on the south or the north side?
13  The left or the right?
14  A. The vehicles?
15  Q. Yes.
16  A. I don't remember. I don't remember either
17  north or the south.
18  Q. All right. Go ahead.
19  A. They were here.
20  Q. All right. Do you know the order, which
21  one was in front, which one was behind?
22  A. I just remember seeing Officer Thomas'
23  vehicle in front of me.
24  Q. So I'm going to do this, you've got a
25  purple circle?

Romero Reporting
575-625-1710

## Page 169

1  wasn't even going fast, like I said.
2     Q.   All right.  So from point -- from Point 4
3  to five to six to rest you weren't going that fast?
4     A.   No.
5     Q.   How fast would you estimate you were
6  going?
7     A.   About 5 miles per hour.
8     Q.   With your windows open?
9     A.   Yes, trying to find -- trying to find
10  where they were at.
11     Q.   All right.  Did you look at your watch?
12     A.   I did not.
13     Q.   Did you look at -- did you at any point
14  try to activate your recorder?
15     A.   I did not.
16     Q.   Did you at any point call to dispatch to
17  let them know you were there?
18     A.   I do not remember.
19     Q.   Do you know if dispatch knew that you were
20  even on the scene?
21     A.   No, I do not know.
22     Q.   Dispatch logs indicate you were dispatched
23  long after the event took place.  Do you know why?
24     A.   I do not.
25     Q.   Is it required of an officer when he gets

Romero Reporting
575-625-1710

## Page 170

1  on scene that he notify dispatch that he is on
2  scene?
3     A.   Not necessarily.
4     Q.   There's a code, isn't there?  For being on
5  the scene?
6     A.   10-97.
7     Q.   All right.  Did you give a 10-97?
8     A.   I don't remember.
9     Q.   And is it your testimony that it's not
10  required to 10-97 to dispatch?
11     A.   Depends on the totality of the incident.
12     Q.   What do you mean?
13     A.   It's 10-3.
14     Q.   You have to help me out, I don't know what
15  that means.
16     A.   10-3 means hold the air for the officer,
17  therefore, don't talk.
18     Q.   Okay.  I'm going to infer something, you
19  tell me if I'm inferring it right.  Because it's
20  10-3, you don't believe it's necessary for you to
21  10-97 and notify dispatch that you're there on
22  scene?
23     A.   Yes, sir.
24     Q.   Okay.  So we get to the point where you
25  have parked your car where you have "unit" on

Romero Reporting
575-625-1710

## Page 171

1  Exhibit 22, right?
2     A.   Yes.
3     Q.   What do you do next?
4     A.   Arrived on scene, exited my vehicle, my
5  patrol unit.
6     Q.   Right.
7     A.   At this point -- you want what I saw,
8  right?
9     Q.   I want what you heard --
10     A.   Okay.
11     Q.   -- or saw.
12     A.   I exited my patrol unit.  I observed Mr.
13  Towler on his knees, flailing his hands, throwing
14  rocks in the air.  And actual -- also heard tasers
15  being deployed.
16     Q.   Okay.  Now my understanding is that you
17  couldn't see his hands when you were coming up to
18  Mr. Towler, correct?
19     A.   No, I did see his hands.
20     Q.   Well let me ask you to look at that, we've
21  got your statement here, so look at Exhibit No. 2,
22  please.  Go to Page 368, please.
23     A.   Okay.
24     Q.   Okay.  Beginning at Line 1, first line,
25  Scribner says:

Romero Reporting
575-625-1710

## Page 172

1     "Okay.  When you caught back up to Kelton
2  and Thomas and the guy was on his knees, did you see
3  anything in his hands?"
4     "It was pretty hard to see from where I
5  was at because like I said, he was -- he was on a
6  position where he could actually move his arms and
7  everything but I wasn't really able to see his
8  waistline at all whatsoever."  Do you see that?
9     A.   Uh-huh.
10     Q.   Are you saying, sir, that you could see
11  his hands or that you couldn't?
12     A.   I could see.
13     Q.   But you couldn't see his waistline
14  whatsoever, correct?
15     A.   Correct.
16     Q.   Is that because he was more laying down on
17  his knees and hands so you couldn't see his
18  waistline?
19     A.   I don't remember that.
20     Q.   Explain to me what you meant by "I
21  couldn't see his waistline at all, whatsoever."
22     A.   All I can say is the position, like I say,
23  I don't recall.  The position, I mean that was -- I
24  wasn't able to see his waistline.
25     Q.   Isn't it fair to say that the only reason

Romero Reporting
575-625-1710

Page 173

1  you couldn't see his waistline is because he wasn't
2  erect enough to be able to see his waistline?
3     A.  I don't -- I don't know.
4     Q.  Okay.  This was the same day as the event,
5  correct?
6     A.  Correct.
7     Q.  And you've indicated that you couldn't see
8  his waistline at all, whatsoever.
9     A.  Yes.
10    Q.  Is there any other explanation that you
11 can give me except he was not erect enough on his
12 knees for you to be able to see a waistline?
13    A.  Like I said, I don't know.
14    Q.  He certainly was never standing up while
15 you were there, correct?
16    A.  No.
17    Q.  And so the best you can say is that Mr.
18 Towler was on his knees, right?
19    A.  Yes.
20    Q.  And that you could, in the position
21 walking forward toward him, never see his waistline?
22    A.  Correct.
23    Q.  Are you aware of that?
24    A.  Yes.
25    Q.  Officer Thomas said that during his period
Romero Reporting
575-625-1710

Page 174

1  there, he only saw Mr. Towler on his knees one time.
2  Did you ever see him on his knees more than one
3  time?
4     A.  Just that once.
5     Q.  Okay.  So you didn't see anything in his
6  hands, I take it, except rocks, is that right?
7     A.  Yes.
8     Q.  But you're not saying that Mr. Towler was
9  throwing rocks intentionally, correct?
10    A.  I don't know what his intentions were.
11    Q.  You just saw gravel going up in the air,
12 right?
13    A.  Correct.
14    Q.  You don't know that he was trying to throw
15 rocks, that wasn't -- you weren't able to discern
16 that, correct?
17    A.  Correct.
18    Q.  All right.  Does that mean, sir, that his
19 front hands are in the gravel and that he's
20 flailing?
21    A.  Could be that he's on his knees also
22 throwing rocks in the air.
23    Q.  But you couldn't see his waistline?
24    A.  Correct.
25    Q.  So, sir, is he leaned forward when you
Romero Reporting
575-625-1710

Page 175

1  come up to him?  Basically pointing his head to you?
2     A.  I do not remember that.
3     Q.  Okay.  Now when you got there, sir, you
4  saw a baton on the ground, right?
5     A.  Yes.
6     Q.  About 10 feet away from him, correct?
7     A.  Yes.
8     Q.  Far -- was it toward the officers or
9  behind the officers -- behind Mr. Towler?
10    A.  Towards.
11    Q.  All right.  So the baton is far closer to
12 the officers than to Mr. Towler, fair?
13    A.  Fair.
14    Q.  All right.  Now when you arrive, you heard
15 Taser being cycled, correct?
16    A.  Yes.
17    Q.  Do you know how many cycles of the Taser
18 you heard?
19    A.  I heard two.
20    Q.  Was it two or around two?
21    A.  Around two I would say.
22    Q.  Could it have been three?
23    A.  Could have.
24    Q.  Do you believe it -- how long do you think
25 it took you to get from -- from your unit, out of
Romero Reporting
575-625-1710

Page 176

1  your unit to the point where you engaged Mr. Towler
2  yourself?
3     A.  Are we talking about from over here?
4     Q.  No, sir.
5     Q.  From here?
6     A.  From the point where we've got "unit" on
7  Exhibit 22.
8     A.  How long did it take me?
9     Q.  Yes, sir.
10    A.  Less than a minute.
11    Q.  Can you give me any more -- can you be any
12 more specific than that?
13    A.  Less than a minute.
14    Q.  All right.  Let's do this then, tell me
15 everything you did from the moment you put your unit
16 in park until the time that you got to the point
17 where you were ready to engage Mr. Towler.
18    A.  I don't honestly remember what I did.  I
19 just -- I obviously put my car in park.
20    Q.  Right.
21    A.  I exited my vehicle.
22    Q.  You reached over, pulled the door handle?
23    A.  Yes.
24    Q.  Opened your door?
25    A.  Yes.
Romero Reporting
575-625-1710

44  (Pages 173 to 176)

Page 177

1  Q.  Got out?
2  A.  Yes.
3  Q.  Did you do anything with the equipment on
4  your belt?
5  A.  No.
6  Q.  Did you do anything -- did you make any
7  call on the radio?
8  A.  No.
9  Q.  Did you close your car door?
10  A.  I don't remember.
11  Q.  Were your lights still on?
12  A.  My headlights and my spotlight was.
13  Q.  Did you leave the car running?
14  A.  Yes.
15  Q.  All right.  Did you go around your door or
16  close it?  Your car door.
17  A.  As far as going around?
18  Q.  Did you leave your car door open and walk
19  around it?
20  A.  I don't remember if I left it open or not.
21  Q.  What path did you take, were you nearer to
22  the fence on the north side of the alley?
23  A.  I don't remember my approach.
24  Q.  Did you run?
25  A.  I don't remember either.

Romero Reporting
575-625-1710

Page 178

1  Q.  Did you hurry?
2  A.  More than likely I did.
3  Q.  In the period of time it took you to get
4  from the unit until you activated, you heard two
5  Taser cycles go off, correct?
6  A.  Correct.
7  Q.  They were Officer Thomas' Tase cycles,
8  correct?
9  A.  I suppose they were.
10  Q.  Why do you suppose?
11  A.  Because he's the only one I saw with a
12  tears.
13  Q.  You didn't see Officer Kelton with a
14  Taser?
15  A.  No.
16  Q.  What did Officer Kelton have in his hands?
17  A.  I don't -- I don't remember what it was in
18  his hands.
19  Q.  Did he have his Asp in his hands?
20  A.  I do not know.
21  Q.  Did he have a gun in his hands?
22  A.  I do not know.
23  Q.  Do you believe that if he had a gun in his
24  hand that you would have seen it?
25  A.  Not quite.

