IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RACHAEL SMITH, as next friend and
mother of, SEBASTIAN TOWLER,
ETHAN TOWLER, and JESSIE TOWLER,
and CHARLIE NELMS, as next friend and
mother of NOAH TOWLER-NELMS and
SHERRIE TOWLER, individually, and
KRISTINA MARTINEZ, as Personal
Representative of the estate of CODY TOWLER,

      Plaintiffs,

vs.                                                                    Civ. No. 15-1004 KG/KRS

CITY OF ROSWELL, a New Mexico
municipality, PHILLIP SMITH,
JONATHON KELTON, JORGE
ARROYO-JAMIE and DYLAN THOMAS,
individually and as agents and
employees of the City of Roswell,

      Defendants.

MEMORANDUM OPINION AND ORDER

      This matter is before the Court on Defendants' Motion to Dismiss Plaintiffs' Second

Amended Complaint and/or Motion for Summary Judgment on the Grounds of Qualified

Immunity and Protections Afforded under the New Mexico Torts Claims Act, and Memorandum

of Law in Support Therefore, filed November 12, 2015.  (Doc. 5).  Plaintiffs filed a response to

the motion on December 15, 2015, and Defendants filed a reply on January 22, 2016.  (Docs. 19

& 23).  Having reviewed the motion, the accompanying briefs, and relevant law, the Court

GRANTS IN PART AND DENIES IN PART Defendants' motion.

*I. Background*

      This is a police excessive force case arising from an incident in which Defendants

Roswell Police Officers Jonathon Kelton, Jorge Arroyo-Jaime, and Dylan Thomas (together, the "officers") Tased and ultimately caused the death of Cody Towler ("Mr. Towler"). Plaintiffs originally filed this case on October 29, 2014, in the Fifth Judicial District Court, County of Chaves, New Mexico. (Doc. 1-2). Defendants removed the case to this Court on November 5, 2015. (Doc. 1).

Prior to Defendants removing the case, Plaintiffs filed a Second Amended Complaint for Wrongful Death and Damages and Liability under the Tort Claims Act, and for Violations of Civil Rights ("Second Amended Complaint") in the Fifth Judicial District Court on October 27, 2015. (Doc. 1-51). The Second Amended Complaint alleges six counts. In Counts I through IV, Plaintiffs bring New Mexico Tort Claims Act ("NMTCA") claims against the officers for negligence, assault and battery, *res ipsa loquitur*, and a spoliation claim. *Id*. at 5-8. In Count I, Plaintiffs further allege that Defendants City of Roswell and Phillip Smith ("Officer Smith"), in his official capacity as the Chief of Police, negligently hired, trained, and supervised Defendants Kelton, Arroyo-Jaime, and Thomas. In Count V, Plaintiffs allege loss of consortium in violation of 42 U.S.C. § 1983 Fourth and Fourteenth Amendments. *Id*. at 8-9. Finally, in Count VI, Plaintiffs bring 42 U.S.C. § 1983 Fourth and Fourteenth Amendment claims for unreasonable search, excessive force, and failure to provide medical care against Defendants Kelton, Arroyo-Jaime, and Thomas and a corresponding municipal liability claim against Defendants the City of Roswell and Officer Smith. *Id*. at 9-14.

Defendants now move to dismiss the Second Amended Complaint, or, in the alternative, for summary judgment on all claims. The officers raise a qualified immunity defense with respect to the Section 1983 claims. Further, the officers argue that they are statutorily immune from the NMTCA state law claims. Plaintiffs oppose the motion in its entirety.

*II. Standard of Review*

Because the Court will examine exhibits outside the Second Amended Complaint in addressing the merits of Defendants' motion, it is appropriate that the Court use a summary judgment standard of review in its analysis. *See* FED. R. CIV. P. 12(d) (if a party presents the court with "matters outside the pleading" and the court does not exclude those matters, then "the motion must be treated as one for summary judgment under Rule 56.").

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). A dispute over a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The Court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's favor. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013).

When a defendant moves for summary judgment on the basis of a qualified immunity defense, the Court "still view[s] the facts in the light most favorable to the non-moving party and resolve[s] all factual disputes and reasonable inferences in its favor." *Estate of Booker v. Gomez*, 745 F.3d 405, 411(10th Cir. 2014). Unlike other affirmative defenses, the plaintiff bears the burden of overcoming the defense of qualified immunity. *Id.* "This is a heavy burden." *Carabajal v. City of Cheyenne, Wyoming*, 847 F.3d 1203, 1208 (10th Cir. 2017).

At the summary judgment stage, the Court "must grant qualified immunity unless the

plaintiff can show (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Estate of Booker*, 745 F.3d at 411. The Court may in its discretion decide which of the two-parts of the qualified immunity test to address first. *Id.* at 412.

"[I]n order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City and Cty. of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992). As the Tenth Circuit recently clarified:

> "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Although plaintiffs can overcome a qualified-immunity defense without a favorable case directly on point, "existing precedent must have placed the statutory or constitutional question 'beyond debate.'" "The dispositive question is 'whether the violative nature of the *particular conduct* is clearly established.'" In the Fourth Amendment context, "the result depends very much on the facts of each case," and the precedents must "squarely govern" the present case. "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"

*Garcia v. Escalante*, 2017 WL 443610, at *4 (10th Cir.) (quoting *Aldaba v. Pickens*, 844 F.3d 870, 877 (10th Cir. 2016) (citations omitted)). The United States Supreme Court has "emphasized that the clearly-established inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *Mullenix v. Luna*, 577 U.S. ___, 136 S.Ct. 305, 308 (2015)). On the other hand, "[t]he law is also clearly established if the conduct is so obviously improper that any reasonable officer would know it was illegal." *Id.* (quoting *Callahan v. Unified Gov't of Wyandotte Cty.*, 806 F.3d 1022, 1027 (10th Cir. 2015)).

Whether a defendant's conduct is objectively reasonable is a legal question, but a factual question may arise when there is a dispute regarding the historical facts material to the objectively reasonable issue. *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1251 (10th Cir.

2003) (holding that objective legal reasonableness of officer's actions is legal question whereas "where the 'historical facts material to [that] issue are in dispute [there] ... [is] an issue for the jury.'" (citation omitted)). As the Tenth Circuit Court of Appeals instructs,

> [i]f the plaintiff does not satisfy either portion of the two-pronged test, the Court must grant the defendant qualified immunity. If the plaintiff indeed demonstrates that the official violated a clearly established constitutional or statutory right, then the burden shifts back to the defendant, who must prove that "no genuine issues of material fact" exist and that the defendant "is entitled to judgment as a matter of law." In the end, therefore, the defendant still bears the normal summary judgment burden of showing that no material facts remain in dispute that would defeat the qualified immunity defense. When the record shows an unresolved dispute of historical fact relevant to this immunity analysis, a motion for summary judgment based on qualified immunity should be "properly denied."

*Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002) (citations omitted).

*III. Facts and Reasonable Inferences Viewed in the Light Most Favorable to Plaintiffs[1]*

On February 4, 2013, at approximately 2:00 a.m., Mr. Towler was in the area of South Union, West Buena Vista Drive and Ridgecrest, in Roswell, New Mexico. (Doc. 1-51) at ¶ 13. Officers from the Roswell Police Department ("RPD") were dispatched to Mr. Towler's location on a complaint of a disorderly person and a possible fight. (Doc. 5-1) at 132:17-21; (Doc. 5-2) at 167:22-168:4. Defendant Officer Thomas arrived on the scene first, identified himself as an RPD officer, and asked Mr. Towler to speak to him. (Doc. 5-1) at 146:9-12. Mr. Towler turned to face Officer Thomas, deployed an asp baton, and then turned and walked away from Officer Thomas. *Id*. at 146:15-147:2. As Mr. Towler walked away, he was yelling, screaming, hitting objects with his baton, and not listening to Officer Thomas' commands. *Id*. at 150:17-25.

Defendant Officer Kelton arrived on the scene after Officer Thomas, at which point Mr. Towler was walking away from the officers and into an alleyway. (Doc. 5-1) at 154:18-20;

---

[1] Unless otherwise noted, the summary of material facts is undisputed.