Romero Reporting
575-625-1710

Page 179

1  Q.  Why?
2  A.  Because I was more focused on Mr. Towler.
3  Q.  To this point you've never described
4  Mr. Kelton, Officer Kelton, with a gun or Asp in his
5  hands, correct?
6  A.  Correct.
7  Q.  Did you at any time see Officer Kelton
8  doing any more than waiting for the cycling of the
9  Taser to complete?
10  MR. SHANOR:  Officer, I'm sorry, did
11  you say Officer Kelton or Officer Thomas?
12  Q.  I meant to say Officer Kelton.  Let me ask
13  it again.
14  During the period of time between the time
15  you exited the unit to the time you actually engaged
16  officer -- sorry, you actually engaged Cody Towler,
17  did you see Kelton do anything other than wait for
18  the cycles to finish activating?
19  A.  I did not see what he was doing.
20  Q.  To your knowledge, he was standing there
21  for the 10 seconds, correct?
22  A.  I don't know what he was doing.
23  Q.  Well, you were walking toward him, right?
24  A.  I was walking to Cody Towler.
25  Q.  Where was Officer Kelton in relation to

Romero Reporting
575-625-1710

Page 180

1  Cody Towler as you were walking forward?
2  A.  I don't recall where he was at.  He was
3  there, I just remember -- I want to say it was me --
4  well.  I just know Officer Thomas was next to me,
5  that's all I remember.
6  Q.  All right.  Here's what we're going to do,
7  I'm going to make another exhibit here.  I'm going
8  to have you draw me a map.  Okay?  I'd like you to
9  just take this, I'd like you to --
10  Here's what I'd like you to do, I'd like
11  you to draw your unit, please, like you to draw the
12  contours of the alley, just parallel lines for the
13  alley, please.
14  A.  Like that?
15  Q.  Well, where the outlines of the area, or
16  the -- the outside -- strike that.  Just draw me two
17  parallel lines where the alley is so we can see
18  where you were.
19  A.  As far as this?
20  Q.  Yeah.  All right.  So as you walk forward,
21  can you give me -- can you give me an X where Cody
22  Towler is standing?
23  A.  He is in front of my unit.
24  Q.  All right.  Take the green marker and give
25  me an X where you're standing before you activate

Romero Reporting
575-625-1710

45 (Pages 177 to 180)

Page 181

1  and engage Cody Towler.
2      A.  I don't remember the position where I was
3  at.
4      Q.  Were you -- was Mr. Towler to your left or
5  right forward in front of you?
6      A.  I'm going to say he was right here.
7      Q.  Basically right in front of him?
8      A.  Right.
9      Q.  Basically let me have that, take this
10  purple one and indicate to me with two -- two purple
11  Os where the two officers were standing.
12      A.  Officer Thomas was next to me and Officer
13  Kelton, like I said, I don't remember in relation
14  where he was standing.
15      Q.  All right.  So it looks to me as you're
16  facing Cody Towler -- I'm going to put an arrow this
17  direction, is it okay?
18      A.  Yes.
19      Q.  That's the direction everybody is facing
20  except for potentially Mr. Towler, and we don't
21  remember which direction Mr. Towler is facing,
22  correct?
23      A.  Correct.
24      Q.  You know that Officer Kelton is to your
25  right; that's what you remember?

Romero Reporting
575-625-1710

Page 182

1      A.  Yes.
2      Q.  All right.  So as you got to Cody Towler,
3  are you standing beside Officer Kelton or is he --
4  did I say Thomas?  Are you beside Officer Thomas or
5  is he slightly in front of you?
6      A.  Say next to me.
7      Q.  Okay.
8      A.  About 15 feet, 20 feet maybe?
9      Q.  All right.  So what did you do observe
10  when you walk up?
11      A.  Cody Towler was on his knees.
12      Q.  Okay.  Anything else?
13      A.  As far as what I -- flailing his hands,
14  throwing gravel.
15      Q.  Yeah, flailing, throwing gravel, right?
16      A.  Right.  Yelling, screaming.
17      Q.  What was he screaming?
18      A.  Just screaming.
19      Q.  Was he making sense?
20      A.  No.
21      Q.  Was he saying anything that had any
22  intelligible words at all that you could discern?
23      A.  I couldn't understand nothing.
24      Q.  All right.  Did he appear to be agitated?
25      A.  Yes.

Romero Reporting
575-625-1710

Page 183

1      Q.  Did he appear to be scared?
2      A.  I wouldn't say scared.
3      Q.  Did he appear to be coherent,
4  understanding of what was going on the best you
5  could discern from looking at the situation?
6      A.  I don't know.  I can't -- I don't know.
7  All I know is he was agitated.
8      Q.  Did you make an immediate assessment at
9  that point of Mr. Towler's mental condition?
10      A.  No.
11      Q.  You hadn't heard anything about somebody
12  10-57 or any code like that, right?
13      A.  No.
14      Q.  That would be somebody on narcotics or
15  drunken, correct?
16      A.  Correct.
17      Q.  Didn't hear that, right?
18      A.  No.
19      Q.  All right.  So at this point, how long do
20  you believe you stood there before you engaged Mr.
21  Towler with your -- with your Taser?
22      A.  30 seconds to a minute.
23      Q.  Okay.  And what were you doing during that
24  30 seconds to a minute while you stood there?
25      A.  Observing what he was doing.

Romero Reporting
575-625-1710

Page 184

1      Q.  And for all 30 seconds to a minute, how
2  long were Tasers going off?
3      A.  Like I say, I just heard -- I don't
4  remember how many there were but I heard Tasers
5  going off.
6      Q.  More than one Taser going off?
7      A.  A cycle.
8      Q.  All right.  Now, did you hear Kelton's
9  Taser going off?
10      A.  Like I say, I just saw Officer Thomas with
11  a Taser.  I don't know what he had.
12      Q.  And I want to make sure that the testimony
13  is clear and I have it clear.  Did you -- do you
14  know whether Officer Kelton was engaging Mr. Towler
15  with his Taser as well?
16      A.  I do not know.
17      Q.  He could have been or he could not have
18  been, that's all you know, right?
19      A.  I just don't know.
20      Q.  All right.  Now did you know at that
21  moment how many times Mr. Towler had been Tased and
22  how many cycles had activated?
23      A.  I did not know how many times.  Like I
24  said, I just heard about two cycles go off, that's
25  it.

Romero Reporting
575-625-1710

Page 185

1  Q. So you, personally, were aware of two
2  cycles?
3  A. Correct.
4  Q. And you were waiting 30 seconds to a
5  minute, so for some good period of time after the
6  cycles went off, correct?
7  A. Correct.
8  Q. And Mr. Towler never got to his feet,
9  correct?
10 A. Correct.
11 Q. And he only got to his knees that one
12 time?
13 A. Yes.
14 Q. All right. So did you ever hear any of
15 the officers saying "shut up, shut up"?
16 A. No.
17 Q. Did you hear anything that the officers
18 were saying during that 30 seconds to a minute that
19 you waited before you activated your Taser?
20 A. I don't remember the exact verbiage but it
21 was something in the area of "get on the ground".
22 Get on the ground" I believe it was.
23 Q. All right. "Get on the ground" you
24 believe is what you heard?
25 A. Uh-huh.

Page 186

1  Q. Is that about it?
2  A. As far as I can remember.
3  Q. Okay. Now when you went up, I'm going to
4  ask you to look in -- actually, this booklet here.
5  At one of Mr. Kelton's exhibits in this folder, and
6  it's this one here, do you see Exhibit 14?
7  Deposition Exhibit 14 for Officer Kelton?
8  A. Yes.
9  Q. Do you see the face of Mr. Towler?
10 A. Right.
11 Q. When you walked up, sir, did his face look
12 like that?
13 A. No, it did not.
14 Q. How did his face look when you walked up,
15 sir?
16 A. Didn't have injuries.
17 Q. He did not?
18 A. No.
19 Q. All right. Fair to say then that from the
20 moment you walked up until the moment he was finally
21 subdued, those injuries occurred during that period?
22 A. More than likely it did.
23 Q. When I say "those injuries," I mean the
24 injuries depicted on Exhibit 14 of Officer Kelton's
25 deposition, correct?

Page 187

1  A. Correct.
2  Q. All right. How close were you when you
3  deployed your Taser?
4  A. Same, about 10, 15 feet.
5  Q. All right. But you were able to see his
6  face, correct?
7  A. Somewhat. The side of his face.
8  Q. You were facing him, correct?
9     MR. SHANOR: Object to form.
10 A. In the front? I was in front.
11 Q. You were in front of him, correct?
12 A. Correct.
13 Q. So as you walked up, you did not go around
14 behind him, correct?
15 A. Correct.
16 Q. And then when you got close enough and you
17 waited 30 seconds to a minute, what did you do?
18 A. I deployed my department-issue Taser.
19 Q. Why did you deploy your Taser?
20 A. Based on what was happening, Officer --
21 clearly see that Officer Thomas' Taser was not
22 working well, not working, not having an effect on
23 Mr. Towler.
24 Q. Now you waited 30 seconds to a minute?
25 A. Correct.

Page 188

1  Q. And Cody Towler never stood, correct?
2  A. Correct.
3  Q. And he did not have all the injuries on
4  his face, correct?
5  A. Correct.
6  Q. Can you explain, if the Tasings had no
7  effect why he was not standing up?
8  A. No, wouldn't be able to explain that
9  because it's his body, I don't know what he was
10 feeling.
11 Q. Did he ever attempt to get to his feet?
12 A. No, he did not.
13 Q. Were the three of you standing there as he
14 was flailing with his arms on his knees?
15 A. Yes.
16 Q. Isn't it true that the reason why you --
17 you activated is because you said it didn't
18 incapacitate his arms?
19 A. His body.
20 Q. Didn't you say it didn't incapacitate his
21 arms?
22 A. Arms are part of the body.
23 Q. Okay. But that's actually what you
24 testified --
25 A. Correct.