(Doc. 19-3) at 180:19-22.  Officers Thomas and Kelton waited a minute and then followed Mr. Towler into the alley.  *Id*. at 190:4-12.  According to Officer Thomas, Mr. Towler was ahead of the officers by approximately 30 yards and would periodically turn around and take several steps towards the officers and then turn back and continue walking down the alley.  (Doc. 19-1) at 183:6-13.  Officer Kelton described the steps as "quick and deliberate."[2]  (Doc. 5-2) at 209:7-18.  During this time, Mr. Towler continued to yell, wave his baton, and ignore the commands of the officers to stop and drop the baton.  *Id*. at 205:9-11; (Doc. 19-1) at 186:5-11.

Eventually, Mr. Towler turned around and charged the officers.[3]  (Doc. 5-2) at 205:21-24.  Officer Kelton explained that this charge was different than the other advancements because "[i]t was with ferocity."  *Id*. at 209:1.  It is not clear from the officers' depositions where in the alley this charge took place because Officer Kelton's statements were not consistent and conflicted with Officer Arroyo-Jaime's statements as to Mr. Towler's final location.  *Compare* (Doc. 19-3) at 210:17-212:25, 294:9-295:6; *with* (Doc. 19-4) at 149:11-18; *and* (Doc. 19-6) at 4.  When Mr. Towler was 5 yards away from the officers and running towards them, Officer Kelton

---

[2] Officer Kelton first described Mr. Towler as turning and charging the officers.  Later he stated that Mr. Towler was not charging the officers but took several steps toward them that were "deliberate and quick."  (Doc. 5-2) at 205:10-11, 209:7-18.  Considering the evidence in the light most favorable to Plaintiffs, the Court will adopt Officer Kelton's second description of the steps.

[3] Plaintiffs dispute this fact, stating that they are entitled to an inference that Mr. Towler did not charge the officers, because: (1) Mr. Towler was struck by Taser darts in his back and on the back of his head; (2) Officer Kelton has conflicting memories of how the charge occurred; and (3) the location of where the officers describe this charge is 50 to 55 yards from where the body ultimately lay.  (Doc. 19) at 24.  These facts are supported by the evidence.  However, even accepting these facts as described by Plaintiffs does not lead to a reasonable inference that the charge did not occur.  Therefore, the Court adopts Defendants' version of this fact.

deployed his Taser.[4] (Doc. 5-2) at 214:7-14. The prongs from the Taser struck Mr. Towler in his chest, Officer Kelton described Mr. Towler as falling to his hands and knees and dropping his baton. (Doc. 19-3) at 215:1-18. Officer Thomas stated that because Mr. Towler was running at the officers, he was unable to brace himself and fell down hard when hit by the Taser prongs. (Doc. 19-2) at 4. From this point forward, Mr. Towler did not have his baton and was unarmed. (Doc. 19-3) at 215:9-22, 217:7-9.

The Taser seemed to slow down Mr. Towler initially, but he began to get back on his feet during the 5 second Taser cycle.[5] *Id.* at 215:1-2, 216:14-18, 218:22-25. The two officers were giving Mr. Towler commands to stop resisting, but Mr. Towler began to pick up handfuls of rocks and tried to throw them at the officers.[6] (Doc. 5-1) at 192:11-193:4. Mr. Towler was Tased a second time when Officer Thomas deployed his Taser approximately six seconds after Officer Kelton. (Doc. 19-3) at 219:16-21. This second Tasing "hampered" Mr. Towler, but did not subdue him.[7] *Id.* at 220:10-25. Officer Thomas' Taser prongs hit Mr. Towler in the chest and on the top of his head. (Doc. 19-1) at 199:19-200:22. Officer Thomas explained that the prong hit Mr. Towler on the top of the head because Mr. Towler was reaching down to pick up

---

[4] Plaintiffs dispute the statement that Mr. Towler was running towards the officers, but as described in Footnote 3, *supra*, even considering the facts as alleged by Plaintiffs does not tend to support a reasonable inference that Mr. Towler did not charge at the officers. Therefore, the Court adopts Defendants' version of this fact.

[5] Plaintiffs dispute this fact, but do not offer any evidence pursuant to FED. R. CIV. P. 56(c) to support a factual dispute. Therefore, the Court adopts Defendants' version of this fact.

[6] Based on Officer Kelton's Deposition, Plaintiffs dispute this fact, but do not offer any evidence pursuant to FED. R. CIV. P. 56(c) to support a factual dispute. Therefore, the Court adopts Defendants' version of this fact.

[7] Plaintiffs describe this second Tasing as stopping Mr. Towler. However, in his deposition testimony, Officer Kelton stated that "I would change my word from stop to hamper. It hampered him." (Doc. 19-3) at 10-11.

rocks. *Id*. Officer Thomas and Officer Kelton next ran Taser cycles together. *Id*. at 221:8-10.

Officer Kelton described these Tasings as more effective, but stated that Mr. Towler continued to

resist and tried to rip the Taser cords off.[8] *Id*. at 221:11-18. At this point, Mr. Towler had been

Tased four times, two times each by Officers Thomas and Kelton.

      Officer Kelton admits to running at least one more cycle of his Taser, which he states was

not effective. (Doc. 19-3) at 224:24-225:12. However, the Taser logs for Officer Kelton show

that he ran six five-second Taser cycles in total; therefore, he must have run four more Taser

cycles at this point. (Doc. 19-7) at 6. After running his last Taser cycle, Officer Kelton holstered

his Taser because he did not believe it was having enough effect and drew his firearm. *Id*. at

224:7-10, 227:6-10.

      Soon thereafter, Defendant Officer Arroyo-Jaime arrived in the alley, heard Tasers being

deployed, and saw Mr. Towler on his knees, flailing, and throwing rocks in the air.[9] (Doc. 19-4)

at 171:12-15, 173:17-19. Officer Arroyo-Jaime observed what was happening for 30 seconds to

one minute, after which he Tased Mr. Towler himself. (Doc. 5-1) at 209:21-23; (Doc. 5-3) at

187:16-18; (Doc. 19-4) at 183:19-22. Although Officer Arroyo-Jaime stated that he Tased Mr.

Towler because he did not believe Officer Thomas' Taser was having any effect on Mr. Towler,

Mr. Towler was on his knees and screaming, but not "making any sense." (Doc. 5-3) at 187:19-

---

[8] In their facts, Plaintiffs refer to Officer Kelton's deposition that these Tasings were more
effective. (Doc. 19) at 8, ¶¶ 34-35. However, Officer Kelton also states that Mr. Towler
continued to try and resist and was ripping the Taser cords out of his chest. (Doc. 19-3) at
221:11-18.

[9] Officer Arroyo-Jaime could not say whether Mr. Towler was trying to throw the rocks at the
officers or just in the air. (Doc. 19-4) at 174:10-25. Considering the evidence in the light most
favorable to Plaintiffs, the Court will accept that Mr. Towler was throwing rocks in the air and
not at the officers.

23; (Doc. 19-4) at 182: 15-23, 188:13-15.  Officer Thomas stated that Officer Arroyo-Jaime Tased Mr. Towler in the back.[10]  (Doc. 19-3) at 232:9-11.

The officers stated that the Tasing was effective at this point and Mr. Towler dropped to the ground on his stomach and he was incapacitated immediately.  (Doc. 5-1) at 209:23-25; (Doc. 19-3) at 241:18-23; (Doc. 23-4) at 191:21-192:14.  Officer Thomas stated that this Tasing was immediately effective and was more effective than the last Tasings.  (Doc. 19-3) at 236:14-17.  However, Officer Arroyo-Jaime Tased Mr. Towler a second time, this deployment was simultaneous with a Taser deployment by Officer Thomas.[11]  *Id.* at 239:14-17.  In total, Officer Arroyo-Jaime Tased Mr. Towler four times and Officer Thomas Tased Mr. Towler five times. (Doc. 19-7) at 1-4.  Mr. Towler was therefore Tased 15 times by Officers Kelton, Thomas, and Arroyo-Jaime.[12]

---

[10] Officer Arroyo-Jaime stated that he Tased Mr. Towler in the front.  (Doc. 19-4) at 187:10-12. Considering the evidence in the light most favorable to Plaintiffs, the Court will accept that Officer Arroyo-Jaime Tased Mr. Towler in his back.