## Page 189

1 Q. He's head of you, correct?
2 A. Mr. Towler is, yes.
3 Q. But you can't catch up to him?
4 A. Not the way we were moving, no.
5 Q. Why couldn't you catch up to him?
6 A. Because we weren't going to run to catch
7 up to him.
8 Q. All right. He is staying ahead of you
9 though, correct?
10 A. Yes.
11 Q. And is anybody else joining you?
12 A. Not at that point.
13 Q. About the time that you're at the seven,
14 he is still moving the direction of northbound in
15 the alley, correct?
16 A. Yes.
17 Q. How long do you believe you stood at
18 positions three and four and Mr. Towler at position
19 five before he headed up the alleyway?
20 A. No longer than a minute.
21 Q. Okay. And how long did you wait after the
22 call was made at 2:05:49 "has baton in his hand
23 headed northbound in the alley", how long did you
24 and Officer Thomas wait?
25 A. Before we pursued him, sir?
Romero Reporting
575-625-1710

## Page 190

1 Q. Yes, sir.
2 A. I don't know. I have no recollection of
3 how long we waited.
4 Q. Did you wait more than a minute to go
5 follow him up?
6 A. I don't believe so.
7 Q. Did you wait less than a minute to follow
8 up?
9 A. I would say it was at or about a minute.
10 Q. So he had about a minute headstart on you
11 going down the alley, is that correct?
12 A. About, yes.
13 Q. And you believe you were at points three
14 and four for less than a minute, correct?
15 A. Yes.
16 Q. And during that minute, Mr. Towler, is he
17 continually standing on the corner where you've got
18 the number five?
19 A. He -- he -- not continually, he was moving
20 back and forth.
21 Q. What do you mean by moving back and forth?
22 A. He would walk towards the vehicles, yell
23 "come get me, I'm going to fucking kill you", walk
24 back to the fence, hit the fence, yell, wave his
25 hands, wave his baton. Seemed disoriented and
Romero Reporting
575-625-1710

## Page 191

1 extremely aggravated but in that general area he
2 would --
3 Q. Now Officer Thomas has testified that he
4 doesn't think that Mr. Towler ever recognized that
5 you were police. Do you have an opinion?
6 MR. SHANOR: I'm going to object.
7 MR. NEWTON: That's fine.
8 A. I don't know. I would say that based
9 on -- I mean we attempted to contact him, he looked
10 in our direction, I believe he saw us. Based on his
11 statements of "come and get me, I'm going to fucking
12 kill you", I mean he definitely acknowledged that we
13 were there. Whether he knew we were police or not,
14 I don't know.
15 Q. You've testified that you were not -- you
16 did not feel in jeopardy until the final charge. Do
17 you remember that?
18 A. Yes.
19 Q. You've indicated that a big concern of
20 yours was his baton, is that correct?
21 A. Correct.
22 Q. Now why did you not feel in jeopardy until
23 we get to -- in fact, let's go ahead and put at
24 seven -- let's put an eight where you believe the
25 final charge occurred.
Romero Reporting
575-625-1710

## Page 192

1 You believe it occurred at this point
2 where No. 8 is, is that right?
3 A. I believe so.
4 Q. And why do you believe that?
5 A. I remember there being an opener area of
6 where the incident taking place, I believe that's
7 it.
8 Q. Okay. I will report to you that the
9 photographs appear to have -- to be some place, as I
10 recall, in this area.
11 A. Okay.
12 Q. I can't be certain but in this area. And
13 I'm going to put an X here in red, is that okay?
14 A. Certainly.
15 Q. Did you at any point, you or Officer
16 Thomas or anyone there, move the body more than a
17 few feet to roll it over?
18 A. No.
19 Q. Okay. But your recollection is that the
20 incident occurred at this No. 8 that you placed down
21 here, is that right?
22 A. That's my recollection.
23 Q. So let's go back to the No. 5
24 place, okay?
25 A. Okay.
Romero Reporting
575-625-1710



**Page 193**

1 completed the fourth cycle?
2    A. Officer Kelton grabbed his left arm.
3    Q. Right.
4    A. And his arm was placed in his back, on his
5 back.
6    Q. And how long did that require? After the
7 tasing -- let me go back. After the tasing, Cody
8 Towler is on his face; correct?
9    A. Correct.
10    Q. Laid completely prone, correct?
11    A. Correct.
12    Q. And Officer Kelton simply walks in, he
13 grabs his left arm, he pulls it behind his back,
14 correct?
15    A. Once the cycle was over.
16    Q. Right. He waited until the whole fourth
17 cycle was over, correct?
18    A. Correct.
19    Q. All right. Then, sir, he was able, within
20 a single movement, to get the left arm behind his
21 back and cuff it; correct?
22    A. Correct.
23    Q. All right. What happened next, sir?
24    A. His arm was placed on his back. Kept on
25 trying to pry his or grab -- get his right arm which
Romero Reporting
575-625-1710

**Page 194**

1 he had in his waistline. And he wasn't -- he wasn't
2 letting us have his arm. That's whenever I
3 delivered some kicks to his right torso, right lower
4 torso. I believe it was four kicks. Still he
5 wouldn't give us his hand or his arm. Then I
6 deployed my Asp; I struck him two times on his
7 thigh, right thigh. And immediately after that, we
8 were able to get his right arm.
9    Q. All right. I'm going to go back and break
10 that down, okay? As I understand it, it did not
11 require any pain compliance to get his left arm
12 cuffed, correct?
13    A. Correct.
14    Q. And you said that his right arm was
15 underneath his body and at his waistline, correct?
16    A. Correct.
17    Q. Up until this point, you had never seen
18 Mr. Towler with a weapon in his hands, correct?
19    A. Correct.
20    Q. You'd never seen him go for a weapon,
21 correct?
22    A. Correct.
23    Q. There was nothing about his pants or his
24 body that suggested he was hiding a weapon, correct?
25    A. Well, from where I was standing, yeah.
Romero Reporting
575-625-1710

**Page 195**

1    Q. And he had a wife beater T-shirt on so he
2 didn't have a loose fitting T-shirt, correct?
3    A. Correct.
4    Q. Is at any point, sir, did you have any
5 suspicion of a weapon on him at that point?
6    A. Well the Asp was there, so I got some
7 idea.
8    Q. Okay. But the Asp was out of his reach,
9 right?
10    A. Exactly. But none -- in our job, we don't
11 like to risk.
12    Q. I getcha. But you didn't have any
13 suspicion beyond the Asp that he had a weapon in his
14 hands?
15    A. Not in his hands.
16    Q. Or on his body, correct?
17    A. From what I could see, yes.
18    Q. You might always have a fear, but not a
19 suspicion at that point, correct?
20    MR. SHANOR: Object.
21    A. There's fear but with fear there's
22 suspicion.
23    Q. I don't want to quibble with you, I
24 understand what you're saying. So at this point did
25 you hear anybody saying "shut up shut up"?
Romero Reporting
575-625-1710

**Page 196**

1    A. I don't remember.
2    Q. All right. At this point he's got his
3 hand underneath his body, his left arm behind his
4 back cuffed, right?
5    A. Yes.
6    Q. Kelton is on his back, correct?
7    A. Yes.
8    Q. And you are -- and Kelton is trying to
9 reach around and grab his right arm, correct?
10    A. (No response.)
11    Q. Did you attempt -- since his arm is
12 underneath his body, and his -- and his hand about
13 his waist, did you attempt to grab his arm or his
14 elbow and pull his arm out from behind his back?
15    A. I do not remember doing that.
16    Q. Did you attempt to do anything to assist
17 in getting his right arm behind his back except
18 begin delivering kicks?
19    A. If I did anything other than that?
20    Q. Yeah. Before you began delivering kicks,
21 did you do anything to get his arm behind his back?
22    A. No, I did not do that.
23    Q. Did you attempt any maneuver that you have
24 been trained with pain compliance such as by
25 utilizing his left arm?
Romero Reporting
575-625-1710

## Page 197

1  A.  Well, no because Kelton had his hand.
2  Q.  Did Kelton attempt, to your knowledge, to
3  do anything to utilize pain compliance?
4  A.  I do not know.
5  Q.  Did -- did -- do you know whether there
6  was any tactic you could have employed besides
7  kicking him which would have allowed you to get his
8  right arm behind his back and cuff him?
9  A.  Are you asking me if there was another
10  way?
11  Q.  Yes, sir.
12  A.  I would say so.  There's several ways.
13  Q.  Tell me about them.
14  A.  Well, first off, I mean like you said if I
15  had his left arm, something, we could a done some
16  pain maneuvers.
17  Q.  Right.
18  A.  Pried his arm out of his -- from under his
19  body.  That's about -- that's about it, I would say.
20  Q.  Prying his arm from behind his body --
21  A.  Attempt.
22  Q.  -- under his -- is a very legitimate
23  tactic, correct?
24  A.  Yes.
25  Q.  And at this point, the leverage would be

## Page 198

1  all yours as you were over the top of him, Kelton
2  was over the top of him, Kelton had his left arm and
3  you and Thomas both have the ability to stand over
4  him and pry his arm out, true?
5  MR. SHANOR:  Object to the form.
6  A.  To attempt it.  I would attempt to do it.
7  Q.  But you didn't attempt it, did you?
8  A.  No.
9  Q.  Okay.
10  A.  But then again, we wouldn't a known if
11  that was going to work.
12  Q.  Now you say you delivered some kicks to
13  his right side of his torso, correct?
14  A.  Correct.
15  Q.  How many kicks?
16  A.  Four, I believe.
17  Q.  All right.  And then you say you deployed
18  your baton, correct?
19  A.  Yes.
20  Q.  Tell me positionally where you were when
21  you kicked him?
22  A.  I was in his leg area.
23  Q.  Were you standing between his legs?
24  A.  No.
25  Q.  Were you standing to his right as he lay