[11] Both Plaintiffs and Defendants agree that Officer Arroyo-Jaime and Officer Thomas Tased Mr. Towler at the same time; however, there is some discrepancy as to when that occurred. Defendants appear to suggest Officer Thomas Tased Mr. Towler at the same time as Officer Arroyo-Jaime's first Taser deployment, a fact that Plaintiffs agreed was undisputed. (Doc. 5) at ¶ 12; (Doc. 19) at 19, ¶ 1.  However, in their response, Plaintiffs also appear to suggest that Officer Thomas Tased Mr. Towler at the same time as Officer Arroyo-Jaime's second Taser deployment. (Doc. 19) at 10, ¶¶ 46-49.  Officer Thomas stated that after he Tased Mr. Towler a third time, Officer Arroyo "was there and we kind of get him at the same time."  (Doc. 5-1) at 209:21-23. Officer Kelton noted that Officer Thomas activated his Taser during Officer Arroyo-Jaime's second cycle.  (Doc. 19-3) at 239:14-17.  Considering the evidence in the light most favorable to Plaintiffs, the Court will consider Plaintiffs version of the facts that Officer Thomas Tased Mr. Towler simultaneously with Officer Arroyo-Jaime during Officer Arroyo-Jaime's second Taser deployment.

[12] The Court notes that Plaintiffs contend Mr. Towler was Tased fourteen times, (Doc. 19 at 8); however, the Taser logs show that Tasers were activated by Officer Kelton six times, Officer Thomas five times, and Officer Arroyo-Jaime four times.  (Doc. 19-7).  Therefore, Mr. Towler was Tased a total of 15 times.

After Officer Arroyo-Jaime ran his last Taser cycle, Officer Kelton was able to pull Mr. Towler's left arm behind his back and cuff it. (Doc. 5-1) at 209:25-210:1. Officer Arroyo-Jaime stated that Officer Kelton was able to cuff Mr. Towler's left arm easily without any "pain compliance."[13] (Doc. 19-4) at 193:12-22; 194:9-13.(Doc. 19-3) at 245:16-19. Even so, Officer Kelton testified that Officer Arroyo-Jaime used pain compliance to help Officer Kelton with Mr. Towler's left arm by striking Mr. Towler's thighs with his baton. (Doc. 19-3) at 255:19-256:18. After securing Mr. Towler's left arm, Officer Thomas kicked Mr. Towler's shoulder or upper arm between 5 and 10 times with his boot and Officer Arroyo-Jaime kicked Mr. Towler's lower, right torso and struck his thigh twice with a baton to free Mr. Towler's right arm from under his body. (Doc. 5-1) at 210:13-20; (Doc. 19-3) at 253:1-25; (Doc. 19-4) at 193:23-194:8. Officer Arroyo-Jaime stated that the officers did not try to free Mr. Towler's right arm in another way before using pain compliance. (Doc. 19-4) at 196:20-198:9.

Once the officers handcuffed Mr. Towler, Officer Arroyo-Jaime stated that he continued to move and fight, so the officer sat on Mr. Towler's legs to hold him down. (Doc. 5-3) at 205:6-10). Officer Burkowski, sat on Mr. Towler's feet and Officer Arroyo-Jaime detailed that Officer Kelton was sitting on top of Mr. Towler.[14] (Doc. 5-2) at 4-18; (Doc. 19-4) at 209:10-19. The sergeant on duty, Sergeant Sharpe, indicated that he saw between 3 and 5 officers on top of Mr. Towler when he arrived at the scene. (Doc. 19-8) at 2. At some point, Officer Arroyo-Jaime felt Mr. Towler kick his back, so he asked another officer, Officer McKinnon, to shackle Mr.

---

[13] Officer Kelton stated that it took all of his strength to get Mr. Towler's left arm cuffed. (Doc. 19-3) at 245:16-19). Considering the evidence in the light most favorable to Plaintiffs, the Court will consider Officer Arroyo-Jaime's description of the events.

[14] Officer Kelton stated that he let his knee rest on Mr. Towler's back so that Mr. Towler was not able to roll. (Doc. 19-3) at 250:22-24. Considering the evidence in the light most favorable to Plaintiffs, the Court will accept that Officer Kelton was sitting on top of Mr. Towler.

Towler's legs. (Doc. 19-3) at 205:11-16. Officer Arroyo-Jaime stated that Mr. Towler calmed down after his legs were shackled. *Id.*

Officer Kelton stated that he and Officer Arroyo-Jaime were sitting on Mr. Towler's legs when Sergeant Sharpe radioed that Mr. Towler was in custody, which occurred at 2:12:37 a.m.[15] (Doc. 19-3) at 252:1-12; (Doc. 19-4) at 213:28-23. At 2:17:04 a.m., Sergeant Sharpe called for an ambulance, which is standard after Tasers are used on an individual, and told the officers to get off of Mr. Towler. (Doc. 5-2) at 269: 10-17; (Doc. 19-3) at 264:1-9. When the officers got off Mr. Towler, he remained lying face down. (Doc. 19-4) at 222:7-8.

At 2:18:56 a.m., the officers saw that there was a problem with Mr. Towler and called a code three for an emergency. (Doc. 5-2) at 269:21-25. The officers rolled Mr. Towler to his side and checked his pulse and pupils and found that Mr. Towler was not breathing. (Doc. 23-2) at 268:6-10. At 2:21:30 a.m., the officers reported starting CPR.[16] (Doc. 19-3) at 44:20-25, 272:13-16. The officers did not have face masks, so they did not perform mouth-to-mouth CPR, but they did perform multiple rounds of chest compressions. (Doc. 23-2) at 39:12-40:5, 273:4-8. Mr. Towler was pronounced deceased on February 4, 2013. (Doc. 1-51) at ¶ 9.

Photographs from the scene show Mr. Towler had facial lacerations. (Doc. 19-10). Officer Arroyo-Jaime testified that Mr. Towler did not have the facial lacerations when Officer Arroyo-Jaime arrived at the scene. (Doc. 19-4) at 186:11-18. He stated that the facial lacerations more than likely occurred when the officers were subduing Mr. Towler and

---

[15] Once the shackles were put on, Officer Arroyo-Jaime stated that he got off of Mr. Towler. (Doc. 5-3) at 213:8-9. This testimony conflicts with Officer Kelton's testimony regarding when Officer Arroyo-Jaime got off of Mr. Towler; therefore, the Court will consider Officer Kelton's testimony that the officers remained on top of Mr. Towler.

[16] Officer Kelton reported that he did not believe it took so long before CPR was started; however, considering the evidence in the light most favorable to Plaintiffs, the Court will consider that the officers did not begin CPR until 2:21:30 a.m. (Doc. 19-3) at 272:22-273:1.

acknowledged that the injuries could have been caused by Mr. Towler's face being rubbed against the gravel on the ground. *Id*. at 186:19-22, 218:1-9.

In terms of training, Officer Kelton stated that he was trained to give pauses between Taser deployments and to minimize the number of deployments. (Doc. 19-3) at 240:21-241:2, 281:3-17. Officer Arroyo-Jaime admitted that he learned that it was important to limit the number and duration of Tasings and that arrestees should be placed in a seated position to avoid positional asphyxiation. (Doc. 19-4) at 249:18-24, 244:23-245:2.

*IV. Discussion*

Defendants moved for summary judgment on all of Plaintiffs' claims under Section 1983 and the NMTCA. The Court will address each in turn.

A. *Count VI: Section 1983 Fourth and Fourteenth Amendment Claims Against the Defendants*

Plaintiffs bring unreasonable search, excessive force, and failure to provide medical care claims under both the Fourth and the Fourteenth Amendments. (Doc. 1-51) at 11-13. Before discussing the claims, the Court will review which Amendment is proper for Plaintiffs' unreasonable seizure and excessive force claims.

1. *Which Amendment Covers Unreasonable Seizure and Excessive Force Claims*

a. *Unreasonable Seizure Claims*

It is well-established that if "a particular [Constitutional] Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of [Fourteenth Amendment] substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (internal quotation marks omitted). In the context of unlawful seizures, the Fourth Amendment is the appropriate Amendment to apply when the government behavior at

issue "lead[s] up to and include[es] an arrest of a citizen previously at liberty . . . ." *Porro v. Barnes*, 624 F.3d 1322, 1325 (10th Cir. 2010). That is the case here and so the applicable Amendment is the Fourth Amendment and not the Fourteenth Amendment. Therefore, the Court will dismiss the Fourteenth Amendment unreasonable seizure claims with prejudice.