## Page 199

1  on the ground?
2  A.  To his right.
3  Q.  And where did you kick him?
4  A.  Lower right side torso.
5  Q.  As you were kicking him, what was Officer
6  Thomas doing?
7  A.  I don't remember what he was doing.
8  Q.  All right.  How long did it require, from
9  the time Officer Kelton first attempted to get his
10  right arm up, until you had him cuffed?
11  A.  It was a while.  I don't know exactly how
12  long.
13  Q.  You weren't timing it though, right?
14  A.  No.
15  Q.  Officer Kelton believes it required
16  approximately 10 seconds from the time he attempted
17  to get his right arm up until he was cuffed.  Do you
18  disagree?
19  MR. OLSON:  Object to the form.
20  A.  I'm not saying -- could a been.  Could a
21  been.
22  A.  I'm not saying -- could a been.  Could a
23  Q.  All right.  So it is -- it is within the
24  realm of your testimony that it required approximately
25  10 seconds to get his right arm cuffed from the time

## Page 200

1  you initially started to try to do so, correct?
2  A.  Correct.
3  Q.  All right.  Now during that 10 seconds,
4  you kicked him four times and then what did you do?
5  A.  And I retrieved my Asp and struck him
6  twice.
7  Q.  Kicked him four times, retrieved your asp,
8  struck him twice; correct?
9  A.  Correct.
10  Q.  Where did you strike him?
11  A.  In his thigh, right thigh.
12  Q.  All right.  And why did you believe it was
13  necessary to kick him each of the four times?
14  A.  Well, to give us his arms.
15  Q.  And were you yelling at him to give --
16  give you his arm?
17  A.  Yes.
18  Q.  And what was he doing?
19  A.  Not complying.
20  Q.  Was he yelling?
21  A.  Yes.
22  Q.  Ways he screaming?
23  A.  Yes.
24  Q.  What was he yelling?
25  A.  Couldn't make sense.

Page 201

1    Q.   Incoherent, correct?
2    A.   I would say so.
3    Q.   And was he loud?
4    A.   Extremely.
5    Q.   Do you -- did you discern anything to
6    suggest he was in great pain?
7    A.   No.
8    Q.   Did you believe he was in custody at that
9    point?
10   A.   Of course he was.
11   Q.   So at the point where you are kicking him,
12   was he in custody?
13   A.   Once the cuffs were on him, yes.
14   Q.   He had a left cuff on, but he didn't have
15   a right cuff on.  Do you deem him to be in custody
16   when he had a cuff on his left hand?
17   A.   Yeah, he was going to be placed under
18   arrest.
19   Q.   And I understand this is a precise term
20   you guys use, I don't know what it means, but in
21   custody, I'm hearing you that he was in custody when
22   the left arm was behind his back and the cuff was
23   on, right?
24   A.   No.
25        MR. SHANOR:  Object to form.
                    Romero Reporting
                    575-625-1710

Page 202

1    A.   No.
2    Q.   So we have a distinction there.
3    A.   Right.
4    Q.   Help me understand it.
5    A.   In custody obviously means when both hands
6    are handcuffed.
7    Q.   That's what I needed to hear from you,
8    keep me straight on that, all right?
9    A.   Okay.
10   Q.   So now did you -- after you hit him with a
11   baton in the thigh -- in the side of the thigh
12   twice, is that correct?
13   A.   Yes.
14   Q.   Not more than twice?
15   A.   No.
16   Q.   You're certain of that?
17   A.   Certain.
18   Q.   Then I take it you officers were able to
19   get his right hand behind his back, correct?
20   A.   Correct.
21   Q.   And I said it very generally because I
22   don't know how that happened.  Explain how his hand
23   came from under him and behind his back.
24   A.   I don't remember exactly how it happened,
25   be honest with you.  But I just know that his --
                    Romero Reporting
                    575-625-1710

Page 203

1    right after that, his right arm was handcuffed as
2    well.
3    Q.   All right.  But you don't know whether you
4    got down there and grabbed it, you don't know
5    whether Kelton grabbed it, you don't know whether
6    Thomas grabbed his right arm?
7    A.   Right.  I don't remember.
8    Q.   Mr. Towler, did he just take his hand out
9    and put it behind his back?
10   A.   Could a been but I don't remember.
11   Q.   But you don't remember?
12   A.   I don't remember.
13   Q.   Fair enough?
14   A.   Fair enough.
15   Q.   All right.  So at that point, you guys had
16   cuffed him up, right?
17   A.   Yes.
18   Q.   Now in that process, did Mr. Kelton ever
19   say a coherent word like I'll comply or quit or help
20   or please, or please stop or anything like that?
21        MR. SHANOR:  You said Kelton?
22   Q.   Yeah, I'm so sorry, Officer Arroyo.  I
23   apologize.  I'm getting -- let me say it right.
24        At any time during that arrest sequence,
25   did Cody Towler say I'll comply or help or quit or
                    Romero Reporting
                    575-625-1710

Page 204

1    please stop or any coherent word?
2    A.   Not that I'm aware of.
3    Q.   Were you all listening for them?
4    A.   To be honest with you, I was on his lower
5    by his legs so I wasn't paying attention.
6    Q.   Okay.  What had Cody Towler done wrong
7    that would justify an arrest to your knowledge?
8    A.   I don't know what Officer Thomas and
9    Officer Kelton saw.
10   Q.   Is it fair to say that your role there was
11   simply to back up those officers and you had no
12   knowledge of whether he had violated a law, is that
13   fair?
14   A.   I would say so.
15   Q.   So you did not make any effort to reach a
16   probable cause determination whether you had the
17   right to arrest, is that fair?
18        MR. SHANOR:  Object.
19   A.   Fair.  There's no time to talk.
20   Q.   I understand.  I'm not -- I'm not saying
21   anything else.  I want to make sure of this:  That
22   you don't come to trial and say I deemed that we had
23   probable cause -- to arrest him because I believed
24   X, Y or Z.  I just want to rule that out.  You did
25   not -- you did not make an arrest decision based on
                    Romero Reporting
                    575-625-1710

Page 205

1    anything that you knew, correct?
2        A.   Correct.
3            MR. SHANOR: Same objection.
4        Q.   Thank you. All right. Now you've cuffed
5    him up. What happens next?
6        A.   We are able to handcuff his arms. He's
7    still moving, still fighting. He's still moving to
8    his -- from side to side. So I move in his legs so
9    I made the decision to get on his legs, hold him
10   down. My hands are almost to his buttocks holding
11   him down. And when I'm on there, I feel his -- his
12   feet kicking my back. So he's obviously moving his
13   legs. Officer McKinnon is there. I asked him to
14   retrieve some leg shackles and he does. Leg
15   shackles were placed on his legs or his feet. And
16   soon after that, he calmed down, he came down.
17       Q.   Okay. All right. Several of the other
18   officers say after that that he was laying alone for a
19   minute or so, do you recall that?
20           MR. SHANOR: Object to form.
21       A.   I do.
22       Q.   All right. So as that relates to him
23   laying alone, what do you recall?
24       A.   Well, let me back up a little bit. His
25   leg shackles were on him.

Romero Reporting
575-625-1710

Page 206

1        Q.   Right. Handcuffed behind the back.
2        A.   He came down. He was searched, retrieved
3    his ID.
4        Q.   You did?
5        A.   Yes.
6        Q.   Okay.
7        A.   I went back to my unit.
8        Q.   Right.
9        A.   To my unit and checked for warrants, ran
10   his name.
11       Q.   Right.
12       A.   Now who was with him, I don't know.
13       Q.   Right.
14       A.   Went back. And that's whenever I observed
15   Officer Burkowski and Officer -- I believe it was
16   Kelton kind of were checking for his pulse and stuff
17   which, I mean a light turned on, oh, something is
18   wrong. And sure enough, the handcuffs -- I guess
19   they were able to -- they decided that or came to
20   the conclusion that he wasn't breathing, so that's
21   whenever his handcuffs came off and CPR was started.
22       Q.   All right. I'm going to get to all of
23   that but I need to back up, all right? Need to back
24   up to the point where you guys all get off of him
25   and he's laying by himself. Did you see that?

Romero Reporting
575-625-1710

Page 207

1            MR. SHANOR: Object to form.
2        A.   Him laying by himself?
3        Q.   Yes, sir.
4        A.   He was never laying by himself.
5        Q.   I don't mean -- I just mean nobody is on
6    top of him and he's just laying there.
7        A.   Correct.
8        Q.   And you guys haven't realized something
9    wrong has gone on.
10       A.   Right.
11       Q.   You remember that though, right?
12       A.   Yes.
13       Q.   How long was he laying there before you
14   guys realized something wrong was going on?
15       A.   I don't know. Like I said, I retrieved
16   his driver's license or we searched him, retrieved
17   his driver's license, went back to my unit. I don't
18   know how long I took at my unit.
19       Q.   All right. Let's go back, okay? I need
20   to do a little bit more, more slower. I want to get
21   to the point where you've cuffed him up, right?
22       A.   Correct.
23       Q.   So at that point, I understand some of the
24   other officers are arriving, is that right?
25       A.   Yes.