### b. Excessive Force Claims

The Fourth Amendment is also the appropriate Amendment to apply when one contends that the government used excessive force in the arrest of a citizen. *Id.* Moreover, the Fourth Amendment governs when an officer uses excessive force after the warrantless arrest of a person but prior to that person being "brought before a judicial officer for a determination of probable cause to arrest." *See Frohmader v. Wayne*, 958 F.2d 1024, 1026 (10th Cir. 1992). In this case, the applicable Amendment is the Fourth Amendment, not the Fourteenth Amendment. The Court will, therefore, dismiss the Fourteenth Amendment excessive force claims with prejudice.

### 2. Fourth Amendment Unreasonable Seizure Claims

### a. Law of Unreasonable Seizure

"A police officer violates an arrestee's clearly established Fourth Amendment right to be free of unreasonable seizure if the officer makes a warrantless arrest without probable cause." *Olsen*, 312 F.3d at 1312 (citing *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995) (internal quotation marks and citations omitted). "When a warrantless arrest is the subject of a [Section] 1983 action, the defendant arresting officer is entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest the plaintiff." *Id.*

However,

> [w]hen there are unresolved disputes of historical fact relevant to whether the officer had probable cause and to what information he possessed—and thus to whether he may properly claim qualified immunity, a court may not grant summary judgment based on qualified immunity because the officer would not have shown that no genuine dispute exists as to material fact.

*Olsen*, 312 F.3d at 1312-13.

Under Fourth Amendment law, there are "three categories of police-citizen encounters: consensual encounters, investigative stops, and arrests." *Morris v. Noe*, 672 F.3d 1185, 1191 (10th Cir. 2012). The issue in this case is whether seizing Mr. Towler was justified as an investigative detention, a *Terry* stop. An officer justifiably conducts a *Terry* stop when the officer has a reasonable, articulable suspicion that a crime is being committed. *Id.* (citing *United States v. Sokolow,* 490 U.S. 1, 7 (1989)). "A detention ceases to be a *Terry* stop and becomes an arrest if it continues for an excessive time or closely resembles a traditional arrest." *Id.* at 1192 (citing *Hiibel v. Sixth Judicial Dist. Ct. of Nev.,* 542 U.S. 177, 186 (2004)). Although the Tenth Circuit has held that the use of handcuffs generally exceeds the scope of a *Terry* stop, the Tenth Circuit has approved "takedowns" and handcuffing during *Terry* stops to "maintain the status quo" or "to protect [officers'] personal safety," if "the circumstances reasonably warrant such measures." *United States v. Melendez-Garcia*, 28 F.3d 1046, 1051-52 (10th Cir. 1994).

> b. *Whether the Officers are Entitled to Qualified Immunity on Plaintiffs' Section 1983 Claims for Unreasonable Seizure*

Defendants argue that the officers had reasonable suspicion sufficient to stop Mr. Towler and probable cause to subsequently arrest him. (Doc. 5) at 13. The officers contend that when they arrived on the scene, Officer Thomas announced himself as RPD and asked to speak to Mr. Towler. *Id.* at 14. Mr. Towler responded by turning to face Officer Thomas, deploying a baton,

and then turning around and walking away from Officer Thomas while screaming and hitting objects with his baton. *Id.* The Officers maintain that they did not arrest Mr. Towler until after he charged at them while holding the baton. *Id.*

Plaintiffs state that the officers did not have probable cause to arrest Mr. Towler. (Doc. 19) at 35. Plaintiffs admit that "[i]f the jury concludes that Mr. Towler charged the officers without provocation, obviously, probable cause for his arrest existed." *Id.* However, Plaintiffs maintain that they are "entitled to the inference" that the officers deployed their Tasers at Mr. Towler's back and the back of his head in order to stop Mr. Towler as he was walking away from them. *Id.*

The officers arrived on the scene after a call regarding a disorderly person and a possible fighting. As described above, when Officer Thomas encountered Mr. Towler at the scene and announced he was from the RPD, Mr. Towler faced Officer Thomas, deployed a baton, then turned around and walked away screaming and hitting objects with his baton. Mr. Towler refused to obey the officers' instructions or identify himself to the officers. Consequently, Officer Thomas could reasonably conclude that a crime was being committed, specifically concealing one's identity, a petty misdemeanor in New Mexico. *See* NMSA 1978, § 30-22-3 (Repl. Pamp. 2004). Based on these facts, the officers were justified in trying to detain Mr. Towler pursuant to a *Terry* stop to investigate. The question then becomes whether circumstances reasonably warranted the officers' use of forceful techniques to detain Mr. Towler.

As Officer Thomas and Officer Kelton were following Mr. Towler, the undisputed facts show that Mr. Towler turned around and ran at them with his baton.[17]  Once Mr. Towler ran at the officers with a baton, the officers were permitted "to take such steps as reasonably necessary to protect their personal safety . . . ."  *Melendez-Garcia*, 28 F.3d at 1051 (quoting *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993)) (internal quotations marks omitted).  Officer Kelton initiated the use of force once Mr. Towler was actively threatening officers.  These facts entitle the officers to qualified immunity from Plaintiffs' unreasonable seizure claim, as the officers had a "reasonable suspicion" that a crime was being committed when they tried to stop Mr. Towler.  Further, as Plaintiffs admit, once Mr. Towler charged at the officers, the officers had probable cause to arrest him.  Given these facts, Plaintiffs have failed to demonstrate that the officers violated Mr. Towler's Fourth Amendment right to be free from an unreasonable seizure.  Therefore, the officers are entitled to qualified immunity on the unreasonable seizure claim.  Because the Court finds that no constitutional violation occurred, it need not reach the question of whether the right allegedly violated was clearly established.  The Court will grant summary judgment as to the Fourth Amendment unreasonable seizure claim.

3. *Fourth Amendment Excessive Force Claims*

a. *Law of Excessive Force*

"Excessive force claims are governed by the Fourth Amendment's objective reasonableness standard."  *Morris v. Noe*, 672 F.3d 1185, 1195 (10th Cir. 2012) (quoting *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 664 (10th Cir. 2010)).  "Under this standard, the question is whether the officers' actions are objectively reasonable in light of the facts and

---

[17] Plaintiffs maintain that they are entitled to an "inference" that Mr. Towler did not run at the officers, but was in fact walking away when he was Tased from behind.  However, even a consideration of the facts in a light most favorable to Plaintiffs does not tend to support a reasonable inference that Mr. Towler did not charge the officers.

circumstances confronting them, without regard to their underlying intent or motivation." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). The determination whether actions are objectively reasonable turns on "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to flee." *Lord v. Hall*, 520 Fed. Appx. 687, 692 (10th Cir. 2013) (unpublished) (citing *Graham*, 490 U.S. at 396).

Excessive force claims "are generally fact questions for the jury." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1288 (10th Cir. 2008) (citing *Quezada v. Cty. of Bernalillo*, 944 F.2d 710, 715 (10th Cir. 1991) ("[W]hether the police used excessive force in a § 1983 case has always been seen as a factual inquiry best answered by the fact finder.") (collecting cases), *overruled on other grounds by Saucier v. Katz*, 533 U.S. 194 (2001)). That is, a jury typically decides a "mixed factual-legal inquiry . . . whether the force used was reasonable." *Cavanaugh*, 718 F.3d at 1254.

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. The Tenth Circuit "will not approve summary judgment in excessive force cases—based on qualified immunity or otherwise—if the moving party has not quieted all disputed issues of material fact." *Olsen*, 312 F.3d at 1314 (citing *Allen v. Muskogee*, 119 F.3d 837, 840-42 (10th Cir. 1997) (denying summary judgment where material dispute of fact remained as to officers' actions prior to shooting and killing man who refused to drop his gun while threatening suicide)); *see also Cavanaugh*, 718 F.3d at 1254 ("Only where there are no disputed questions of historical fact does the court make the excessive force determination on its own, such as on summary judgment."). Specifically, the Tenth Circuit has held that "such material factual

disputes involving the 'immediate connect[ion]' of an officer's use of force in response to 'a suspect's threat of force' prevent a court from granting summary judgment." *Id.* at 1315 (quoting *Muskogee*, 119 F.3d at 840).