Romero Reporting
575-625-1710

Page 208

1        Q.   Who arrived first?
2        A.   I don't remember who arrived, sir.
3        Q.   But you do remember McKinnon arrived,
4    right?
5        A.   Yes.
6        Q.   Do you remember who arrived around the
7    time McKinnon arrived?
8        A.   I just know Officer Craine was there as
9    well and Officer Armijo.
10       Q.   All right. What about Burkowski?
11       A.   He was already -- he was on scene as well.
12       Q.   All right. So if I could -- who do you
13   think was there earliest, McKinnon, Burkowski,
14   Craine?
15       A.   I do not know.
16       Q.   All right. Then I'm not going to push
17   anymore.
18           Now as Mr. Towler is laying with his
19   handcuffs on but before the shackles, you indicated
20   he was still resisting, right?
21       A.   Yes.
22       Q.   And at that point my understanding is that
23   you got on top of his legs, right?
24       A.   Correct.
25       Q.   Almost to his buttocks --

Romero Reporting
575-625-1710

Page 209

1    A.   Correct.
2    Q.   -- correct?  And you were actually on top
3  of him, correct?  Sitting on top of him?
4    A.   I wasn't sitting.  I was -- all the
5  pressure was coming from my hands so I was doing
6  this to his legs, holding him.
7    Q.   Are you seated with your knees on the
8  ground holding his buttocks on the ground?
9    A.   Correct.
10    Q.   All right.  Now you indicated that Officer
11  Kelton was sitting on top of him, pretty much what
12  you were doing, right?
13    A.   Uh-huh.
14    Q.   That's a yes?
15    A.   Yes.  Sorry.
16    Q.   So Kelton is literally sitting on his
17  back, correct?
18    A.   I don't know if he was actually sitting or
19  not, but he was in the same position I was.
20    Q.   Let me ask you to go to your deposition or
21  your statement at Page 368 -- I'm sorry, 370.  About
22  18 lines down from the top.
23    Do you see, Officer Arroyo, where you
24  begin the words "He was just sitting, not sitting
25  just on top of him, I mean I don't know how to

Romero Reporting
575-625-1710

Page 210

1  explain it.  Pretty much what I was doing but on his
2  back", right?
3    A.   Correct.
4    Q.   So was he sitting or not sitting like
5  that?
6    A.   He was doing what I was doing.
7    Q.   And you had a foot -- a knee on each side,
8  correct?
9    A.   Correct.
10    Q.   Pushing down --
11    A.   Right.
12    Q.   -- right?  And he had a knee on each side
13  of Mr. Towler --
14    A.   From what --
15    Q.   -- pushing down with his hands?
16    A.   From what I could see, yes.
17    Q.   All right.  Can you discern how much
18  weight Officer Kelton was placing on Mr. Towler's
19  back?
20    A.   I could not.
21    Q.   How much weight were you pushing?  What
22  percentage of your weight were you putting on Mr.
23  Towler?
24    A.   I weigh 175 back then, I'm not sure.
25    Q.   What percentage do you think you were

Romero Reporting
575-625-1710

Page 211

1  putting down on --
2    MR. SHANOR:  Object to form.
3    A.   I would say about 25 percent.
4    Q.   Was he resisting pretty hard?
5    A.   He was kicking my back.
6    Q.   Were you having to push down -- were you
7  having to use quite a bit of your own strength to
8  keep him down?
9    A.   Yes.
10    Q.   So you could bench press back then about
11  210?
12    A.   About.
13    Q.   Is it fair to say you had about half that,
14  three-fourths of that strength pushing down on him?
15    MR. SHANOR:  Object to the form.
16    A.   I wouldn't say that much.
17    Q.   Okay.  At that point, do you believe that
18  he was in custody?
19    A.   Yes.
20    Q.   Do you know whether anyone made a call
21  that said hey, we're 10-15 with this subject?
22    A.   I do not know.
23    Q.   Did you hear anybody say 10-15, let's log
24  five Taser strikes and several baton deployments?
25    A.   I do not remember that.

Romero Reporting
575-625-1710

Page 212

1    Q.   You don't remember that?  All right.  So
2  from the time that Officer Kelton got on his back
3  and began -- and grabbed his left hand and cuffed it
4  until the time that he was, in your mind, in custody
5  and you could call 10-15, somebody could, how long a
6  time was that?
7    A.   Wait a minute.  Can you repeat it real
8  quick?
9    Q.   I can.  I'm going to start at a certain
10  point in time.  Point in time is Officer Kelton is
11  on his back with his left arm cuffed.
12    A.   Okay.
13    Q.   Until you believe he was in custody and it
14  was appropriate to call 10-15, what's that period of
15  time?
16    A.   As soon as the subject is secured.
17    Q.   All right.  We know that it took about 10
18  seconds to get his right arm behind his back,
19  correct?
20    A.   Right.
21    Q.   All right.  So -- so from -- 10 seconds to
22  get his right arm.  Did you all begin getting on his
23  back as he's laying face down right about the time
24  you got his right arm behind him and cuffed?
25    A.   What do you mean getting on his back?

Romero Reporting
575-625-1710

## Page 213

1     Q. Well, you got on his buttocks, Kelton was
2 really basically on his back and you guys were
3 holding him down, correct?
4     A. Yeah.
5     Q. And he was resisting. How long did you
6 stay there before you believed we've got him in
7 custody?
8     A. Once the shackles went on, like I said, he
9 immediately came down and that's when I got off.
10     Q. Okay. Once the shackles -- are you
11 talking the leg shackles or the arms?
12     A. Shackles, the legs.
13     Q. All right. Now I'm going to have you go
14 to another exhibit here just to show you some so we
15 can kind of identify. Go to Exhibit 5, if you will.
16     A. Okay.
17     Q. I've written some numbers beside the
18 entries there, this event log. Do you see Entry
19 No. 13, five Taser deployments and several baton
20 strikes, subject 10-15?
21     A. Yes.
22     Q. That's at 2:12:37, right?
23     A. Yes.
24     Q. That's 2:00 a.m. and 12 minutes and 37
25 seconds after 2:00 a.m., correct?

## Page 214

1     A. Right.
2     Q. All right. Now did you all talk among
3 yourselves before someone called the 10-15 to sort
4 of collectively figure out how many Taser strikes
5 and how many baton deployments and that kind of
6 thing?
7     A. No, I did not talk to nobody.
8     Q. All right. You guys are on top of Mr.
9 Towler -- on top of Mr. Towler -- Mr. Towler. Start
10 again.
11     You folks, you and Officer Kelton, were on
12 top of Mr. Towler at this point when he is finally
13 in custody, right?
14     A. I don't know.
15     Q. Okay. Now you say McKinnon had the
16 shackles or McKinnon applied the shackles?
17     A. He applied them. He retrieved the
18 shackles, I don't know from where.
19     Q. Do you know?
20     A. Possibly Burkowski's, I want to say.
21     Q. Okay.
22     A. Officer Burkowski's. He placed the leg
23 shackles on Mr. Towler so.
24     Q. All right. Now I heard you say that once
25 the shackles were on, Mr. Towler's demeanor changed

## Page 215

1 in your mind, did it?
2     A. Yes.
3     Q. What happened?
4     A. Once they came on, the shackles went on,
5 he mumbled something, I don't remember, like I said,
6 I had issues understanding him that when he did,
7 something about I'm done. I'm done, something like
8 that.
9     Q. All right.
10     A. That's whenever we were -- he was searched
11 and again, his driver's license was located. His
12 name was ran in my patrol unit by me, went back, and
13 by that time I -- like I said, Officer Burkowski,
14 not for sure, Kelton, seemed to -- well something is
15 going on here.
16     Q. We'll get to that in just a second. So as
17 I understand it, sir, you heard him say "I'm done".
18     A. Correct.
19     Q. At any point before you heard him say "I'm
20 done", did you see him make any effort to bite at
21 Officer Kelton or anybody else?
22     A. I did not.
23     Q. All right. Were you able to see his head?
24     A. The back of his head.
25     Q. Okay. Was Officer Kelton immediately in

## Page 216

1 front of you?
2     A. Yes.
3     Q. On his body, correct?
4     A. Right.
5     Q. So his head, you would have had to move
6 your head around Officer Kelton's body to see Mr.
7 Towler's head, correct?
8     A. Correct.
9     Q. And Mr. Towler's face is face down,
10 correct?
11     A. I don't know if it was actually touching
12 the ground, but yes.
13     Q. After the event, Mr. Towler has a pretty
14 chewed up face, correct? As we've seen in that
15 picture?
16     MR. SHANOR: Object to form.
17     Q. Is that fair?
18     A. Yeah.
19     Q. I don't want some -- here's what I'd like,
20 you explain to me how you would describe Mr.
21 Towler's face as you saw it after these events took
22 place between the time of your tasing and the time
23 that he was in custody. What did it look like at
24 the end?
25     A. It had injuries on it.

## Page 217

1  Q.  Tell me what they looked like.
2  A.  Had lacerations.  Blood.  That's all I
3  could see.
4  Q.  Did the -- the picture that I showed you
5  in Kelton Deposition Exhibit 15, did that look like
6  a true and accurate depiction of the way his face
7  looked at about the time you guys had him in
8  custody?
9  A.  I never saw his face.  That's the first
10  time I see his face.
11  Q.  In this picture?
12  A.  Correct.  I've never seen a picture from
13  him like that.
14  Q.  Fair to say then that all the time you
15  were in the process of subduing him, his face was
16  face down?
17  A.  Correct.
18  Q.  Was anybody pushing his face into the
19  ground?
20  A.  I don't know.
21  Q.  Can you explain how these injuries
22  occurred on his face?
23  MR. SHANOR:  Object to form.
24  A.  Possibly the gravel, I would say.
25  Q.  And?  Gravel and what?

Romero Reporting
575-625-1710

## Page 218

1  A.  Rubbing the face against the gravel.
2  Q.  Who rubbed his face against the gravel?
3  A.  I don't know.
4  Q.  All right.
5  A.  I'm not saying it happened.  You're asking
6  me how would it happen.
7  Q.  You can't explain any other way for it,
8  right?
9  A.  No.
10  Q.  Because when you deployed your Taser, he
11  did not have those on his face, right?
12  A.  No.
13  Q.  Okay.  Now he wasn't as aggressive
14  anymore.  He had come down and you got his ID,
15  right?
16  A.  Right.
17  Q.  And you went to your unit, right?
18  A.  Correct.
19  Q.  Now Officer Craine testified that there
20  were three officers holding him down, one on his
21  legs who he said was Burkowski, one in his middle
22  and one on his back who he said was Kelton.
23  MR. SHANOR:  Object.
24  Q.  I'm happy to show you that testimony.  Do
25  you know, sir, if someone took your place?