### b. Whether the Officers are Entitled to Qualified Immunity on Plaintiff's Section 1983 Claim for Excessive Force

Defendants argue that Officers Kelton, Thomas, and Arroyo-Jaime did not use excessive force against Mr. Towler as their actions were objectively reasonable. (Doc. 5) at 2, 8. Further, Defendants contend that the officers are entitled to qualified immunity because they did not violate any of Mr. Towler's clearly established rights. *Id.*

Plaintiffs maintain that the officers' number of Taser applications, the length of the Taser applications and aggregate duration, the lack of pauses between applications, the simultaneous applications, and the failure to use "the window of opportunity" violate Mr. Towler's clearly established Fourth Amendment right to be free from excessive force. (Doc. 19) at 21.

### i. The Fifteen Tasings

### 1. Constitutional Violation

Turning first to the severity of the crime, officers were called to the scene based on a complaint of a disorderly subject and a possible fight. Officer Kelton stated he did not have any suspicion that Mr. Towler had violated the law at the time the officers arrived on the scene. (Doc. 19-3) at 196:18-20. Officer Thomas believed that Mr. Towler violated the law by not stopping and speaking with the officers. (Doc. 19-1) at 151:6-13. Defendants now argue that Mr. Towler committed a petty misdemeanor by failing to identify himself to the officers.[18]

---

[18] In New Mexico,

> [c]oncealing identity consists of concealing one's true name or identity, or disguising oneself with the intent to obstruct the due execution of the law or with

Assuming Mr. Towler did commit this crime, as a petty misdemeanor "his infraction would be among the least severe crimes contemplated by New Mexico law, and the amount of force used should have been reduced accordingly." *Fogarty v. Gallegos*, 523 F.3d 1147, 1160 (10th Cir. 2008) (citing *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007)).  Mr. Towler's minor offense, if any, supported the use of minimal force.

As for the second factor of whether Mr. Towler posed an immediate threat to the safety of the officers or others, when Officer Thomas encountered Mr. Towler, Mr. Towler deployed a baton and walked away, yelling and hitting objects with his baton.  Officers Thomas and Kelton followed him and Mr. Towler would turn around and take several steps towards them, eventually turning around and running at the officers.  Officer Thomas used his Taser for the first time as Mr. Towler ran towards the officers with his baton.  Based on these facts, Mr. Towler posed an immediate threat to the safety of the officers when he ran at them with a baton; thus, it was reasonable for the officers to use force against him at that time.

Because the officers had probable cause to arrest Mr. Towler after he charged at them, Mr. Towler's reaction after charging the officers is properly evaluated under the third factor of whether he was actively resisting or evading arrest.  The facts show that Mr. Towler resisted arrest; therefore, use of some force when he was resisting was reasonable.  "However, the relevant inquiry is whether the Taser use was reasonable and proportionate given [Mr. Towler's] resistance." *Perea v. Baca*, 817 F.3d 1198, 1203 (10th Cir. 2016).  After the initial use of force, the officers Tased Mr. Towler fourteen times.  Mr. Towler continued to resist arrest until Officer

intent to intimidate, hinder, or interrupt any public officer or any other person in a legal performance of his duty or the exercise of his rights under the laws of the United States or of this state.

NMSA 1978, § 30-22-3.

Arroyo-Jaime Tased him. The Tenth Circuit has upheld an officer's use of force against individuals who were physically resisting arrest. *Waters v. Coleman*, 632 F. App'x 431, 437 (10th Cir. 2015) (collecting cases). Therefore, it was not objectionably unreasonable for the officers to use force when Mr. Towler was resisting arrest.

The Defendants compare the facts in this case to *Hinton v. City of Elwood, Kan.*, where after a dispute with an animal control officer, police officers shoved a resident's face into the asphalt, twisted his arm behind his back, and Tased him at least three times in order to handcuff him. 997 F.2d 774, 777 (10th Cir. 1993). The Tenth Circuit held that even though the resident was initially stopped by police for the misdemeanor of disturbing the peace and he was not an immediate threat to the police or public, the force used by the police was reasonable because the resident was resisting police officers commands and the force stopped once the resident was secured. *Id*. at 781. It is well-settled that "the Fourth Amendment recognizes the right of the police, in making an arrest or stop, 'to use some degree of physical coercion or threat thereof to effect it.'" *Id*. (citing *Graham*, 490 U.S. at 396)). The Court agrees that the case at bar is similar to *Hinton* until Officer Arroyo-Jaime Tased Mr. Towler. However, there is evidence that once Officer Arroyo-Jaime used his Taser, Mr. Towler stopped resisting.

Although the use of force against an individual who continues to resist may be justified, "continued and increased use of force against a subdued detainee is not." *Perea*, 817 F.3d at 1203 (citing *Dixon v. Richer*, 922 F.2d 1456, 1463 (10th Cir. 1991)). The officers admitted that Officer Arroyo-Jaime's first Taser deployment was effective. Officer Arroyo-Jaime specifically stated that Mr. Towler "immediately dropped to his stomach," and the Taser "incapacitated his body immediately." (Doc. 23-4) at 191:21-25. Yet, once Mr. Towler was "incapacitated," both Officers Thomas and Arroyo-Jaime continued to Tase Mr. Towler. Mr. Towler initially posed a

threat to the officers such that they were justified in using force against him; however, "the justification disappeared" once Mr. Towler "was under the officers' control." *Perea*, 817 F.3d at 1204. Continuing to Taser Mr. Towler after he was subdued was objectively unreasonable.

The Court is aware that the officers were "forced to make split second judgments – in circumstances that [were] tense, uncertain, and rapidly evolving – about the amount of force" that was necessary in this situation. *Graham*, 490 U.S. at 396-97. However, it is clear from the officers' testimony that the situation they faced changed over time. When Officer Kelton first Tased Mr. Towler, Mr. Towler was charging at the officers with a baton in his hand. By contrast, after Officer Arroyo-Jaime Tased Mr. Towler, he had been subdued. Considering the facts in the light most favorable to Plaintiffs, Mr. Towler was no longer a threat to the officers once he was subdued and on the ground, but the officers continued to Taser him. This force was disproportionate to the threat that Mr. Towler posed and was objectively unreasonable.

### 2. *Clearly Established Law*

Notwithstanding the unreasonable use of force, Defendants argue that there was no clearly established Tenth Circuit law such that a reasonable officer would know that his conduct was unlawful. (Doc. 5) at 11. This case is most similar to the *Perea* case, in which the Tenth Circuit found that it was objectively unreasonable to continue to Taser a suspect at least nine times in a row after he had been subdued by officers. *Perea*, 817 F.3d at 1204. The Tenth Circuit held that at the time of the arrestee's death in 2011, it was "clearly established that officers may not continue to use force against a suspect who is effectively subdued." *Id*. Further, the Court noted that the "disproportionate use of a Taser, and repeated use of a Taser against an effectively subdued individual, are clearly established constitutional violations." *Id*. at 1204, n.4.

Viewing the evidence in a light most favorable to Plaintiffs, a reasonable jury could find that the officers continued to use force after Mr. Towler was subdued. Given *Perea*'s general principle that force may not be used once a suspect is subdued, a jury could find that the officers' use of force in these circumstances was unlawful. Accordingly, the officers are not entitled to qualified immunity on the Fourth Amendment excessive force claims based on the Tasings.

*ii.* *The Force Used During and After Handcuffing Mr. Towler*

*1. Constitutional Violation*

After being Tased 15 times, Officer Arroyo-Jaime struck Mr. Towler's thighs several times with a baton, and Officer Thomas kicked Mr. Towler with his boot approximately five times and also struck Mr. Towler with his baton in order to handcuff Mr. Towler. Mr. Towler also sustained facial lacerations that most likely occurred after he was Tased and on the ground during the handcuffing. The deposition testimony of the officers conflicts as to whether Mr. Towler was resisting while the officers tried to handcuff him. Further, the parties disagree as to how long the officers remained on top of Mr. Towler after he was handcuffed and stopped resisting.

Applying the *Graham* test to the circumstances as they relate to the officers' conduct after Mr. Towler was Tased and subdued; the officers' conduct cannot be justified by the severity of the crime at issue, by any threat to the safety of the officers or others, or by active resistance to arrest or an attempt to evade arrest by flight. Indeed, taking the facts in a light most favorable to Plaintiff, Mr. Towler's crime was not severe; Mr. Towler had already been subdued on the ground and was not resisting arrest. Despite this, the officers hit Mr. Towler several times with their batons, kicked him, and sat on him for approximately four minutes as he was handcuffed

and lying face down. Continuing to use force on an individual that is no longer resisting is not objectively reasonable. *Dixon*, 922 F.2d at 1463.