Romero Reporting
575-625-1710

## Page 219

1  A.  I do not know.
2  Q.  When you got up, did someone grab his
3  legs?
4  A.  I do not know.
5  Q.  Did you see McKinnon on his legs?  On his
6  shins?
7  A.  No, I did not see -- I didn't see nobody
8  after that.  I don't know what they were doing.
9  Q.  Did you see Burkowski with a knee on his
10  butt?
11  A.  I did not see Burkowski.
12  Q.  Did you see Burkowski holding his hands?
13  A.  No, I didn't.
14  Q.  Cuffed and holding his feet in shackles?
15  A.  I don't know if that happened or not.
16  Q.  Okay.  But when you got up, he wasn't
17  resisting anymore, right?
18  A.  No.
19  Q.  Okay.  And you ran his name and did you
20  come back with any kind of indications of any crimes
21  or warrants?
22  A.  I don't remember what he came back.  I
23  don't recall.
24  Q.  All right.  So let me ask you to look at
25  Exhibit -- wow.  I might have to see if I can find

Romero Reporting
575-625-1710

## Page 220

1  it.  Can I borrow your set, Ken?  All right.  It
2  looks like it's Exhibit 16, sir.
3  A.  Okay.
4  Q.  But that's actually -- it's actually not,
5  I apologize, go to Exhibit 16 and I'd like you to
6  work your way back to Page 416, all right?  We
7  should have had another tab in there.  It's actually
8  within Exhibit 16, you'll see Page 4.  You'll see
9  Page 418.  You see that?
10  MR. SHANOR:  418?
11  MR. NEWTON:  418.
12  Q.  Do you see that?
13  MR. SHANOR:  Can you identify what
14  that is since it's not tabbed?
15  Q.  I will tell you that's Sergeant Sharpe's
16  statement, a portion of it, okay?  Just an excerpt
17  of it.  And I'm happy to show you more but if we
18  start at Line 1, he begins talking about repeating
19  himself about bringing an ambulance in.  Okay?
20  Would you just read that first paragraph there, to
21  yourself.
22  A.  Oh, okay.  I thought out loud.
23  Q.  No, just read it to yourself.
24  A.  Okay.
25  Q.  Can I get you also to go to the page

Romero Reporting
575-625-1710

## Page 221

1  before, Page 16 of Sharpe's statement, to about Line
2  18. You have to kind of count down, it's about 18
3  lines down.
4        MR. OLSON: What does it start with?
5        MR. NEWTON: I'll get right over
6  there to it and tell you. Yeah, it starts with "saw
7  numerous patrol vehicles in front of me."
8        MR. OLSON: Okay.
9        MR. NEWTON: Please read that
10 paragraph.
11     A.  Okay.
12     Q.  All right. Now as you -- as you recall,
13 what I'm asking you is do you recall what Sergeant
14 Sharpe stated that when he got there there were
15 three to five officers on Mr. Towler?
16        MR. SHANOR: Object.
17     Q.  Do you recall when Officer Sharpe got
18 there that there were three to five officers on Mr.
19 Towler?
20        MR. SHANOR: Same.
21     A.  I don't recall. It's in the statement.
22     Q.  Were you on Mr. Towler when Sergeant
23 Sharpe arrived?
24     A.  I don't know.
25     Q.  Do you recall that when Sergeant Sharpe

## Page 222

1  arrived, he had the guys get off Mr. Towler, as he
2  stated on Page 418?
3     A.  I don't recall.
4     Q.  Do you have any way of anchoring a point
5  in time when everyone got off of Cody Towler?
6     A.  I don't.
7     Q.  When you got off of Cody Towler, he was
8  still face down, correct?
9     A.  Correct.
10    Q.  And when you got off of Cody Towler, you
11 do not recall if or who -- if someone or who that
12 someone would be was on his back or buttocks or
13 shins, correct?
14       MR. SHANOR: Object to form.
15    A.  Correct.
16       MR. NEWTON: What's the nature of the
17 objection?
18       MR. SHANOR: I think it's compound.
19       MR. NEWTON: Let's do it, make sure
20 we get it.
21    Q.  (By Mr. Newton) When you got off of his
22 back, you don't remember who might have, if anyone,
23 been on his back, correct?
24    A.  Correct.
25    Q.  Or on his buttocks, correct?

## Page 223

1     A.  Correct.
2     Q.  Or on his shins, correct?
3     A.  Yes.
4     Q.  All right.
5        MR. OLSON: If anyone being part of
6  the question, right?
7        MR. NEWTON: If anyone was in there.
8     Q.  (By Mr. Newton) All right. Officer
9  Kelton testified that it was at least four and a
10 half to five minutes that people were on his back.
11 Do you disagree?
12       MR. SHANOR: Object to form.
13    A.  That's his statement. I don't know.
14    Q.  All right. After you got back from
15 checking the license, were you -- let me back up
16 more.
17       While you're checking the license, as
18 you're receiving the information from dispatch, are
19 you aware of any problem?
20    A.  No, sir.
21    Q.  Were you looking forward in your car out
22 the window as you were checking your license --
23 checking his license?
24    A.  I don't believe I was.
25    Q.  What were you -- where were you looking?

## Page 224

1     A.  I wouldn't be in the front because if I
2  was looking towards the front I would a been keeping
3  an eye -- I would actually see who was on top of him
4  if somebody was on top of him. So therefore, I
5  don't know what I was doing, probably just taking a
6  breather.
7     Q.  All right.
8     A.  Getting back my air and stuff like that.
9     Q.  Were you winded?
10    A.  Yeah.
11    Q.  Were you -- tell me why you were winded.
12    A.  He was strong. Takes the fight out of
13 you, gets you tired.
14    Q.  When did you first become aware of and
15 concerned that there was a problem, a medical
16 problem with Cody Towler?
17    A.  Once I walked back to the -- to where he
18 was at.
19    Q.  All right. When you were walking back,
20 who -- who do you believe alerted you or what
21 alerted you to the problem?
22    A.  How officers were checking for pulse.
23    Q.  Who was checking?
24    A.  I want to say Officer Burkowski was.
25    Q.  Did you hear anything?

## Page 225

1   A.   No.
2   Q.   Did you see Sergeant Sharpe there?
3   A.   He was present, yes.
4   Q.   What was he doing?
5   A.   He was supervising. He was -- he was
6 looking at -- or at Burkowski, I believe.
7   Q.   Do you know whether an ambulance had
8 already been ordered?
9   A.   I do not know.
10   Q.   Can I get you to go back to Exhibit 6
11 again, please?
12   A.   Which page?
13   Q.   Exhibit 6, just the tab.
14   A.   I'm sorry.
15   Q.   No, no, you're doing great.
16   A.   It's nap time.
17   Q.   Yeah, I here ya. I think I've lied again,
18 yeah, about time.
19       Okay. Can I get you, please, to look at
20 Item No. 14 -- I'm sorry, Item No. 15. Do you see
21 need 55 North Alley?
22       MR. OLSON:  You're not on Exhibit 6,
23 are you?
24       MR. NEWTON:  Am I not?  I'm sorry,
25 I've got -- it's a bad Exhibit call.

## Page 226

1       MR. SHANOR:  16?
2       MR. NEWTON:  It's five, I'm sorry.
3 Five.
4       MR. OLSON:  Yeah, okay.
5       MR. NEWTON:  I'm sorry.
6       MR. OLSON:  That's okay.
7   Q.   (By Mr. Newton) Can we go to Line 15
8 that I've handwritten in the numbers, do you see it?
9   A.   Yes.
10   Q.   And at 15 it says I assume it's need 55
11 north alley of Sunny Acres. Do you see that?
12   A.   Yes.
13   Q.   That's at 2:17:04, right?
14   A.   Yes, sir.
15   Q.   That is a -- a call for an ambulance,
16 correct?
17   A.   Correct.
18   Q.   Do you remember if Sergeant Sharpe did
19 that?
20   A.   I don't know.
21   Q.   All right. And do you see at 2:18:56 Z1,
22 that's Sergeant Sharpe, right?
23   A.   I'm sorry, where?
24   Q.   16.
25   A.   Okay.

## Page 227

1   Q.   Line 16, that's Sergeant Sharpe, correct?
2   A.   Correct.
3   Q.   He says need 55, code three; correct?
4   A.   Correct.
5   Q.   So code three is an emergency ambulance,
6 right?
7   A.   Yes, sir.
8   Q.   Do you know what happened between the time
9 he called the ambulance without an emergency and he
10 called the ambulance with the emergency?
11   A.   I do not know.
12   Q.   That's about a minute and 52 seconds,
13 right?
14   A.   Yes, sir.
15       MR. SHANOR:  According to the sheet,
16 right?
17       MR. NEWTON:  Yeah, I mean all we have
18 is Exhibit 5.
19   A.   According to it, yes.
20   Q.   Do you have any reason to suspect that the
21 dispatch doesn't keep accurate times?
22   A.   I wouldn't be able to answer that, I don't
23 work there.
24   Q.   I wouldn't expect you to but I just wanted
25 to make sure. All right.

## Page 228

1       Now do you remember when Sergeant Brisco
2 arrived in sequence, not the time but in sequence?
3   A.   I just know he was probably one of the
4 last ones, I'm not sure.
5   Q.   All right. So Officer McKinnon said that
6 you were doing chest compressions for probably about
7 a minute when Sergeant Brisco arrived. Do you have
8 any way to confirm or deny that?
9   A.   I was doing?
10   Q.   No, no, he said they were, somebody was
11 doing chest compressions for about a minute when
12 Sergeant Brisco arrived.
13   A.   I didn't pay attention to it.
14   Q.   Okay. Now did you see them doing chest
15 compressions?
16   A.   Yes.
17   Q.   Did you see anyone attempting to do any
18 breathing assistance for Mr. Towler?
19   A.   I did not see that.
20   Q.   Okay. Are you taught in your CPR class to
21 do breathing assistance for a person who needs to be
22 resuscitated?
23   A.   From when I remember?
24   Q.   Yes.
25   A.   When I went?