Defendants present a different version of events and characterize Mr. Towler as continuing to be aggressive after the Tasings. However, the Court views Plaintiffs' version of events to be true, absent any evidence in the record that "utterly discredit[s]" Plaintiffs' version so "that no reasonable jury could have believed [them]." *Rhoads v. Miller*, 352 Fed. Appx. 289, 291 (10th Cir. 2009) (unpublished) (citing *Scott v. Harris*, 550 U.S. 372, 378, 380 (2007)). Here, the officers themselves dispute the events that occurred after Mr. Towler was Tased. For the foregoing reasons, the Court cannot find that the officers' conduct was objectively reasonable as a matter of law.

## 2. *Clearly Established Law*

Again, in order to overcome the defense of qualified immunity, Plaintiffs must show that the officers' use of force violated "clearly established law." *Casey*, 509 F.3d at 1286. As stated above, it was clearly established at the time of Mr. Towler's arrest that officers cannot continue to use force on a suspect that has been subdued. Further, the Tenth Circuit has held that it is "clearly established that putting substantial or significant pressure on a suspect's back while the suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." *Estate of Booker*, 745 F.3d at 424 (quoting *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004)) (internal quotation marks omitted). Accordingly, the officers are not entitled to qualified immunity on the Fourth Amendment excessive force claim based on the actions of the officers during and after handcuffing Mr. Towler.

### 4. Fourteenth Amendment Failure to Provide Medical Care

#### a. Law of Failure to Provide Medical Care

Plaintiffs also allege that the officers violated Mr. Towler's Fourteenth Amendment rights by failing to provide adequate medical care by failing to determine Mr. Towler's medical needs and delaying CPR. (*See* Doc. 1-51) at ¶¶ 59-60. Defendants argue that the officers provided Mr. Towler the appropriate medical care by calling an ambulance when they noticed that he needed attention and by performing chest compressions. (Doc. 23) at 16.

"[T]he Eighth Amendment's standard of deliberate indifference to a prisoner's medical needs applies to pretrial detainees, and even arrestees, under the Fourteenth Amendment's Due Process protections." *Estrada v. Cook*, 166 F. Supp. 3d 1230, 1244 (D.N.M. 2015) (citing *Wilson v. Meeks*, 52 F.3d 1547, 1555-56 (10th Cir. 1995), *abrogated by Clark v. Bowcutt, et al.*, No. 14-4163, 2017 WL 56283 (10th Cir. 2017) (unpublished)). A plaintiff must establish "an excessive risk to [ ] health or safety" was known and disregarded and the delay resulted in substantial harm. *Id*. (quoting *Sealock v. Colo.*, 218 F.3d 1205, 1209 (10th Cir. 2000)) (internal quotation marks omitted). To be held liable for deliberate indifference, a defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (quoting *Farmers v. Brennan*, 511 U.S. 825, 837 (1994)). Deliberate indifference can be demonstrated by showing that medical care was intentionally denied or delayed. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).

The Supreme Court established a two-pronged test for deliberate indifference claims, such that a plaintiff must satisfy an objective and a subjective prong. *Farmer*, 511 U.S. at 837-40. The objective prong considers the severity of a plaintiff's need for medical care, while the

subjective prong considers the defendant's state of mind. *Sealock*, 218 F.3d at 1209. Defendants do not dispute the objective prong that Mr. Towler had a sufficiently serious medical need, but instead dispute the subjective prong. Therefore, the Court will focus on the subjective question of whether Plaintiffs have "present[ed] evidence of the [Defendants'] culpable state of mind." *Estate of Booker*, 745 F.3d at 430 (quoting *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005)) (internal quotation marks omitted).

### b. Whether the Officers are Entitled to Qualified Immunity on Plaintiff's Section 1983 Claim for Failure to Provide Medical Care

Here, the officers on the scene called for an ambulance, which is standard procedure after Tasers are used on an individual. The Call for an ambulance was at 2:17:04 a.m. At 2:18:56 a.m., the officers called an emergency and checked Mr. Towler's vital signs and his pupil dilation. Plaintiffs contend that Mr. Towler was left alone, lying face down from 2:17:04 a.m. until 2:18:56 a.m., even though officers had been trained to monitor arrestees after they are Tased. (Doc. 19) at 30-31. However, Officer Arroyo-Jaime stated that Mr. Towler was never by himself and Officer Kelton stated that the officers noticed very quickly that something was wrong with Mr. Towler. (Doc. 23-2) at 269: 4-9; (Doc. 23-4) at 204:4. Although less than two minutes passed between the time an ambulance was called and an emergency was called, the Tenth Circuit has recognized that "even a brief delay" in providing medical care "may be unconstitutional." *Estate of Booker*, 745 F.3d at 432 (quoting *Mata*, 427 F.3d at 755) (internal quotation marks omitted).

Plaintiffs compare this case to that of *Estate of Booker*, where after Tasing a pretrial detainee, using a carotid neck hold, and placing weight on his back, officers placed the detainee face down in a cell by himself for 3 to 5 minutes without checking whether he needed medical attention. *Id*. at 415-16. When officers placed the detainee in the cell, a video suggested that he

was already limp, unconscious, and in need of medical care. *Id*. at 431. The Tenth Circuit found that "a reasonable jury could conclude the [officers] inferred that [the pretrial detainee] was unconscious and needed immediate medical attention," and the officers were deliberately indifferent. *Id*. at 431-32. The case at bar is distinguishable from *Estate of Booker*, as here, the officers called for an ambulance after the Tasings and called an emergency as soon as they saw Mr. Towler was no longer responding. Given these facts, Plaintiffs have failed to demonstrate that the officers delayed medical care for Mr. Towler by calling for an ambulance and calling an emergency when they did.

Plaintiffs further contend that the officers failed to commence CPR in a reasonable amount of time and only performed chest compressions. After calling an emergency at 2:18:56 a.m., the record shows that the officers did not report starting chest compressions until 2:21:30 a.m. The due process clause requires officers to provide medical care for individuals who are injured while being apprehended by police officers. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). The question in this case is how much medical care must the officers provide. The parties both cite cases in which Courts have found police officers that failed to perform CPR to be both deliberately indifferent and not deliberately indifferent. *Compare Estate of Booker*, 745 F.3d at 431-32 (citing *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1083 (9th Cir. 2013) ("While the failure to provide CPR to a prisoner in need does not create an automatic basis for liability in all circumstances, a trier of fact could conclude that, looking at the full context of the situation, officers trained to administer CPR who nonetheless did not do so despite an obvious need demonstrated the deliberate indifference required for an Eight Amendment claim."), *McRaven v. Sanders*, 577 F.3d 974, 983 (8th Cir. 2009) ("An officer trained in CPR, who fails to perform it on a prisoner manifestly in need of such assistance, is

liable under [Section] 1983 for deliberate indifference."), *Tlamka v. Serrell*, 244 F.3d 628, 633-34 (8th Cir. 2001) (10-minute delay in providing CPR or any other form of assistance to unconscious inmate could support finding of deliberate indifference)); *with Tagstrom v. Enockson*, 857 F.2d 502, 504 (8th Cir. 1988) (officer had no affirmative duty to give medical assistance himself, such as CPR, when he immediately called an ambulance), *and Estate of Cartwright v. City of Concord, Cal.*, 618 F. Supp. 722, 729 (N.D. Cal. 1985) (five to seven minute delay in starting CPR on prisoner found hanging in jail cell did not result in Section 1983 liability, because Court found "that defendants' actions during the few intervening minutes between discovering [the prisoner] – cutting him down, checking his vital signs, and giving him aid – and the arrival of the emergency crews was not deficient.").

It is clear in the cases cited by both parties that Courts find deliberate indifference when officers either delay in seeking medical attention or fail to seek any medical attention for individuals, including starting CPR. Here, although there was an approximately two minute and thirty second delay between calling an emergency and beginning chest compressions on Mr. Towler, the officers did not fail to seek medical attention. As described above, the officers had already called an ambulance and called an emergency once they saw Mr. Towler was not responding, and soon after calling the emergency, officers began chest compressions. Given that the officers sought medical care for Mr. Towler immediately, a two and a half minute delay in beginning chest compressions does not amount to deliberate indifference. Therefore, Plaintiffs have failed to demonstrate that the officers violated Mr. Towler's Fourteenth Amendment right to medical care and the officers are entitled to summary judgment on Plaintiffs' medical care claims.