## Page 229

1  Q.  Yes.
2  A.  Yes.  I don't remember exactly how it went
3  down though.
4  Q.  I understand.  But CPR included breathing
5  assistance, correct?
6  A.  Yes, sir.
7  Q.  All right.  Do you know whether there's
8  any policy that says if you do not have a mask, you
9  must not do breathing assistance when you do CPR?
10  A.  I'm not aware of it.
11  Q.  Okay.
12  MR. NEWTON: I'd like to take a short
13  break.
14  (Whereupon, the deposition was in
recess from 2:33 to 2:40 and resumed with all
15  parties present.)
16  Q.  (By Mr. Newton) All right. Officer
17  Arroyo, I'm going to mark your hand-drawn depiction
18  of the configuration of you as you got out and Mr.
19  Towler and Officer Thomas with Exhibit 23, okay?
20  A.  Yes.
21  (Exhibit 23 was marked for identification.)
22  Q.  (By Mr. Newton)  Now I've asked you to
23  look at Exhibit 15 or Tab 15 and to just read over
24  Pages 29 through 31 and 40 through 42 and after that
25  I'd like to ask you a series of questions.
Romero Reporting
575-625-1710

## Page 230

1  A.  29 through?
2  Q.  31 and 40 through 42.
3  A.  Am I reading together then?
4  Q.  Just read them all, yeah, 40 through 42.
5  A.  To 42, correct, sir?
6  Q.  Yes.
7  A.  Okay.
8  Q.  Okay?  All right, sir.  Remember we talked
9  about earlier in the deposition that you were told
10  by Sergeant Brisco to go back to the PD.?
11  A.  Yes, sir.
12  Q.  And you did so about 2:36:36, correct?
13  A.  Yes, sir.
14  Q.  At that time did you go up into a room, a
15  waiting room and wait with other officers for your
16  statement to be taken?
17  A.  Yes.
18  Q.  Did that take between an hour and two
19  hours before you were taken into the room?
20  A.  Yes, sir, just about.
21  Q.  Did you speak with the other officers who
22  were there about what had happened?
23  A.  I don't recall I did.
24  Q.  Do you remember others speaking at length
25  about the events of that evening?
Romero Reporting
575-625-1710

## Page 231

1  A.  Like I said, I don't remember.
2  Q.  Did you do a use of force report that
3  night?
4  A.  I don't remember as well.
5  Q.  Did you begin a use of force report?
6  A.  I don't remember.
7  Q.  It's normal for you to do one because it's
8  policy, right?
9  A.  Correct.
10  Q.  So if you -- if you were responding in the
11  normal course, you would have started a use of force
12  report, right?
13  A.  Not in this situation particularly because
14  CID was involved.
15  Q.  You knew while you were sitting in the
16  room with others that CID was involved?
17  A.  Yes.
18  Q.  And how does CID change the use of force
19  report requirement?
20  A.  Once -- I'm talking about myself.  When
21  the CID is involved, I'll usually just let them talk
22  to me about what's going to happen next.
23  Q.  How many times has CID been involved in a
24  situation you've been in?
25  A.  About, I'd say -- well I mean involved as
Romero Reporting
575-625-1710

## Page 232

1  what I've seen as far as from being there four
2  years?  I usually just let CID take the lead.
3  Q.  I understand.  But how many times have you
4  let CID take the lead when you've been involved in
5  something that has gone down that you would have
6  normally done a report in?
7  A.  Several times.  I mean are we talking
8  about just me, myself being involved in something?
9  Or incidents that varies from felony cases?
10  Q.  How many times have you not done a use of
11  force report where you normally would have done one
12  because CID was involved?
13  A.  I can't think of any.
14  Q.  So is this the only time that you didn't
15  do a use of force report because CID got involved?
16  A.  I would say so.
17  Q.  And so did somebody tell you don't do a
18  use of force report, CID is involved?
19  A.  No.
20  Q.  You saw that Officer Kelton said that
21  happened to him, right?
22  MR. SHANOR: Object to form.
23  A.  I'm sorry, I didn't catch that one.
24  Q.  Officer Kelton, in the excerpt that you
25  read, said somebody told him don't finish that
Romero Reporting
575-625-1710

Page 241

1      Q.   All right.  The next one, Exhibit 10, says
2   you have a basic firearms handgun and shotgun,
3   December of 2011; correct?
4      A.   (No response.)
5      Q.   Exhibit 10?
6      A.   Yes, handgun and shotgun.
7      Q.   That's the only one that's in your file
8   that we can find.  Have you done any --
9      A.   Yes, sir.
10      Q.   -- training and basic firearm and handgun
11   since December, 2011?
12      A.   Yes.
13      Q.   Every year?
14      A.   Every year.
15      Q.   Any reason why you can tell us why it's
16   not in your file?
17      A.   You'd have to ask the person in charge of
18   it.
19      Q.   Going on to Exhibit 11, sir, it's just an
20   introduction to incident command, December 2011;
21   correct?
22      A.   Yes, sir.
23      Q.   All right.  Going on to Exhibit 12, sir,
24   that's your Taser certificate, what we were going
25   for, dated January 5, 2012; correct?

Romero Reporting
575-625-1710

Page 242

1      A.   Yes, sir.
2      Q.   And have you had any Taser training since
3   that date?
4      A.   I have not.
5      Q.   So the last -- the first and only time you
6   had Taser training was January 5, 2012 in an
7   eight-hour course; correct?
8      A.   Correct.
9      Q.   And you have been -- you've received no
10   training in Taser since that date, correct?
11      A.   Correct.
12      Q.   Do you know whether the -- the Roswell
13   Police Department has any kind of a regular Taser
14   training course that they -- that they provide?
15      A.   Mandatory?  Is that what you're asking?
16      Q.   Yes, sir.
17      A.   No.
18      Q.   You know that they do not have one?
19      A.   Yes, sir.  They do not.
20      Q.   All right.  Going on to Exhibit -- looks
21   like it's also part of Exhibit 12 unfortunately, is
22   National Incident Management System; do you see
23   that?
24      A.   Yes, sir.
25      Q.   Going on to -- let's just stop there.

Romero Reporting
575-625-1710

Page 243

1   Sir, one of the things I don't see in here is any
2   kind of a certificate indicating that you've
3   received training in Asp or baton.  Did you?
4      A.   Yes.
5      Q.   From the Roswell Police Department?
6      A.   Yes, and the -- in the Academy.
7      Q.   Do you know why it is not reflected in
8   your training manual?
9      A.   I wouldn't be able to answer that
10   question.
11      Q.   Do you know why it's not reflected in your
12   personnel manual?
13      A.   Again, I couldn't answer that question.
14         MR. SHANOR:  I'm sorry, his personnel
15   manual?
16         MR. NEWTON:  I'm sorry, his personnel
17   file.
18      A.   I wouldn't be able to answer that
19   question.
20      Q.   Got it.  Do you know it's required in
21   order to carry an Asp or baton according to policy
22   that you have training in it, right?
23      A.   Yes, sir.
24      Q.   And it's required you have training in all
25   annual deadly force equipment that you carry, right?

Romero Reporting
575-625-1710

Page 244

1      A.   Yes.
2      Q.   And in this case, you've had no training
3   in Tasers since January, 2012; correct?
4      A.   Correct.
5      Q.   Nor have you had any training in baton
6   since the first time you had it, correct?
7         MR. SHANOR:  Object.
8      A.   Like I said, I got my baton and I went to
9   the Academy.
10      Q.   Okay.
11      A.   Where -- more we talked about it more.
12      Q.   That's when you received training in the
13   baton was at the Academy, right?
14      A.   And at the PD.
15      Q.   PD afterwards?
16      A.   No, before.
17      Q.   Before have you received any training
18   since the Academy in the use of batons?
19      A.   No.
20      Q.   Did you receive any training, sir, in
21   avoiding positional asphyxia of an arrestee?
22      A.   Yes.
23      Q.   And in that training were you taught to
24   place the arrestee in a seated position as soon as
25   possible after arrest in order to avoid positional

Romero Reporting
575-625-1710

Page 245

1 asphyxia?
2 A. Yes.
3 Q. And you were aware and trained that that
4 was a right of the arrestee not to be -- not to be
5 asphyxiated because of the position that you have on
6 him, correct?
7 MR. SHANOR: Object.
8 A. It's preferred.
9 Q. Well, you don't do that, you know, you
10 can't do that, right?
11 A. What?
12 MR. SHANOR: Objection.
13 Q. You can't crush an arrestee so that he
14 can't breathe, right?
15 MR. SHANOR: Object.
16 Q. You know that right?
17 A. I agree. But times, sometimes it doesn't
18 go as planned.
19 Q. Yeah.
20 A. There's always exceptions.
21 Q. Okay. Do you believe that the Cody Towler
22 incident was one of those exceptions?
23 A. Like I said, I wasn't there when -- if the
24 people, like you were asking me, if anybody else was
25 on top of him?