### 5. Municipal Liability under Section 1983

Plaintiffs argue that the City of Roswell and Officer Smith are liable because their policies and customs and failure to adequately train and supervise the officers led to Mr. Towler's death. Defendants allege that Plaintiffs' claim for municipal liability fails to state a claim upon which relief can be granted. (Doc. 5) at 14. Further, Defendants allege that they are entitled to summary judgment because: (1) there is no evidence of a constitutional violation; and (2) there is no evidence of policy or custom that constitutes a driving force behind the alleged deprivation of Mr. Towler's constitutional rights. *Id*. at 14-16.

A municipality can only be liable under Section 1983 if it took "action pursuant to official municipal policy of some nature [that] caused a constitutional tort." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). In *Pembaur v. City of Cincinnati*, the United States Supreme Court further developed the *Monell* rule, stating that "[t]he 'official policy' requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." 475 U.S. 469, 479 (1986). The Supreme Court recognized, however, that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Id.* at 480. The Supreme Court emphasized, however, that "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id.* at 481. Nonetheless, "[i]f the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood." *Id.*

In further defining the contours of the rules regarding municipal liability, the Supreme Court has noted that "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). In this context, "when an official municipal policy itself violates federal law, issues of culpability and causation are straightforward; simply proving the existence of the unlawful policy puts an end to the question." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).

The Tenth Circuit has held that "[a] plaintiff suing a municipality under Section 1983 for the acts of one of its employees must prove: (1) that a municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." *Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998) (citing *Monell*, 436 U.S. at 694). A failure to train claim against a municipality, however, is generally not enough to prove a constitutional violation. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389-90 (1989). Instead, Section 1983 plaintiffs can use a municipality's failure to train as one way to make the required showing that a municipal policy or custom was the "moving force" behind an already established constitutional deprivation. *See id.* at 389.

As discussed above, the Court has already found that the officers violated Mr. Towler's Fourth Amendment right to be free from excessive force; therefore, the Court will focus on whether a municipal policy was a moving force behind the constitutional deprivation. Plaintiffs' Second Amended Complaint asserts that the City of Roswell failed to adequately train and supervise the officers. (Doc. 1-51) at 48-50, 55. However, Plaintiffs have not brought forth any evidence to establish that a policy or custom of the City of Roswell and Officer Smith were the moving force behind the alleged violations. Instead of providing the Court with any evidence,

Plaintiffs state that they "are informed and believe" that the City of Roswell and Officer Smith had a policy or custom. *Id*. Moreover, in their undisputed facts, Plaintiffs admit that the officers were trained on the proper use of Tasers. The Court, therefore, finds that Plaintiffs have not met their burden to demonstrate a genuine issue of material fact. Thus, Defendants are entitled to summary judgment on Plaintiffs' municipal liability claims.

    *B. Count V: Section 1983 Loss of Consortium*

    In the Second Amended Complaint, Plaintiffs allege that Sherrie Towler, Mr. Towler's mother, and Sebastian Towler, Ethan Towler, Jessie Towler, and Noah Towler-Nelms, Mr. Towler's children, shared a close familial relationship with Mr. Towler. (Doc. 1-51) at ¶¶ 43-44. Plaintiffs state that Mr. Towler provided them with "love, care, guidance, aid, comfort, protection, counseling, as well as emotional, physical, and financial support" and the actions of Defendants violated their rights to familial relationships under the Fourth Amendment and Due Process under the Fourth and Fourteenth Amendments. *Id*. at ¶¶ 45-46.

    The Tenth Circuit has held that deprivation of the right to familial relationships, including between a parent and child, can create a cause of action under Section 1983. *Murphy v. Bitsoih*, 320 F. Supp. 2d 1174, 1184 (D.N.M. 2004) (citing *Trujillo v. Bd. of Cty. Comm'rs*, 768 F.2d 1186, 1190 (10th Cir. 1985) (allowing mother and sister to bring Section 1983 claim for deprivation of right to intimate association)). However, under Section 1983, a plaintiff must assert a violation of a constitutional right personal to the plaintiff and not the right of someone else. *Id*. (citing *Archuleta v. McShan*, 897 F.2d 495, 497 (10th Cir. 1990)). Therefore, a plaintiff "must allege a police deprivation directed at themselves and not [the] decedent." *Id*. at 1185 (citing *Trujillo*, 768 F.2d at 1190) (plaintiffs could not establish intentional deprivation of rights by transferring law enforcement officer's intent to deprive decedent of his constitutional

rights to plaintiffs).

While Defendants argued that the Court should grant summary judgment and dismiss Plaintiffs' Second Amended Complaint, Defendants did not argue that the Court should grant summary judgment on Plaintiffs' loss of consortium claim. The Court may grant summary judgment on claims *sua sponte* when there are no disputes of material fact and "if 'the losing party was on notice that [they] had to come forward with all of [their] evidence;" however, this practice "is not favored." *Ward v. Utah*, 398 F.3d 1239, 1245 (10th Cir. 2005) (citing *Celotex*, 477 U.S. at 326; *Procter & Gamble Co. v. Haugen*, 317 F.3d 1121, 1132 (10th Cir. 2003)). Because Plaintiffs have not had the chance to address the loss of consortium claim, the Court will not grant the motion for summary judgment as to this claim.

In order to rule on this issue, the Court finds it appropriate to require supplemental briefing as to whether the loss of consortium claim should be dismissed. Plaintiffs shall file a brief by June 9, 2016. Defendants shall file a response to Plaintiffs' brief by June 23, 2016, and Plaintiffs may file a reply by July 7, 2017.

### C. Count IV: The NMTCA Spoliation Claim

Plaintiffs bring a spoliation claim under the NMTCA. (Doc. 1-51) at 8. In New Mexico, the tort of spoliation is defined as "the intentional destruction, mutilation, or significant alteration of potential evidence for the purpose of defeating another person's recovery in a civil action." *Sean E. v. Fraga*, 2008 WL 8937906, at *9 (D.N.M.) (unpublished) (quoting *Coleman v. Eddy Potash, Inc.*, 1995-NMSC-063 ¶ 13, 905 P.3d 185, *overruled on other grounds*, *Delgado v. Phelps Dodge Chino, Inc.*, 2001-NMSC-034, 34 P.2d 1148) (internal quotation marks omitted). Specifically, Plaintiffs allege that the Defendants "intentionally disposed of, destroyed,

mutilated, or significantly altered evidence" relevant to the case. [19]  (Doc. 1-51) at ¶ 37.

Defendants argue that the claim for spoliation is barred by the NMTCA.  (Doc. 5) at 18-19.

The NMTCA was enacted in order to create an instrument to "compensate those injured

by the negligence of public employees and to impose duties of reasonable care," at the same time

limiting "governmental liability so that [the] 'government should not have the duty to do

everything that might be done.'" *Cobos v. Doña Ana Cnty. Hous. Auth.*, 1998-NMSC-049 ¶ 6,

970 P.2d 1143.  The NMTCA balances these two important public policies "by providing

immunity from tort liability for governmental entities and public employees acting within the

scope of their duties, except as that immunity is waived, as relevant here, by" NMSA 1978, § 41-

4-6;[20] *Rayos v. State ex rel. N.M. Dep't of Corrs., Adult Prob. & Parole Div.*, 2014-NMCA-103

¶ 6, 336 P.3d 428.  If no specific waiver can be found in the NMTCA, a plaintiff's complaint

against a public employee or a governmental entity must be dismissed.  *Williams v. Bd. of*

*Regents of Univ. of N.M.*, 20 F. Supp. 39 1177, 1186 (D.N.M. 2017) (citing *Begay v. State*, 1985-

NMCA-117 ¶ 12, 723 P.2d 252, *rev'd on other grounds Smialek v. Begay*, 1986-NMSC-049, 721

P.2d 1306).

Plaintiffs' spoliation claim is based on a waiver of immunity for the "operation and

maintenance" of public buildings.  N.M. STAT. ANN. § 41-4-6.  This waiver applies to the

operation and maintenance of the physical aspects of a building, as well as the "safety policies

---

[19] It is not clear from the Second Amended Complaint or the briefing what evidence Plaintiffs are
alleging Defendants destroyed.