Romero Reporting
575-625-1710

Page 246

1 Q. Right.
2 A. I wasn't there. But if it did happen, you
3 got to ask them why they chose to do it.
4 Q. Because after the shackles were on, he was
5 pretty well compliant, right?
6 A. When I left, yes.
7 Q. All right. Did you ever receive any
8 materials, sir, that trained you on Taser use at the
9 RPD?
10 A. Yes.
11 Q. Okay. Did you -- did you get that Taser
12 training that you got in January 2012 at the RPD?
13 A. Yes, sir.
14 Q. Okay. I don't have necessarily all the
15 manuals but I do have some we've been provided and I
16 attached them to Officer Kelton's deposition, so I'm
17 going to show you.
18 MR. OLSON: And counsel, we told you
19 when we -- when we provided that, that that's -- our
20 understanding is that may not be the one exactly
21 that was used at the time some of these officers
22 were trained; in the process of trying to get that
23 information from Taser because that is, if I
24 understand, current or relatively current.
25 MR. NEWTON: I will go over that with

Romero Reporting
575-625-1710

Page 247

1 the witness.
2 Q. (By Mr. Newton) I'm going to show you,
3 sir, a training module at Exhibit 11 of Kelton's
4 deposition. Do you see that or have you ever seen
5 that training material before?
6 A. It's been a long time so I can't say I
7 have.
8 Q. Let me just -- let me just ask you about a
9 few things in this training. One of things it
10 addresses is -- a case called Beaver versus City of
11 Federal Way about using a Taser and how multiple
12 Taser applications can't be justified solely on the
13 grounds of a suspect fails to comply with a command.
14 A. Correct.
15 Q. Did you -- were you taught that, sir?
16 A. I don't remember, like I said.
17 Q. Were you taught -- do you have any
18 recollection of being taught about Beaver versus
19 City of Federal Way?
20 A. It's been a little while, I can't say yes
21 or no.
22 Q. The answer is no, you don't recall?
23 MR. SHANOR: I'm going to object.
24 MR. NEWTON: What did I do wrong?
25 MR. SHANOR: I don't think that

Romero Reporting
575-625-1710

Page 248

1 correctly states what his answer was.
2 MR. NEWTON: Okay.
3 Q. (By Mr. Newton) My understanding is you
4 don't have a recollection one way or the other what
5 you were taught, is that fair?
6 A. That's fair. I don't remember.
7 Q. Were you taught -- this sentence "if
8 circumstances require extended duration discharges
9 and rapid restraint is not an option, the ECD
10 operator should carefully observe the subject and
11 provide breaks in the ECD stimulation when
12 practical." Were you taught that, sir?
13 A. I don't remember.
14 Q. In this case, do you know what breaks you
15 provided to Mr. Towler between your Taser
16 applications?
17 A. Are you asking me if I gave him breaks?
18 Q. Do you recall giving him breaks?
19 A. I don't remember.
20 Q. All right. Were you taught, sir, that any
21 decision to apply multiple Taser applications --
22 this is from Exhibit 11 again -- must take into
23 consideration whether the suspect is capable of
24 complying with the officer's commands?
25 A. I don't remember.

Romero Reporting
575-625-1710



Page 249

1  Q. Okay. I'm going to do this, I have a
2  series of documents in Exhibit 12 to Kelton's
3  deposition which are from a Taser manual dated
4  April, 2013.
5  Let me ask you this: I'm going to show
6  you a few of these and I would like you to breeze
7  through a few of them and say do you have any
8  recollection of receiving this training as depicted
9  on these pages?
10  A. Okay.
11  Q. Okay? You've seen the first page which
12  would be, I believe, Roswell Towler -- wow, I do not
13  see the Bates stamp until we get to this page here,
14  Roswell Towler 2508.
15  Let me do this, sir, so I can have a Bates
16  Stamp number in front of me and you. I'm going to
17  have you go to 2509, first one there. That's a --
18  in Exhibit 12 of Kelton's deposition, that's one
19  that talks about limiting the number and durations
20  of Taser exposures because of the potential
21  physiologic and metabolic effects of Taser. Were
22  you ever taught to limit the number and duration of
23  Taser exposures?
24  A. I believe this was in there.
25  Q. You believe that 2509 was in there?
Romero Reporting
575-625-1710

Page 250

1  A. (Witness nods head.)
2  MR. SHANOR: Is that a yes?
3  A. Yes.
4  MR. NEWTON: Thank you, Steve.
5  Q. Go to 2512, please. That indicates that
6  several law enforcement groups set 15 seconds as the
7  significant safety point for deploying and cycling a
8  Taser. Were you taught that, sir?
9  A. I don't remember this one.
10  Q. Okay. Go to 2513, please. That one says
11  that in -- greater than 15-second Tasings, it
12  increases the risk of death or serious injury. Were
13  you taught that?
14  A. Second one?
15  Q. Yes, greater than 16 seconds increases --
16  in Tasing someone -- increases the risk of death or
17  serious injury. Were you taught that?
18  A. I believe this was on there, too.
19  Q. Okay. Can I get you to look at 2514 --
20  actually, stay there at 2513. It also says that
21  greater than 15 seconds in tasing has to be
22  independently justifiable weighed against other
23  force options. Were you trained that?
24  A. I don't remember that part.
25  Q. Okay. Go to 2514, please. It's an
Romero Reporting
575-625-1710

Page 251

1  indication there that people are okay cardiac wise
2  with Tasings up to 15 seconds. Were you taught
3  anything about limiting your tasing to 15 seconds?
4  A. I believe I was.
5  Q. All right. Go to the next one, please,
6  2516. This is one that talks about arrest related
7  deaths. Have you ever heard of that term?
8  A. Yes.
9  Q. You're aware that people are at risk
10  because of the physiological and metabolic stresses
11  that can contribute to their death when they are
12  arrested, right?
13  A. Right.
14  Q. And you've been taught about excited
15  delirium and arrest related deaths, correct?
16  A. Talked about it.
17  Q. Talked about it. At the Academy?
18  A. Correct.
19  Q. Okay. Were you taught that there is a
20  significant problem as it relates to tasing greater
21  than 15 seconds increasing the risk of arrest
22  related death?
23  A. I believe that was part of the class as
24  well.
25  Q. Okay. Could we have you go, please, to
Romero Reporting
575-625-1710

Page 252

1  2547 through 49. Actually, I think you've already
2  addressed this. My understanding is you do not
3  recall being taught about Beaver versus City of
4  Federal Way, is that true?
5  A. That is true.
6  Q. All right. Let's go on to 2665, sir.
7  A. 2665?
8  Q. 2665.
9  A. 65, correct?
10  Q. Yes, sir.
11  A. Okay.
12  Q. Were you taught that stress induced
13  hesitations may unnecessarily result in additional
14  five-second cycles or extended exposures?
15  A. (No response.)
16  Q. Let me say it a little simpler. Were you
17  taught that sometimes officers forget or are
18  distracted and hold down the trigger or extend and
19  repeat tasing?
20  A. I agree.
21  Q. And that that's a risk?
22  A. Yes, sir.
23  Q. Can you go to 2666? By the way, were you
24  taught about 2665?
25  A. Yes.
Romero Reporting
575-625-1710

### Page 253

1    Q.   All right.  2666, it indicates that you
2  can do -- go hands on during a cycle, right?
3    A.   (No response.)
4    Q.   Is that right?
5    A.   I don't believe -- well, remember talking
6  about it.
7    Q.   Isn't it true that in your statement you
8  believed everyone knew you couldn't go hands on,
9  right?
10   A.   It happens.
11   Q.   You weren't taught about the ability to go
12 hands on, were you?
13   A.   It was touched on, but it wasn't taught.
14   Q.   Was it touched on enough that you
15 understood it?
16   A.   Electricity, everybody is afraid of
17 electricity.
18   Q.   Okay.  All right.  So let's go to 2667.
19 Sir, were you trained that you're supposed to move
20 in during the cycle, five-second cycle, and utilize
21 that window of opportunity to subdue the arrestee?
22   A.   I don't remember that.
23   Q.   Okay.  You don't -- you don't remember
24 being taught that, right?
25   A.   Huh-uh.

Romero Reporting
575-625-1710

### Page 254

1    Q.   That's a yes?  You don't remember?
2    A.   Yes, I don't remember.
3    Q.   Okay.  What about 2668.  Were you taught
4  that sometimes people can't comply if they're
5  suffering from excited delerium?  Do you remember
6  that?
7    A.   I don't.
8    Q.   How about 2683, sir.  Were you taught that
9  if you Tase someone a bunch of times or for an
10 extended cycle or cycles that you're to carefully
11 observe the subject and provide breaks during the
12 Taser stimulations?
13   A.   2683 says that?
14   Q.   Yes, sir.  I believe so.  Maybe I got the
15 wrong one.
16   A.   Control cuff.  (Interruption by Reporter.)
17 It just says once the subject is controlled, cuffed,
18 evaluate the need for medical attention.
19   Q.   Good.  Let's just use that one then, I
20 must have written the wrong one.  Were you trained
21 in that one, 2683?
22   A.   Yes.
23   Q.   Okay.  All right, sir.  I'm going to take
24 a break, I may be done.
25      (Whereupon, the deposition was in
recess from 3:14 to 3:16 and resumed with all
Romero Reporting
575-625-1710
recess from 3:14 to 3:16 and resumed with all

### Page 255

1  parties present.)
2    Q.   (By Mr. Newton)  Officer Arroyo, is there
3  anything in this incident that you wish you could do
4  differently if you could do it again?
5    A.   No, sir.
6    Q.   Is there anything, sir, that you believe
7  that -- or that you wish that you had done that you
8  didn't do?
9    A.   No, sir.
10   Q.   Sir, do you believe that you were -- you
11 were trained adequately to be able to handle the
12 situation as it came up?
13   A.   I did everything in my knowledge to do it
14 correctly.
15   Q.   I understand that but we've gone over
16 several items of training that you hadn't seen
17 before, correct?
18   A.   Correct.
19   Q.   And do you believe that if you'd had those
20 items of training you might have been able to handle
21 this differently, sir?
22   A.   Saw some items that I don't remember if I
23 seen or not.
24   Q.   Right.
25   A.   But that was still do the same way, I

Romero Reporting
575-625-1710

### Page 256

1  would a done the same that I did, that happened that
2  day.
3    Q.   Do you have any regrets about the
4  incident, sir?
5    A.   I'll be honest.
6    Q.   Yeah.
7    A.   I am -- it is sad that he lost his life
8  but I mean there's nothing we could a done
9  different.
10   Q.   You don't believe there's anything you
11 could have done differently?
12   A.   No, sir.
13      MR. NEWTON:  Bass the witness.
14      MR. SHANOR:  We'll reserve our
15 questions for the time of trial.  Officer Arroyo,
16 you have a right to read and sign your deposition,
17 that's to read through the questions asked as they
18 were taken down, your responses.  It's our
19 suggestion that you do that.  Are you agreeable?
20      THE WITNESS:  Yes, sir.
21      MR. SHANOR:  All right.  If you'd get
22 that to me, Lori.
23      (The proceedings concluded at 3:18)
24
25

Romero Reporting
575-625-1710