[20] Immunity granted pursuant to the NMTCA

> does not apply to liability for damages resulting from bodily injury, wrongful
> death or property damage caused by the negligence of public employees while
> acting within the scope of their duties in the operation or maintenance of any
> building, public park, machinery, equipment or furnishings.

NMSA 1978, § 41-4-6.

necessary to protect the people who use the building." *Sean E.*, 2008 WL 8937906, at \*10.

Plaintiffs argue that the removal of trash is a normal component of maintaining a building, thus "the term 'maintenance' in [Section] 41-4-6 includes the disposal of trash." (Doc. 19) at 33. Plaintiffs contend that their "allegations are sufficient to encompass the scenario in which the subject evidence was held in a building or on property operated by Defendants, and that Defendant[s] disposed of that evidence as trash or erased it from computers in common computer maintenance." *Id*. at 33-34. Therefore, Plaintiffs maintain that their spoliation allegations come within the waiver of immunity. *Id.* at 34.

In *Sean E.*, plaintiffs alleged that a school "disposed of, destroyed, or significantly altered" documents "with the intent to disrupt[ ] Plaintiffs' ability to prosecute their claims." 2008 WL 8937906, at \*9. The Court determined that the defendants did not waive their immunity under Section 41-4-6, because "extending this waiver of immunity to cover the maintenance of school records is outside the spectrum of reasonable statutory construction." *Id*. at \*10. Plaintiffs seek to distinguish *Sean E.* from the case at bar by arguing that that the Court "did not consider or cite" to the definition for maintenance. (Doc. 19) at 34. Plaintiffs' argument is unpersuasive as the facts of the case at bar are indistinguishable from those in *Sean E.* Accordingly, Plaintiffs' spoliation claim is barred pursuant to the doctrine of sovereign immunity and summary judgment is appropriate.

### D. Count I (Negligence), Count II (Assault and Battery), and Count III (Res Ipsa Loquitur),

Counts I, II, and III are state tort claims against all Defendants subject to the NMTCA. Defendants argue "to the extent Plaintiff[s] [are] asserting any state law claims, Defendants are statutorily immune from such claims." (Doc. 5) at 2. However, neither Defendants nor Plaintiffs directly addressed these claims. The Court will briefly review these claims.

Section 41-4-12 of the NMTCA "provides a waiver of immunity for certain torts committed by law enforcement officers and for negligence that causes a specified tort." *Oliveros v. Mitchell*, 449 F.3d 1091, 1096 (citation omitted). Section 41-4-12 states that the immunity

> does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

NMSA 1978, § 41-4-12.

### 1. Negligence Claims

Under the NMTCA, "the negligence complained of must cause a specified tort or violation of rights; immunity is not waived for negligence standing alone." *Caillouette v. Hercules, Inc.*, 1992-NMCA-008 ¶ 18, 827 P.2d 1306. Section 41-4-12 waives immunity for the negligence of a law enforcement officer or agency that caused one of the torts listed in Section 41-4-12; however, "no case has held that simple negligence in the performance of a law enforcement officer's duty amounts to commission of one of the torts listed in the section." *Id.* (quoting *Bober v. N.M. State Fair*, 1991-NMSC-031 ¶ 32, 808 P.2d 614) (internal quotation marks omitted). Although the Court may grant summary judgment on claims *sua sponte* when there are no disputes of material fact and "the losing party was on notice that [they] had to come forward with all of [their] evidence," the Court declines to do so on Plaintiffs' negligence claims because Plaintiffs have not presented their evidence as to this claim. *Ward*, 398 F.3d at 1245 (citing *Celotex*, 477 U.S. at 326).

As with the loss of consortium claim, in order to rule on this issue, the Court finds it appropriate to require supplemental briefing as to whether the negligence claim should be

dismissed.  Plaintiffs shall file a brief by June 9, 2016.  Defendants shall file a response to Plaintiffs' brief by June 23, 2016, and Plaintiffs may file a reply by July 7, 2017.

### 2.  *Res Ipsa Loquitur Claims*

Plaintiffs set out *res ipsa loquitur* as a separate claim in the Second Amended Complaint; however, this is improper.  *Res ipsa loquitur* is a method of proving negligence by inference and is not a substantive tort.  *Strong v. Shaw*, 1980-NMCA-171 ¶ 10, 629 P.2d 784.  "In New Mexico, [ ] *res ipsa loquitur* is simply 'a rule of evidence.'" *Mireles v. Broderick*, 1992-NMCA-011 ¶ 6, 827 P.2d 847, *rev'd on other grounds*, 1994-NMSC-041, 872 P.2d 863 (quoting *Strong v. Shaw*, 1980-NMCA-171 ¶ 10).  Because *res ipsa loquitur* is not a substantive tort, the Court will dismiss the claims with prejudice.

### 3.  *Assault and Battery Claims*

A police officer in New Mexico commits an assault or battery when the officer uses more than necessary force to restrain a person.  *Reynaga v. Cty. of Bernalillo*, No. 94-2182, 1995 WL 503973, at *2 (10th Cir. Aug. 25, 1995) (unpublished) (quoting *State v. Kraul*, 1977-NMCA-032 ¶ 27, 563 P.2d 108) (internal quotation marks and citation omitted).  *See also Mead v. O'Connor*, 1959-NMSC-077 ¶ 4, 344 P.2d 478 (officer is "entitled to use such force as was reasonably necessary under all the circumstances of the case").  Here, as discussed above, a reasonable jury could find that the officers used more force than necessary to restrain Mr. Towler after he was subdued.  The officers, therefore, could be liable for assault and battery.  Accordingly, the officers are not entitled to summary judgment on the NMTCA assault and battery claims.

### E.  *New Mexico Liability Cap Claim*

In the Second Amended Complaint, Plaintiffs argue that the cap on liability under the

NMTCA is unconstitutional. (Doc 1-51) at ¶ 19. However, Plaintiffs failed to respond to Defendants' arguments with respect to the NMTCA cap on liability in their response to the motion. *See* (Doc. 19). Plaintiffs' failure to address this claim constitutes an abandonment of the claim. *See Hinsdale v. City of Liberal, Kan.*, 19 Fed. Appx. 749, 768-69 (10th Cir. 2001) (unpublished) (Court found claim abandoned after failure to address in response to motion for summary judgment). For this reason, the Court finds that Defendants are entitled to summary judgment on Plaintiffs' NMTCA cap on liability claim and it will be dismissed with prejudice.

*V. Conclusion*

In light of the forgoing, IT IS ORDERED that Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint and/or Motion for Summary Judgment on the Grounds of Qualified Immunity and Protections Afforded under the New Mexico Torts Claims Act, and Memorandum of Law in Support Therefore is GRANTED IN PART AND DENIED IN PART in that:

(1) the Motion for Summary Judgment is denied as to the Count I claims against Defendants for negligence;

(2) summary judgment is denied as to the Count II claims against Defendants for assault and battery;

(3) summary judgment is entered in favor of Defendants as to the Count III claims for *res ipsa loquitur*, and those claims are dismissed with prejudice;

(4) summary judgment is entered in favor of Defendants as to the Count IV claims for spoliation, and those claims are dismissed with prejudice;

(5) summary judgment is denied as to the Count V claims against Defendants for loss of consortium;

(6) summary judgment is entered in favor of Defendants on Plaintiffs' Count VI: Section 1983 Fourteenth Amendment claims for Unreasonable Seizure and Excessive Force, and the claims are dismissed with prejudice;

(7) summary judgment is entered in favor of Defendants on Plaintiffs' Count VI: Section 1983 Fourth Amendment Unreasonable Seizure claims, and the claims are dismissed with prejudice;

(8) summary judgment is denied on Plaintiffs' Count VI: Section 1983 Excessive Force claims against Defendants Officers Kelton, Arroyo-Jaime, and Thomas; and

(9) summary judgment is entered in favor of Defendant the City of Roswell and Officer Smith on Plaintiffs' Count VI: Section 1983 Municipal Liability claims, and the claims are dismissed with prejudice.

(10) Plaintiffs' supplemental brief on the issues of loss of consortium and negligence is due on June 9, 2017. Defendants shall file a response to Plaintiffs' brief by June 23, 2016, and Plaintiffs may file a reply by July 7, 2017.

IT IS SO ORDERED

_____

UNITED STATES DISTRICT JUDGE